<pre>
 1                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2

 3  CRYSTAL ROBERTSON, on behalf )
    of herself and her minor    )
 4  child D.R., et al.,         )
                                )
 5          Plaintiffs,         ) CASE NO. 1:24-cv-00656-PLF
                                )
 6      vs.                     )
                                )
 7  DISTRICT OF COLUMBIA,       )
                                )
 8          Defendant.          )
    _____
 9

10                 TRANSCRIPT OF MOTION HEARING
         BEFORE THE HONORABLE PAUL L. FRIEDMAN, DISTRICT JUDGE
11                      July 11, 2024
                  10:05 a.m. - 12:46 p.m.
12                     Washington, DC

13  FOR THE PLAINTIFFS:
         McDermott Will & Emery, LLP
14       BY:  MARGARET HANLEY WARNER
         500 North Capitol Street, NW
15       Washington, DC 20005
         (202) 756-8228
16
         Washington Lawyers' Committee for Civil Rights &
17       Urban Affairs
         BY:  KAITLIN ROSE BANNER
18       700 14th Street, NW, Fourth Floor
         Washington, DC 20005
19       (202) 319-1000

20

21

22                     SONJA L. REEVES
                  Registered Diplomate Reporter
23                 Certified Realtime Reporter
                  Federal Official Court Reporter
24                 333 Constitution Avenue, NW
                     Washington, DC 20001
25       Transcript Produced from the Stenographic Record
</pre>

1    **FOR THE DEFENDANT:**
         Office of the Attorney General for the District of Columbia
2        BY:  MATEYA BETH KELLEY, DAVID R. WASSERSTEIN and
             GREGORY KETCHAM-COLWILL
3        400 Sixth Street, NW
         Washington, DC 20001
4        (202) 724-7854

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Call to Order of the Court at 10:05 a.m.)

2              DEPUTY CLERK:  This is Civil Action 24-656, *Crystal*

3    *Robertson, et al. versus the District of Columbia.*

4              Counsel, please approach the podium and state your

5    appearances for the record.

6              THE COURT:  I don't have to say anything about how

7    long you have been practicing law, but as I recall, you and I

8    were co-counsel in a case before I ever became a judge.

9              MS. WARNER:  That's correct, Your Honor.

10             THE COURT:  I'll leave it at that.

11             MS. WARNER:  Please do.

12             Peg Warner for the plaintiffs.  And with me today,

13   Your Honor, is my partner, Gene Goldman; my associate, Chris

14   Shoemaker; my summer associates Caroline Sherard (ph) and Noah

15   Dreban (ph), who have worked on this case.

16             I also would like to introduce you to one of our named

17   plaintiffs, Mr. David Clark.

18             THE COURT:  Good morning, Mr. Clark.

19             MR. CLARK:  Good morning.

20             MS. BANNER:  Good morning, Kaitlin Banner from the

21   Washington Lawyers Committee for Civil Rights and Urban

22   Affairs.  Also here on behalf of the plaintiffs at counsel

23   table with me is Chelsea Sullivan with our office, and we have

24   some other folks here in the audience today.  Thank you so

25   much.

1    THE COURT:  Okay.

2    MS. KELLEY:  Good morning, Your Honor.  Mateya Kelley

3 for defendant District of Columbia.  I'm joined from the Office

4 of the Attorney General by Gregory Ketcham-Colwill and David

5 Wasserstein.  OSSE is represented by their general counsel

6 Carol Epstein and Vincent Enriquez.

7    THE COURT:  Good morning to everybody.

8    In some ways it's not just seeing Ms. Warner, but

9 seeing a District of Columbia and DCPS, it's kind of déjà vu

10 all over again.

11    Just last night we granted a motion, which was

12 unopposed, to admit a declaration by the deputy superintendent

13 for operations concerning next year's budget.  There was also

14 some mention of the fact that there might be a motion on the

15 other side for other things which I haven't any such motion yet

16 this morning.

17    MS. WARNER:  Your Honor, we have not made a motion

18 yet.  We wanted to make sure that the Court was accepting of

19 this.  We have three declarations from clients, members of the

20 putative class who are in their declarations swearing to

21 ongoing transportation issues post the filing of our reply

22 briefs, and we would respectfully request that the Court take

23 those on.

24    I have mentioned to counsel for the District that we

25 would be doing this and that the only thing that we would be

1  putting into these declarations from these individuals is the

2  ongoing problem since we last filed our declarations in our

3  reply brief.

4      THE COURT:  Ms. Kelley, has your side seen those

5  declarations yet?

6      MS. KELLEY:  No, Your Honor, we have not.  We did have

7  a discussion with the plaintiffs about consent.  We wanted to

8  file something, they wanted to file something.  We will stick

9  to our agreement, but we would request the opportunity to file

10  a sur-reply or some sort of response after today since we have

11  yet to read these declarations.

12      THE COURT:  In other words, are you agreeing that I

13  can grant the motion and consider those declarations, but you

14  may want to respond to those declarations in some fashion, or

15  do you want to reserve on whether I should consider the

16  declarations?

17      MS. KELLEY:  Your Honor, I'll admit I'm at a loss

18  because we did consent, but I did not imagine that we would not

19  see the declarations before the hearing.

20      THE COURT:  Why don't we do this.  We have two motions

21  this morning.  I kind of like taking a break between the two

22  arguments.  Plaintiffs can refer to them.  If it comes up in

23  the first half of the morning, you can look at them during the

24  break and we'll see where we are at the end of that.  I mean,

25  it's unlikely that I can resolve the motions orally today, so

1    you might have time afterwards or you might have time during

2    the break, but I want the plaintiffs and the defendant -- the

3    plaintiffs to proceed as if they are in evidence, subject to

4    your review of them later and filing anything you want to file.

5         While you're on your feet, there are two motions this

6    morning.  The plaintiffs are the moving parties in both.  I

7    don't know if you discussed which one you want to deal with

8    first.  I have no preference.

9         MS. KELLEY:  We have not.

10        THE COURT:  It's up to you.

11        MS. WARNER:  We have no preference, Your Honor.  It's

12   your decision obviously.

13        THE COURT:  I'll leave it up to the plaintiffs.

14        MS. WARNER:  For the record, I am now providing to the

15   District the three declarations that we have discussed.

16        MS. BANNER:  Your Honor, since you left it up to us, I

17   think we will handle our motion for preliminary injunction

18   first, which I will be arguing, and Ms. Warner will be arguing

19   our class certification motion this afternoon.

20        Good morning, Your Honor.  Again, my name is Kaitlin

21   Banner, representing the plaintiffs in this case, who include

22   five parents and caregivers of students with disabilities and

23   the Arc of the United States, which is a membership-based

24   organization that advocates for the rights of peoples with

25   intellectual and developmental disabilities.  As we have

1    mentioned, joined with us here today is one of our clients,

2    Mr. Clark.  Another one of our clients was planning on

3    attending this morning, but in the real-time failures of the

4    school busing system, the bus showed up to pick her son up two

5    hours late, which meant that he missed his field trip today and

6    she was unable to come down to the courthouse.

7         Your Honor, this is a case about the District's

8    ongoing failure to provide safe, reliable and appropriate

9    transportation services to students with disabilities.  The

10   District is operating a failing, outdated system that is not up

11   to the task of ensuring that students can get to school safely

12   and on time.

13        THE COURT:  Talk a little bit slower, please.  I'm

14   sure the court reporter would appreciate it.

15        MS. BANNER:  Sure.  Apologize about that.

16        The plaintiffs' motion today is supported by

17   declarations from 20 parents and caregivers from students as

18   young as 8 and as old as 17 across over a dozen schools,

19   including DCPS schools, public charter schools and non-public

20   schools that serve students with disabilities.

21        These declarations are consistent about how the

22   District's failure to have a functioning transportation system

23   impacts the ability to access their education.  Transportation

24   arrives late or not at all, it arrives without the necessary

25   staff to support students' needs, like aides, attendants and

1    nurses, and it arrives without the appropriate accommodations,

2    like child safety restraint systems or secure spots for

3    wheelchairs.

4         Parents cannot get reliable information about when the

5    buses will show up or where their children even are.  And

6    because of the District's failures, students are losing

7    critical instruction time and therapies that they are entitled

8    to under federal law.

9         The transportation failures also impact students'

10   emotional wellbeing and availability to learn and their

11   physical wellbeing.  Students arrive home after hours on the

12   bus soaked in their own urine, hungry, thirsty and sometimes

13   missing medication on which they depend.

14        I want to tell you about a couple of examples from

15   these 20 declarations.  A.F. is a student with autism and a

16   seizure disorder.  For months, he could not get the proper

17   harness or adaptive stroller to help him ride safely, and

18   missed school or his parent had to drive him.

19        THE COURT:  That's one of the declarations?

20        MS. BANNER:  Yes, Your Honor.  That's one of the

21   declarations, Your Honor, from Ms. Guerrero, who is one of our

22   named plaintiffs.

23        In another declaration from Ms. Smith-Davis about her

24   daughter C.S., her daughter is medically fragile and is at risk

25   of serious complications when her bus is delayed in the

1    afternoon.

2           And then Ms. Lewis's son, M.L., is a student who is

3    deaf and uses ASL to communicate and does not have anyone on

4    the bus who speaks ASL who can communicate with him when the

5    bus is late in the afternoons.  When he's stuck on the bus, he

6    doesn't know what's going on.

7           Today's transportation unfortunately mirrors the fact

8    of the *Petties* litigation, which Your Honor is, of course,

9    familiar with, and which only improved after years of rigorous

10   court intervention and supervision.  Like then, the District is

11   failing in its need to provide safe and reliable transportation

12   to students with disabilities so that they can access their

13   education.  This violates the Individuals with Disabilities and

14   Education Act and also the Americans with Disabilities Act,

15   Section 504 of the Rehabilitation Act and the DC Human Rights

16   Act, which all guarantee that students with disabilities have

17   equal opportunity to access their education.

18          Fundamentally, nothing in the District's opposition

19   says otherwise.  They acknowledge, as they must, the failings

20   of the past two years.  And although they tout various things

21   they are doing to attempt to fix transportation, the District

22   offers no evidence of a system that is working to provide safe

23   and reliable transportation on a consistent basis to students

24   with disabilities.

25          And as the Supreme Court has cautioned, the Court

1    should not be taken in by promises of reform.  Plaintiff and

2    the District's evidence alike demonstrates that transportation

3    is failing, there is significant and persistent delays and

4    cancellations causing students with disabilities to miss

5    critical instruction time.

6          A preliminary injunction will ensure that defendants

7    provide transportation to services to all students with

8    disabilities so that they have the opportunity to arrive and

9    thrive at school.

10          Today I'm going to summarize some of the evidence

11    presented, and then I'll turn to address the factors of the

12    preliminary injunction.  Of course, I am happy to answer any

13    questions from Your Honor at any time.

14          THE COURT:  Let me go back to one thing you said at

15    the beginning, and that has to do with the Arc.  You said it's

16    a membership organization.  Is there evidence in the record

17    about exactly what that means?  Does it have members who

18    finance the organization, who guide its activities, who select

19    its leadership?

20          MS. BANNER:  So the evidence in the record comes from

21    Ms. Neas's declaration as the executive director of the Arc,

22    who talks about both the mission of the Arc and the membership

23    of the Arc.

24          THE COURT:  What's her name?

25          MS. BANNER:  Neas, N-e-a-s.  I can pull the exact

1    exhibit number if that's helpful to Your Honor.

2         THE COURT:  Yeah.  If you don't mind, somebody can

3    tell me what the exhibit number is, we'll take a look at it.

4       (Pause)

5         MS. BANNER:  It's Exhibit 14 to our initial motion to

6    preliminary injunction.

7         THE COURT:  We'll take a look at it, because there is

8    a DC Circuit case called *Viasat v. Federal Communications*

9    *Commission* that lays out the factors that are, or criteria for

10   associational standing that I want to take a look at.

11        Thanks.  Go ahead.

12        MS. BANNER:  Just to further answer the question, the

13   briefs lay out the Arc's meeting of the factors that the

14   Supreme Court set out in *Hunt* as well, which include the fact

15   that this is in line with this organization's mission, that it

16   has a member, more than one member who has standing.  Many of

17   the declarations discuss the fact that both the individual

18   plaintiffs and the declarants are members of the Arc and that

19   for this kind of injunctive relief that they are seeking they

20   do not need the participation --

21        THE COURT:  I know what the Arc does.  I have been to

22   the Arc.  I have been at events at the Arc.

23        MS. BANNER:  Your Honor, so the District here has a

24   clear idea of what appropriate transportation looks like from

25   the *Petties* case.  At that time, a functioning education

1  transportation system looked like ensuring that students

2  arrived to school on time.  At the time that the *Petties*

3  litigation concluded, that was happening over 94 percent of the

4  time.

5  It includes full staffing with low absentee rates,

6  drivers who are trained and certified, a functioning fleet of

7  vehicles that meets the needs of the students, planned routes

8  that adhere to time standards, and regular and accurate

9  communication with parents.

10  And indeed the District was doing all of this just

11  over 12 years ago when it asserted it was meeting these

12  benchmarks in the motion to vacate the *Petties* consent decree.

13  But today, the education system is a far cry from

14  where it was.  The thing that is perhaps most shocking is that

15  the District is not using the same modernized systems that it

16  said it was using 12 years ago, which means that it's lost the

17  capabilities that it had in 2012.

18  The District's declaration talks about the system that

19  they use called Trapeze, which does not have GPS, does not have

20  data tracking and integration, and requires the use of

21  handwritten paper tickets from its drivers and attendants to

22  track where the buses are.

23  Now, the District has acknowledged that it needs

24  something better.  They tried another system called Seon, which

25  they could not implement, and rather than fix the

1    implementation problems or get a better system, they went back

2    to Trapeze.  And they still haven't gotten a new system now

3    over 18 months later.  The District essentially admits that it

4    needs something better to operate its transportation system,

5    but they haven't done that yet.

6         We also know there is not sufficient drivers and

7    staffing.  There is not enough employees to start out with as

8    the District's declaration says, and that callouts are

9    frequent.  And even though the District is trying to hire more

10   drivers, those things seem to be intermittent and they have not

11   been able to report the success of those measures.

12        THE COURT:  How do you want them to do everything

13   you're asking for in 15 days from the day I enter a preliminary

14   injunction?  That's not realistic.

15        MS. BANNER:  We understand that is a quick timeline,

16   but students have been missing out on their education for a

17   long time, and we think that there is ways for the District to

18   do some short-term fixes in the next 15 days and before the

19   start of the school year, as well as invest in the long-term

20   solutions that they need to fix this transportation problem and

21   see some real sustainability.

22        For example, Your Honor, with the help of expert

23   consultants, we believe that the District can make smart

24   choices about the use of private transportation in the interim

25   to transport students.  We believe that the District can use

1   the software that it owns and has to improve the routing plans

2   and systems for the coming school year.  We believe that this

3   is a problem that cannot wait to be solved because the longer

4   that we wait, the longer that students are going to be at risk

5   of not receiving their education.

6        The other thing that is quite concerning to us here is

7   that the District, although it reports that they are meeting a

8   94 percent on-time rate, that is a very different rate than at

9   the *Petties* litigation.

10       THE COURT:  What's the rate they say they are meeting?

11       MS. BANNER:  They say buses are leaving the terminal

12  94 percent of the time on time, but that "leaving the terminal"

13  measure is essentially meaningless, because all that it means

14  is that at the time that OSSE has directed the buses to leave,

15  the bus leaves.  It doesn't tell us anything about whether

16  that's a realistic time for the bus to pick up all of its

17  students and get to school on time.  It doesn't tell us if that

18  accounts for traffic.  And indeed the experience of all of our

19  parent clients as well as the declarants show that even if the

20  bus leaves the terminal on time, it often is delivering them to

21  school --

22       THE COURT:  My recollection from *Petties* is that, say,

23  you live on a particular street and your child has autism.

24  Down the street is another person who has hearing disabilities,

25  or kidney misfunction.  You can't use the same school bus just

1   because you live houses away from each other, because they are

2   going to different schools to provide that.  So it would seem

3   to me, and the government can speak to this, that if you had

4   fewer buses than you're picking up, you know, three autistic

5   kids in different neighborhoods and maybe some other people

6   that are going to school X, and for children with hearing

7   disabilities from different neighborhoods and they are all

8   going to the same school, it's just simple math, the fewer

9   buses you have, the later they are going to be.

10          And so to put another way, the more buses you have, if

11  you have an adequate number of buses, then you can accomplish

12  -- I guess what I'm saying, it's a question more for the

13  District than for you, that leaving the terminal doesn't

14  necessarily tell us much.

15          MS. BANNER:  I think that's exactly right.  That

16  doesn't predict whether or not -- the important thing, that

17  what the District's core duty is to make sure students arrive

18  to school on time.  That measure does not seem to accurately

19  track that information at all.  The District has not presented

20  any evidence about whether or not school buses are arriving to

21  school on time.  Instead, the evidence from the plaintiffs is

22  unrebutted their buses do not arrive on time to pick them up

23  and that they do not bring them to school on time, and that

24  they do not arrive within their on-time windows in the

25  afternoon.

1          Moreover, to the extent that the District touts

2    improvements, those are often the result of them shifting their

3    own burdens to parents.  Parents have had to drive students to

4    school themselves, often at great personal costs to their

5    families and to their careers, and seek reimbursement, which is

6    often delayed and burdensome.

7          Parents have had to buy air tags that they put into

8    their children's backpacks so they can find out where they are

9    in the afternoon when the buses are delayed because OSSE's

10   parent resource center doesn't provide them with that

11   information.  And oftentimes students are coming home hours

12   late, which is, of course, concerning for any parent, but

13   particularly for parents of children with disabilities who are

14   uniquely vulnerable.

15         Parents have had to set up text chains with each other

16   because OSSE won't give them accurate communication so that

17   they can communicate with other parents about where the bus

18   might be.  And now OSSE is offering a stipend, which is not

19   enough for parents to drive their students themselves, but as

20   the declarations say, those stipends are not enough to make up

21   the cost and require that parents have the time to spend

22   driving their students to and from school every day.

23         Of course, the transportation system does not have to

24   be this way.  Plaintiffs' expert declarations explains that

25   there are better ways to do this, and that is happening in

1  other jurisdictions and offer best practices for fleet,

2  staffing, data, routing, and communication and collaborations

3  with parents.

4         So in this case, in the fall of 2023 and early 2024,

5  the five individual plaintiffs here brought administrative due

6  process hearings asking the District to make changes to the

7  transportation policies and practices so that their children

8  and other children could get to school and home on time and

9  safely.

10         The hearing officers in these cases universally found

11  that the District had failed to provide on time and safe

12  transportation, that that failure denied them FAPE, but the

13  hearing officers also found that they do not have the authority

14  to order the types of systemic changes --

15         THE COURT:  Before you get to that, so the hearing

16  officers, all five of them with respect to the named

17  plaintiffs, ordered compensatory education and ordered some

18  financial remuneration, I believe, and in three cases they also

19  said that essentially you had to comply with the IDEA and

20  provide free and adequate public education.  That was an order

21  from at least, I think, three of the five.  That was back in,

22  what, March or something?

23         MS. BANNER:  Yes, that's correct.

24         THE COURT:  To what extent has that part of those

25  three orders been implemented?

1          MS. BANNER:  So with respect to those three cases,

2    which were Ms. Cannon-Clark, Ms. Robertson and Ms. Daggett, the

3    hearing officer did order that the District provide consistent

4    transportation in accordance with their IEPs.  For some of

5    those clients, things have improved somewhat.  For example,

6    Ms. Robertson has had fewer problems over the past couple of

7    months.  Of course, she, over the years in which she has been a

8    parent or a guardian of the student with disabilities in DC,

9    knows that that oftentimes does not last.

10         Ms. Daggett, who submitted a declaration with our

11   reply, has continued to have problems, particularly in the

12   afternoon.  And then for Ms. McCray and Guerrero, who were the

13   two clients who the hearing officer did not order the forward

14   looking relief, they have continued to have significant

15   problems.

16         In fact, one of the declarations that we will offer

17   this afternoon is from Ms. Guerrero explaining the significant

18   delays and problems.  And Ms. McCray is the parent of the

19   student who was two hours late to school this morning.

20         THE COURT:  Let me ask this question:  I think to a

21   certain extent the District says you get the relief you asked

22   for from the hearing officer so how are you harmed.

23         Now, you say, if I'm reading your briefs right, that

24   the hearing officers erred in their determinations.  Is that

25   what you're saying, or are you saying -- I mean, were they

1  wrong to say -- what does that mean?  Were they wrong to say we

2  don't have any jurisdiction over systemic problems?  Were they

3  wrong to say we don't have any jurisdiction over Section 504?

4  How did they err if they gave you what you wanted?

5          MS. BANNER:  In fact, Your Honor, our position is that

6  the hearing officers did not give any of our clients what they

7  wanted, because our clients were seeking these changes to

8  policies and practices, which would secure the relief that they

9  need --

10          THE COURT:  But isn't your argument really that

11  they -- do you disagree with the hearing officers, they didn't

12  have authority to give you what you're asking for?

13          MS. BANNER:  The case law about systemic claims, like

14  the claims that the plaintiff brought here is frankly a little

15  bit unsettled in this circuit, Your Honor.  There is no clear

16  law that we have found that says that the hearing officers do

17  not have the ability to order the kind of systemic relief that

18  we are seeking.

19          So one option here is that the hearing officer should

20  have ordered that in the first place, and their failure to do

21  so is why the plaintiffs are aggrieved.  Of course, the other

22  sort of competing look at systemic cases is that those systemic

23  claims are exempt from exhaustion requirements because

24  exhausting them would be futile.  This is what the court, for

25  example, found in *D.L. versus District of Columbia*, which is

1    the special education class action dealing with the District's

2    failure to have policies in place to identify and child find

3    the very youngest children.  And so the line of cases around

4    the futility of exhaustion say that because the hearing

5    officers can't order or maybe won't order with consistency the

6    kind of systemic changes that are needed, that parents do not

7    have to go through the administrative hearing process.

8          Your Honor, we felt that it was important for the

9    parents to go through the administrative hearing office and for

10   the hearing officer to make the findings that it could,

11   recognizing that they might not have the jurisdiction to order

12   the systemic relief.

13         THE COURT:  What you just said there, there are three

14   options.  One is to say -- three alternative arguments.  One is

15   that they do have jurisdiction to order systemic changes.  The

16   other is that parents and children are exempt from the

17   exhaustion requirement.  And the third, which I think there is

18   case law to support, is that if they don't have jurisdiction,

19   then it would be futile or inadequate -- or futile to try to

20   exhaust.

21         Now, in this case, at least the five named

22   plaintiffs -- I'm thinking out loud, but if I'm remembering the

23   record -- did try to exhaust with respect to the systemic

24   changes and either the hearing officers didn't deal with them

25   or they were told I don't have authority to deal with them.  So

1  you did what you could and you got the answer you got.

2        MS. BANNER:  I think that's right.  And the hearing

3  officer's decisions to dismiss those claims, in our view, do

4  support that this would have been a futile attempt for them to

5  do so.  We did bring those claims in an attempt to fully

6  exhaust them.

7        And similarly, Your Honor, because I didn't just

8  address them with respect to the antidiscrimination claims, the

9  ADA, 504, and DC Human Rights Act claims, again, the Supreme

10 Court has made clear that when there is overlapping facts

11 dealing with the IDEA and antidiscrimination laws, that parents

12 do need to exhaust, and so we brought those claims at the

13 administrative forum, but the hearing officers found that they

14 do not have the ability to address those.

15       THE COURT:  If I understand what you just said, that

16 even with respect to the non-IDEA claims, 504, and DC Human

17 Rights Act that there is case law that says you have to exhaust

18 or try to exhaust.

19       MS. BANNER:  Yeah.  The Supreme Court in *Fry* has

20 addressed this question and has said that if there are, not

21 using the Supreme Court's exact language, but if there are

22 factual overlaps between the IDEA and 504 claims, that the

23 plaintiffs should attempt to exhaust.

24       The Supreme Court also recently addressed this in the

25 *Perez* case where they found in a unanimous decision that the

1    plaintiffs do not need to exhaust their claims or go through

2    the administrative process if the remedies that the clients are

3    seeking are not available in the administrative forum.  Here

4    again, we believe that the case law is unsettled about whether

5    the hearing officers could have ordered the relief we are

6    seeking, but wanted to do this by the books, and so make sure

7    that we included those claims in our administrative due process

8    complaints.  The hearing officer dismissed them because they

9    can't order the relief, and so that tells us under the Supreme

10   Court's precedent in *Perez* that we sort of fully exhausted it

11   and the plaintiffs have the right to bring those claims here to

12   you, Your Honor.  Thank you.

13          THE COURT:  That's all I have got on that.  Go ahead.

14          MS. BANNER:  So I will go into briefly the factors of

15   the preliminary injunction, if that is helpful to Your Honor.

16          THE COURT:  Essentially since *Winter*, I guess, in the

17   Supreme Court, we no longer have the DC Circuit sliding scale,

18   and the likelihood of success on the merits becomes the most

19   significant factor, so why don't you talk about that.

20          MS. BANNER:  Happy to.  So first, I think the

21   plaintiffs and the defendants here agree on the framing of the

22   case for the IDEA.  I'm going to talk about first the IDEA and

23   second the anti-discrimination claims.

24          The law requires the District to implement students'

25   IEPs as they are drafted.  All of our clients are clients with

1  disabilities who have IEPs, who have transportation services on

2  those IEPs, and what we're challenging here is OSSE's failure

3  to implement those.

4        As I briefly stated already, the District has

5  submitted no evidence that they are getting students to school

6  on time or that their system is working, and all of the

7  evidence points to problems in the system.  The data that the

8  District has is not about whether students get to school on

9  time, and the parents' unrebutted declarations say that

10 students are not getting to school on time and their

11 transportation services are not being implemented.

12        The District submits nothing to refute the parents'

13 declarations, and also offers no expert evidence to rebut our

14 analysis of the problems and recommendations here.  And so

15 under the IDEA, we agree that the District is required to

16 implement students' IEPs, and the evidence shows that they are

17 not implementing students' IEPs, and so this is failure to

18 provide FAPE and is a violation under the IDEA.

19        And again, that means here that we believe that we

20 will win on the merits of this case, because although there is

21 quite a bit of evidence in the record, the fundamental framing

22 of this is pretty simple.  It's required to submit under the

23 law, the District is not providing it, and so there is a

24 violation of FAPE.

25        We have talked already, Your Honor, about most of the

1    District's main opposition, which is procedural and whether or

2    not the clients have standing or whether they have properly

3    exhausted here.  As I just -- we have just discussed, we

4    believe we have properly exhausted our claims on behalf of the

5    individual plaintiffs and that their claims here are properly

6    before the court.

7            I'll briefly address the Arc's standing, which we did

8    a little bit earlier, but the Arc is seeking standing on the

9    associational basis, not on an organizational basis.  They do

10   not need to exhaust because they have members who have standing

11   who have exhausted.  And similarly, the Arc does not need to

12   show its own irreparable harm to it as an organization, but

13   needs to show that it has members who have irreparable harm.

14           And all of the plaintiff declarations and the expert

15   declaration particularly from Dr. Livelli, explain how the

16   failure to provide transportation results in irreparable harm

17   here.

18           I'm happy to answer any questions about the IDEA case.

19   If not, I will turn to the ADA 504 claims.  So here the

20   Rehabilitation Act, the ADA and the DC Human Rights Act

21   prohibit the District from discriminating against the

22   plaintiffs on the basis of their disability.

23           There is two ways that the District is discriminating

24   here.  One is that they are denying equal access and benefits

25   to students because of their disabilities.  Here we have

1    students with disabilities who can't access their education

2    because of the District's failures to transport them.  And

3    defendants are unnecessarily segregating students who, because

4    of transportation failures, miss out on opportunities to be

5    educated.

6          THE COURT:  What does that mean that they are

7    segregating students?

8          MS. BANNER:  So under the Supreme Court's precedent in

9    *Olmstead* --

10         THE COURT:  I just don't understand your *Olmstead*

11   argument at all.  As Ms. Kelley knows, I know something about

12   *Olmstead*, as you will find out in the next few months, I

13   promise you.  I promise you the opinion is being worked on even

14   as I speak, but even this week.  She knows when I'm being

15   apologetic.  I don't understand the *Olmstead* argument in this

16   context.

17         MS. BANNER:  So here students with disabilities have a

18   right to be in education settings with their non-disabled peers

19   as much as possible.  Students here, because of the

20   transportation failures, are often forced to miss out on

21   opportunities, and so, for example, a number of our clients,

22   particularly for students who have delayed transportation in

23   the morning, are missing out on the only time that they have

24   with their non-disabled peers, which is breakfast and sometimes

25   circle time or morning meeting or things like that at the

1    schools.  And so by failing to provide that transportation they

2    are being segregated from their peers because they are stuck on

3    a bus that is delayed or they are stuck at home.

4         It sort of harkens back to the days before the IDEA

5    and before the ECHA when students were basically abandoned in

6    their own homes or in institutions and not allowed to go to

7    school.  And so here what we see is that the transportation

8    failures are leading students with disabilities to miss out on

9    opportunities to be integrated into their school communities.

10        So here under the ADA there are sort of three factors

11   that we need to meet.  The plaintiffs are qualified individuals

12   with disabilities, which nobody disputes.  The defendants are

13   subject to these laws; again, which nobody disputes.  And that

14   defendants are denying them equal access and unnecessarily

15   segregating them.

16        The declarations, much for the same reasons that we

17   showed under the IDEA, are showing that the transportation

18   failures mean that the students are not getting equal access to

19   their education as non-disabled peers.  The framing of this

20   case is not about whether transportation is equal, but whether

21   the access to education is equal.  And it's very clearly not.

22        And so, Your Honor, the other issue under the ADA that

23   I want to address if Your Honor has questions about it is

24   whether or not we need to show a heightened intent standard to

25   show that there is discrimination under 504, ADA and DC Human

1  Rights Act.  Here, we're not suggesting that the reason that

2  our plaintiffs were discriminated against is because they were

3  denied FAPE, but rather that they were denied FAPE and that

4  they were separately discriminated against.

5          And in fact, there are students who might not be

6  eligible for the IDEA who have disabilities.  For example, a

7  student in a wheelchair who has no other impact on their

8  education who still would be denied access to their education

9  under the District's current transportation system and which

10 would violate 504 regardless of whether or not the IDEA was

11 also implicated.

12         And because of that, we do not believe we need to meet

13 the heightened intent standard that the District suggests.  It

14 is also, we believe, inconsistent with the language of the

15 statute and recent Supreme Court precedent using a really

16 textual look at what the IDEA requires.  And while we know that

17 courts in this jurisdiction at the district court level have

18 used the standard on occasion, we believe that it is not

19 appropriate or useful -- is not the right standard under the

20 Supreme Court's recent decisions in *Perez* and in *Fry*.

21         I'm happy to answer any further questions about that

22 that you might have.

23         THE COURT:  Let's talk about the injunction you're

24 asking for.  Injunctions are supposed to be narrowly tailored

25 to the harms that have been identified.  They are supposed to

1    be clear so that an entity enjoined knows what they are

2    supposed to do, and they are supposed to be achievable.  You're

3    asking for a very broad injunction, which is in many respects

4    in some of this language very vague and very overbroad, and you

5    want it all to be done in 15 days.  Well, that's just not

6    realistic.

7         I mean, they're not going to buy more buses in

8    15 days.  They might start, if that's what they need to do.

9    They are not going to air condition existing buses in 15 days;

10   they might start.  I suppose the District has to -- in the real

11   world has to do RFPs and get contracts.  Then they are going to

12   stand up and tell me that the fiscal year has just ended or is

13   about to end or will soon end and they have to wait until the

14   next fiscal year.

15        I might not accept that argument because we have also

16   got a school year that's about to begin.  No matter how narrow

17   the injunction language is, if I were to grant the injunction,

18   you and I would want significant changes before the beginning

19   of the next school year, or otherwise we're in the same cycle.

20        But whether all of this can be done before the next

21   school year, whether all of this can be done in the next

22   15 days, whether Ms. Kelley and her colleagues and their

23   clients even understand precisely what this injunction is

24   ordering them to do, I have serious questions about.  Some of

25   it we know.  You need more buses maybe or you need to fix buses

1    or you need to redesign your routes, but some of it is very

2    unclear.

3            And again, what's realistic to be done in 15 days.  I

4    don't know if you can answer that standing on your feet right

5    now, but assuming you're right in some or all of your

6    substantive arguments and that the declarations are largely

7    unrebutted, I have real trouble trying to figure out what to

8    do.

9            MS. BANNER:  Understandable, Your Honor.  I think this

10   is a problem that is big, but it is also a problem that is

11   urgent.  And as Your Honor noted, the new school year is

12   starting in about six weeks.  And we know that we can't delay

13   in starting to plan for relief and for starting to plan for a

14   functioning transportation system.  And even if everything

15   isn't perfect before the start of the school year, which I

16   understand is a task that may not be possible, we think that

17   anything we can do to make improvements and start that process

18   immediately is helpful and will increase the chance that

19   students are getting to school on time and safely in the coming

20   year.

21           The injunction essentially has two parts.  It has the

22   "what" and it has the "how."  The "what" of the injunction is

23   that the District needs to implement students' IEPs to ensure

24   that the transportation services are safe, reliable and

25   appropriate.  That means we need to have ride time standards

1  and we need to be tracking whether students are getting to

2  school at all and on time.

3          "How" of how to do that, we believe that the District

4  has shown over the last generously 18 months since the

5  January 2023 crisis that they can't figure out how to do this

6  on their own.

7          To get there, we're going to need modernized systems.

8  We're going to need vehicles.  We're going to need drivers.

9  And we're going to need a way to track that data and adjust in

10  real time.  We think that the best way to do this is for an

11  expert to come in and work with the District.  We understand

12  from the declaration that was submitted just said that there is

13  money allocated for improving systems in this year's budget.

14          So in our view, it is the perfect time to ensure that

15  the District is making the best use of those resources by

16  bringing in a transportation operations expert who can help

17  figure out what does the District have, what does the District

18  need and how to make changes to ensure that we're not facing

19  the same problem at the start of the next school year.

20          THE COURT:  Have you all identified such an expert or

21  potential experts that could fulfill that role?

22          MS. BANNER:  So we have had some conversations with

23  Alexander Robinson, who is one of the experts who submitted the

24  declaration here in this case, and had preliminary

25  conversations with other people.  We would invite the District

1    to be part of those conversations with us.  We think the way

2    this works best is if the parties can agree on an expert, agree

3    on their authority, and really work collaboratively to make

4    changes to the system, so we would be open to input from the

5    District here as well.

6        We also think there are some interim things that the

7    District can do.  We don't want to sort of create a list out of

8    nowhere, and, again, would invite the District to the table

9    with us about this, but, again, can think about are there ways

10   to ensure that parents at least get communications that

11   mitigate some of the harms of the long delays so that parents

12   know when the bus will arrive or if they have to make

13   contingency plans, and so they know where the bus is in the

14   afternoon so they are not worried about their child's safety in

15   the afternoon.

16       We think the District can also expand the use of

17   private contracts temporarily while they are fixing their

18   system to ensure that students are able to get to school on

19   time.  And, again, we understand from the declarations that the

20   District has done some of this already.  And while we don't

21   think that's a long-term solution to the problem, we think that

22   it is an interim solution while the system is being improved.

23       And so although we recognize that 15 days is a short

24   timeframe, we think that within 15 days some of this can start,

25   including hiring the expert and getting a plan in place about

1  how the District will improve transportation for the coming

2  school year.

3          We would ask potentially, with Your Honor's approval,

4  of course, that the District submit a plan on how they intend

5  to improve transportation.  Despite the fact that they spend a

6  lot of time in their declaration saying they are working on

7  things, in our view it is not really a plan, so understanding

8  what they intend to do and being able to offer expert

9  commentary about how that can even be improved in the short

10  term, we think would, again, ensure that students have a better

11  chance of getting to school on time at the start of the school

12  year.

13          And then lastly, we just think that the data and the

14  reporting of that data is critical to understand if students

15  are getting to school on time, if they are getting home on

16  time, and so would ask that the injunction does include that

17  data reporting to the Court.

18          THE COURT:  Thank you.

19          MS. BANNER:  Thank you.

20          THE COURT:  Are you ready or do you want to take a

21  break, Ms. Kelley?

22          MS. KELLEY:  Okay.  Well, I have a few things I want

23  to be sure to point out before I leave today, but I want to

24  start by addressing the Court's conversation with Ms. Banner.

25          She began with three examples, concrete examples of

students and families that have had problems with busing.  The

first was plaintiff A.F.  Ms. Banner described a months-long

problem where A.F. did not have a harness.  This is true and it

is a problem and it is a FAPE denial and we agree with that.

I also want to point out that it was specifically

raised and addressed in A.F.'s due process complaint.  There is

no evidence that it has been a problem since.  There is no

evidence that this is a systemic problem.

Ms. Banner pointed to declarant Davis, and for the

Court's convenience, I'll say that's declaration 438 ECF.

Ms. Davis has a medically fragile child, that is true.

Ms. Davis has also filed four due process complaints.

According to her declaration, two of those were settled.  The

most recent one was in September of 2023, and, by all accounts,

my read of the declaration shows that there have been no

problems or issues since.  So, again, I don't see how this is

calling out for immediate systemic relief or why the fact that

Ms. Davis' child is medically fragile means there is a systemic

problems with OSSE's transportation.

Declarant Lewis, as Ms. Banner says --

THE COURT:  What's the name of the third one?

MS. KELLEY:  Lewis, ECF 35-3.  Ms. Lewis's or

Mr. Lewis, I don't remember, their child is deaf, and,

according to the declaration, until April of 2024, which wasn't

that long ago, I don't know which day in April, had a wonderful

1   driver who was fluent in ASL.  And the declaration reports the

2   family was very happy with this driver.  Ms. Banner represents

3   that there is a huge problem now in that for some amount of

4   time, I guess in May and early June, there was not a driver who

5   was fluent in ASL.

6          And, again, I agree that's a problem, but I would

7   submit it may take some time to find a CDL licensed driver who

8   is fluent in ASL and who is immediately available to take the

9   route, and also that this is the only allegation concerning ASL

10  in the entire record and is not in any way evidence of a

11  systemic problem, and is a very different problem than the

12  central problem alleged by the plaintiffs, which is a failure

13  to get to school on time or home at the time announced.

14         I also want to point out that Ms. Banner has said, and

15  the briefing seems to fault the District for trying to do

16  better.  They say we admit that we need something better

17  because we're trying to get a new system and that we concede

18  that we're failing because we say that this is hard.  I just

19  want to be very clear that wanting to do better should not be

20  held against the District.

21         The District is striving every day.  As we described

22  in our motion, this is a whole of government effort.  The mayor

23  is engaged.  At least three council members at the budget

24  hearing in February pledged to do whatever it takes.  And I

25  didn't say this, but it may be of interest given the

procurement conversation, there was an extended conversation in
February between the superintendent and the council members
about how to speed the procurement process for the new routing
system and for whatever else OSSE may need to solve the
problem.  And that I think explains why you received a
declaration yesterday saying that not only is there the money
that the agency requested last year in the fiscal year '25
budget, but an additional $10.5 million announced yesterday to
ensure for August that there are sufficient private routes if
needed.

       THE COURT:  Is that part of Mr. Park's declaration?

       MS. KELLEY:  That is the point of it, yes, just a few
paragraphs.  We learned of it Tuesday.

       THE COURT:  You said $5 million?

       MS. KELLEY:  $10.5 million.

       THE COURT:  I have got the declaration in front of me.
Can I ask a question about that though?

       MS. KELLEY:  Yes.

       THE COURT:  $10.5 million on additional private
transportation services, that's a little unclear.  Is that
amount all targeted for special needs students or is it for
students including others than special needs students, if you
know?

       MS. KELLEY:  So the District does not -- is not
directly responsible for transporting students who don't have

1    IEPs, and that money is ready and fully dedicated to OSSE's

2    transportation for the upcoming school year.

3            THE COURT:  When does the school year begin?

4            MS. KELLEY:  End of August.  I think the last week of

5    August.

6            So Ms. Banner also made a lot of references to the

7    District's failure to put in evidence.  It is not the

8    District's burden to show that this extraordinary relief is

9    warranted, it is the plaintiffs.  And this evidence is

10   unrebutted that the plaintiffs have arrived late home.  That is

11   true.  We're not disputing, for example, the findings of the

12   hearing officer decisions.  We agree that there was enormous

13   problems in the last school year, but, again, that doesn't mean

14   that the extraordinary structural relief they are seeking is

15   warranted.

16           Ms. Banner also complains that the District has

17   shifted the cost to parents.  Let me say here that there is a

18   lot of discussion in the briefs about parent communications.

19           First, even though we pointed this out in our

20   opposition, I have yet to see an argument that that violates

21   the IDEA.  None of that was raised in the hearing officer

22   decisions.  None of that was exhausted.  It may be a problem,

23   it may be an annoying.  I am a parent, I understand that.  It

24   is not a violation of law and it's off the table.

25           For everyone's understanding, including potentially

1  the plaintiffs, the kind of system that they want, which one of

2  the declarants notes has been piloted already, where you can

3  sort of open your phone and see where the buses are at all

4  times, is illegal because all of those kids are special ed kids

5  and the fact that they have IEPs and their home addresses are

6  federally protected information that we cannot share, there are

7  safety reasons for that.  I won't spend more time on this since

8  it's not a violation of law, but so you understand.

9          Turning to the hearings and the looming question of

10  exhaustion, I'm still not clear if the plaintiffs agree or

11  disagree with the hearing officer decisions.  Certainly a

12  central point in our motion is that if you pick up any DC

13  Circuit case and it says what is the standard for deciding an

14  IDEA claim when it comes up from the hearing officer, it says

15  the movant has the burden to convince the judge that there has

16  been an error.  There has to be something, quote, "wrong."

17  That is *Reid*, that is *B.D.*  That is every DC Circuit case to

18  consider this.

19          I have yet to see an argument that those decisions

20  were wrong.  Ms. Banner did touch on sort of complicated

21  questions of exhaustion and exemptions for systemic claims.  I

22  think -- I'm happy to report that Your Honor need not resolve

23  those here because the plaintiffs' claims are not the kind of

24  systemic claims that might warrant an exemption or might show

25  futility.

1          And I would like to point very specifically to what

2     the plaintiffs said in the hearing below, so let me -- I don't

3     think I have it in front of me.  If I look at the -- here it

4     is.  So I'm pulling up ECF 31-7.  This is the District's

5     Exhibit F.  It is the administrative due process claim for

6     Elizabeth Daggett.

7          I'm turning to ECF pages 15 and 16 where they have a

8     prayer for relief.  The request sets out under two separate

9     headings a request for individual relief.  And it says on

10    paragraph 66, "As relief for OSSE's denial of FAPE to H.D.,

11    petitioner respectfully requests this hearing officer," and

12    there is a long list I won't read, but essentially, "order OSSE

13    to provide consistent, reliable, appropriate transportation to

14    and from school," which is the order that they got, as Your

15    Honor already pointed out.

16         On the next page under the heading "systemic relief,"

17    paragraph 67, they ask, "As relief for OSSE's denial of FAPE to

18    H.D., and all similarly situated students, petitioner

19    respectfully requests this officer," and then if you read the

20    list, it's exactly the same as the first one, including, in our

21    view, very generally "order OSSE to develop and implement

22    adequate and effective policies and procedures to provide H.D.

23    and other students with consistent, reliable and safe

24    transportation to and from school."

25         My reading of this complaint is that essentially the

1    individual relief requested is an order that OSSE do the thing.

2    OSSE must deliver the children to school on time in a safe,

3    reliable manner, et cetera.  And their systemic relief is that

4    same thing for other children.

5            Now, if you look at the one hearing officer order

6    granting the District's motion to dismiss that is in the

7    record, Hearing Officer Keith Seat seems to have read the

8    complaint the same way that I do.

9            THE COURT:  Which hearing officer?

10           MS. KELLEY:  Keith L. Seat.  This is ECF 4-16.

11           THE COURT:  I have got -- actually, I have Docket 28.

12    What's the name of the hearing officer?

13           MS. KELLEY:  Seat.

14           THE COURT:  It doesn't give the name of the student.

15    What page are you on?

16           MS. KELLEY:  Is this Document 4-16?  Is that what you

17    have?

18           THE COURT:  I have 28-1, but it may be the same thing.

19           MS. KELLEY:  Okay.

20           THE COURT:  Dated 3-28-24?  Tell me what paragraph.

21           MS. KELLEY:  I'm in Document 4-16.

22           THE COURT:  I have got two from Mr. Seat.

23           MS. KELLEY:  I think you might be looking at the

24    hearing officer's decision on the merits decision.  What I want

25    to point to is an earlier decision in the proceeding.

1        So the plaintiffs say, "We asked for systemic relief,

2   we exhausted, and the District moved to dismiss saying it was

3   beyond the Court's jurisdiction."  All of that is true.  I just

4   want to be sure the Court reads the hearing officer's decision

5   because, and this is the only one in the record again, what he

6   said is -- I'm going to skip over a little -- page 3, "The

7   jurisdiction of hearing officers is limited to any matter

8   relating to the identification, evaluation," et cetera, "or the

9   provision of FAPE to one child," emphasis throughout on the

10  individualized nature of IDEA.

11       The first sentence of the analysis says, "This hearing

12  officer is persuaded that OSSE's challenge to subject matter

13  jurisdiction over petitioner's claim concerning all similarly

14  situated students is well-founded."

15       I'm going to stop there, but it's more.  I think -- I

16  know what I'm trying to say is the hearing officer said I can't

17  grant relief for other children.  IDEA due process complaints

18  are not class action forums, and I believe that's right and I

19  haven't had the plaintiffs say it's wrong.

20       This idea that they were somehow denied relief that

21  they need, whatever this 15-day short-term fix that now they

22  have it was never presented below.  They had five due process

23  hearings.  They had ample opportunity to explore systemic

24  issues and they did none of that, so these are not systemic

25  claims.

1          THE COURT:  A question, which may or may not be

2    related to the point you're making.

3          The three examples of students that you gave are the

4    five named plaintiffs.  The two others, and I think I asked

5    Ms. Banner about this as well, that in three of them, and I

6    think they are three you just mentioned, the hearing officer

7    granted forward-looking relief in the sense that they said,

8    "And you have to do -- you have to provide FAPE, you have to

9    provide transportation going forward."

10          For other two, that language is not in the hearing

11    officer's decision.  They provided compensation in the form of

12    money, I think, and in the form of compensatory education for

13    those two without specifically saying, "And going forward, you

14    have to provide transportation as a related service and that's

15    on you."

16          MS. KELLEY:  Yes and no.  The three plaintiffs -- the

17    three students that Ms. Banner and our parents spoke about, one

18    of them is a plaintiff, A.F.; the other two, declarants Davis

19    and Lewis, are putative class members.

20          The broader question about the five plaintiffs, yes,

21    plaintiffs D.R., H.D., and B.R.C. received prospective relief

22    from the hearing officer and they all had Keith Seat, perhaps

23    not a coincidence.  Plaintiffs J.C. and A.F. did not receive

24    prospective relief.

25          I will note that for one of those, J.C., the hearing

1   officer also expressly found that there was no FAPE denial for

2   a.m. dropoffs in the last school year.  And, again, you could

3   maybe make it up for them, but nothing in plaintiffs' briefing

4   says that those decisions were wrong.  There is no request here

5   for an individualized order of prospective relief or argument

6   as to why the hearing officer should have provided those orders

7   but didn't.

8           Give me just a moment.  I lost my place in my notes.

9           THE COURT:  Happens to me all the time.

10          MS. KELLEY:  As to the ADA and the disability

11  discrimination claims, plaintiffs have also argued that they

12  are aggrieved by the hearing officer's dismissal of those

13  claims.

14          We have said in our briefing, and I don't see any

15  cases supporting that position, that it makes no sense.  It's

16  like saying I tried to bring a battery claim and the hearing

17  officer said no, and, therefore, I have an IDEA cause of

18  action.  That doesn't make sense.  It is true that they need to

19  exhaust and use the IDEA procedures before they can later bring

20  other disability discrimination claims, but that doesn't give

21  them an IDEA cause of action.

22          THE COURT:  Doesn't give them what?

23          MS. KELLEY:  An IDEA cause of action.  They sue under

24  the IDEA or the Rehab Act, but not under 20 U.S.C. 1415.  There

25  is an argument as to the Arc.  Ms. Banner said that the Arc

1  does not need to exhaust its IDEA claim.  That is wholly

2  unsupported.  They cite a couple of cases in their reply in

3  support of the general proposition that the Arc itself has

4  associational standing to bring IDEA claims.  Neither of the

5  cases cited are about IDEA claims.

6          The first one is about Article III standing, which is,

7  of course, different.  And the second case is not about IDEA at

8  all.

9          THE COURT:  Wait a second.  If you have associational

10  standing to bring a lawsuit and some of your members have been

11  harmed, and this may be a question for both sides, you have to

12  show under associational standing that some of your members

13  have been harmed.

14          Are you really arguing that the Arc has to exhaust or

15  that some of its members have to exhaust?  I mean, how would an

16  organization or an association ever exhaust?

17          MS. KELLEY:  It would not.  So I am really arguing

18  that the Arc cannot bring a claim under 20 U.S.C. 1415, which

19  is the IDEA cause of action.  So it can bring other claims.  It

20  can bring an ADA claim.  It can bring a 504 claim.  It could

21  bring an IDEA claim that is not the kind of thing that could be

22  addressed through an individualized proceeding, but nothing in

23  the text of the IDEA itself and nothing that plaintiffs have

24  cited indicates that the Arc could bring such a claim or that

25  there is some special exception for organizations.

1          And I don't think there needs to be, right, like not

2    every square peg/round hole.  Not everything has to be --

3          THE COURT:  The question is if one -- I know what the

4    standards are for associational standing.  And associations can

5    bring all sorts of claims, and one of the claims is have

6    individual members been hurt or some individual members been

7    hurt.

8          So I suppose the question is, is there any case

9    anywhere in the United States of America where a court has said

10   that an association has standing to bring an IDEA claim and is

11   granted some form of relief?  Now, you say they don't cite any

12   cases and it's square pegs in a round hole.  It may be square

13   pegs in a round hole, but it may not be.

14         Associations have standing to bring environmental

15   cases.  They have standing to challenge all sorts of

16   regulations.  And you know -- and I don't know whether if they

17   have standing they have to show through a declaration that a

18   particular member has been harmed or whether they have done so,

19   because I haven't actually looked at all the -- I have looked

20   at the declarations of the five named plaintiffs and some of

21   the others, but I haven't looked as closely at some of the

22   other declarations.  But I don't have to answer that today, but

23   if either side wants to say more about the Arc, I'm happy to

24   hear more about the Arc.

25         MS. KELLEY:  I have at least three thoughts.  The

1    first is, no, we do not have to say anything about that today,

2    because they have also failed to show irreparable harm and

3    that's enough.

4            THE COURT:  With respect to the Arc?

5            MS. KELLEY:  With respect to the Arc.  On the

6    associational standing, so I that think the use of the word

7    "standing" is a little confused in the briefing and also in the

8    case law.

9            So there are cases that talk about, quote, "IDEA

10   standing," when they are really looking at the cause of action,

11   right.  There is a difference between Article III standing, do

12   you have a live case, can you bring this, versus what is the

13   vehicle that your claim comes under.

14           And we're not disputing for now the associational

15   standing.  So we haven't challenged their standing with respect

16   to the disability discrimination claims.  That's not the same

17   as saying that you, the Arc, have a cause of action under the

18   IDEA.  So that's the difference that I want to point out.

19           I will also note that the associational standing

20   doctrine, the third element, I think, requires that it be the

21   kind of claim that doesn't need the participation of the

22   individual association's member, and we haven't raised standing

23   issues, but this is not that case, because this is the -- what

24   they want, the buses should arrive on time in compliance with

25   the IEP, can and has been addressed through individual

1    proceedings and should be exhausted under the plain text of the

2    IDEA, and that requires the participation of the individual

3    student and member, and, therefore, even if you were to going

4    to make the decision under Article III grounds, Arc does not

5    have standing because they need to involve their member.

6        THE COURT:  I don't want to interrupt you, but what

7    strikes me about this whole discussion is the question for

8    today is -- two questions for today -- is whether they have

9    carried their burden to get a preliminary injunction, and for

10   that they have to show -- I think they have to show that at

11   least one named plaintiff and perhaps others, individual

12   children, have been harmed, that they are likely to succeed on

13   the merits and all of those other things.

14       And then we have the class action argument we'll have

15   later.  It seems to me that some of this whole debate about

16   whether the Arc has standing would be ripe for a motion to

17   dismiss the Arc from this case at some point, whether or not I

18   grant the preliminary injunction.  And to decide whether

19   somebody is entitled to a preliminary injunction, some

20   plaintiff is entitled to a preliminary injunction, it seems to

21   me, unless either party disagrees, I have to deal with these

22   harder questions of associational standing and what harm they

23   have to show for today's purposes, but I leave that to you.

24       If you want to continue to argue, if they want to

25   continue, otherwise it seems to me this case is not going to

1    end today regardless of what I do.  You can move to dismiss

2    them as a party.

3          MS. KELLEY:  Your Honor, we completely agree.  It's a

4    minor point.  I just didn't want to leave it on the table.

5          Let me go to the points I wanted to be sure I made

6    first.  So do plaintiffs need systemic relief, that's really

7    why we're here today.  And we think that they have utterly

8    failed to carry their burden to show that they need any

9    particular kind of systemic or structural relief or certainly

10   the extremely broad takeover kind of relief that they have

11   requested.

12         So they repeatedly point to some data that OSSE posts

13   online.  There is some big numbers in both briefings, 1,000

14   delays, 450 delays, et cetera.  Most of that is unsupported in

15   the briefing.  It's not evidence.  It's just argument.  But

16   with their reply, plaintiffs did file a supplemental

17   declaration from Plaintiff Elizabeth Daggett, that's ECF 35-1.

18         Ms. Daggett goes online every day.  There is a website

19   where OSSE has a list of the 550 different routes or

20   approximately that will go out in the morning, and each day the

21   route is delayed or somehow down, when you look at the route

22   number, it will say "delay."  It will either say "on time" or

23   "delay."

24         Ms. Daggett has been tracking the number of routes

25   that say "delay," I'm not sure for how long, but at least since

1   the motion for the PI was filed.  And she reports that in a

2   table, which the plaintiffs have filed along with her

3   declaration.

4        The declaration shows data for 47 school days.  Since

5   the motion was filed, the PI motion, it shows, by my simple

6   addition, 905 instances of delayed routes.  That's a big

7   number, but OSSE ran more than 50,000 routes in that time

8   period.

9        If you use the number from Mr. Park's declaration at

10  paragraph 18, which is 551 routes each morning and each

11  afternoon, there were 51,794 routes run in those 47 days, and

12  the 905 instances of delay represent less than 2 percent.

13       THE COURT:  How much?

14       MS. KELLEY:  1.74 percent.  We submit that is not

15  evidence of a systemic problem, it's just the opposite.  I

16  think even plaintiffs admit the buses may be late and sometimes

17  they may be delayed.  We admit, agree, that is not the same

18  number as arriving to school on time, but it is not

19  meaningless, because in order for the bus to leave the terminal

20  on time, there has to be a bus, it has to be rolling, it has to

21  have a driver, it has to have an attendant, it should have the

22  equipment, they have a route in hand.

23       So many of the problems that plaintiffs speculate are

24  causing delays, you can tell ex-ante are not the cause of a

25  delay if the bus is rolling out of the terminal on time.  So we

1    think that those are meaningful numbers, and they have shown
2    great improvement since last year.

3         Similarly, plaintiffs' declarations of putative class
4    members don't make a clear showing of substantial proof, which
5    is what is required at the PI stage regardless of whether a
6    class is certified.  If they want preliminary relief, they have
7    to meet the PI standard with real evidence and a clear showing.

8         Six of these putative class declarations appear to
9    show minimal or no issues in terms of timely arrival in the
10    last school year.  Declarant Woods at ECF 4-30 has had a
11    privately operated route all of the last year, and there are no
12    reported issues with the current school year in that
13    declaration.

14         Declarant Mitchell at ECF 4-33, reports big problems
15    in the fall of last year, but none at all since her child
16    switched routes and schools in January.

17         THE COURT:  Which parent is this?

18         MS. KELLEY:  Mitchell.  These are all putative class
19    members I'm talking about now, not plaintiffs.

20         Declarant Maltz at ECF 4-35 praises her bus team and
21    their consistent communication.  She reports -- and this was
22    filed in March -- six instances in the school year since March
23    of late a.m. pickups.  If you do the math, that's less than 5
24    percent of schooldays through that date.  That's an estimate.
25    The child is not in DCPS, but roughly speaking.

1          Declarant Kouma, ECF 4-41, eight instances of late

2   a.m. pickups.  Again, this starts to feel like a lot, but it

3   has to be put in perspective and the plaintiffs have to show

4   that it's a material violation of a FAPE.  Eight instances is

5   around 6 percent of school days.

6          Declarant Coleman, ECF 35-10, reports that the

7   student, quote, "has a wonderful bus driver and attendant who

8   texts regularly."  They report six instances of late pickup for

9   the whole school year, three of which were in one week when

10  there was a substitute driver.

11         Declarant Lewis, ECF 35-3, reports one instance of

12  late a.m. pickup, one instance of the bus arriving too early.

13         This hardly shows a need for the Court to take over

14  OSSE's transportation of students.

15         THE COURT:  Well, I don't think that's on the table.

16  I did that once.

17         MS. KELLEY:  Ha, ha, ha.

18         I'm going to touch on *Petties* quickly too, but five

19  more putative class declarations, many of which were filed with

20  their reply, that I want to respond to.

21         Plaintiff Gregory -- excuse me, putative class member

22  Gregory, ECF 35-9, has been driving her child to school herself

23  since 2021.  She doesn't even use OSSE's transportation system,

24  and her complaint is about a reimbursement dispute, seemingly

25  has nothing to do with whether the buses are presently arriving

1  on time.

2       Declarants Watts and Whatley, ECF 35-8 and 35-13,

3  primarily complain that they can't see the bus when it does

4  arrive.  As you may recall, OSSE doesn't use bus stops, it goes

5  door to door, and not everyone has a front door that faces the

6  sidewalk.  It's not always obvious, sometimes it's the back of

7  the apartment complex that the bus can't drive up to.  I'm not

8  sure what is going on exactly, but this again seems like a

9  different problem.

10       Declarant Davis-Smith, ECF 4-38, has had a private

11  route since August of 2023, but complains that the pickup from

12  school is too early.  Again, it is a problem, but it is a

13  different problem and nothing that the expert suggests would

14  seem to remedy this.  Ms. Davis-Smith has filed four due

15  process complaints, which, again, by the declaration seem to

16  have been resolved.

17       Declarant Floyd -- this is the last one -- ECF 35-6,

18  says there have been multiple times this school year when the

19  bus was late.  She also says that her son's bus shows up on

20  time because she has retained an attorney.  It's really unclear

21  if there is any problem there at all.

22       Again, none of this is proof of clear systemic issues

23  warranting any kind of immediate relief or class certification.

24  And even though they have filed many declarations, their

25  supposed class -- I know we're going to get there later, but

1  also as to the systemic question is more than 4,000 children,

2  and the declarations they have submitted are less than a

3  quarter percent of that population.

4       THE COURT:  We'll get to that.  How many special needs

5  children do you estimate OSSE is responsible for?

6       MS. KELLEY:  It's just over 4,000.  You mean who

7  require transportation in their IEPs?  It's just over 4,000.

8       THE COURT:  The purported class is only 40, as I read

9  the filings, and I wondered about that number, and we can talk

10 more about it later, because, as I recall, the *Petties* class

11 was significantly larger.

12      MS. KELLEY:  My reading of their briefing is they

13 think everyone is in the class.

14      Let me just say on *Petties*, I thought it interesting

15 that the -- and I want to talk about in your conversation with

16 Ms. Banner buses came up a lot and the idea that maybe there

17 was a problem with the fleet.

18      And my understanding of *Petties* is that back then,

19 actually, a lot of problem was the fleet, there weren't enough

20 buses, they weren't running, they weren't maintained, et

21 cetera.  There is no evidence that that is the problem today.

22 They include it in their -- I think in our motion we cited one

23 of the plaintiffs points out to one time, I don't know what

24 year, a bus broke down.  That is going to happen when you have

25 700 buses.  That does not indicate that we have a fleet

1    problem, and so I think this also goes to show that while it is

2    unfortunate that the transportation system was under judicial

3    supervision for so long, it was a different problem.

4            Briefly --

5            THE COURT:  It was such a crisis at that point that

6    even the mayor and the superintendent agreed that we needed

7    some outside person to run the system, and I think that's

8    reflected in the record.

9            But I was asked to appoint a receiver at a crisis

10   point, and the word came back through my special master -- who

11   was the mayor, was it Vincent Gray or it may have been Adrian

12   Fenty -- adamantly opposed to a receiver.  The person who had

13   been identified to do the job was David Gilmore.  The

14   superintendent agreed that David Gilmore would do a great job

15   and that they needed help.

16           And so we had the superintendent saying if you appoint

17   David Gilmore, that's okay, and the mayor saying I don't want a

18   receiver.  So the answer was let's not call him a receiver,

19   let's appoint him and call him a transportation administrator

20   and let's have him report to the Court and to the

21   superintendent.

22           There were an insufficient number of buses.  There

23   were buses that were in storage because they didn't have the

24   parts to fix them.  And the drivers were not acting in

25   professional ways.  It was really a crisis.  And we were able

1    to -- this is history.  I know you don't care about history,

2    but in the other part of *Petties* case, there had been so many

3    violations of complying with -- coming up with IEPs in the

4    requisite number of days or placing children within the

5    requisite number of days.  The children were losing a year and

6    sometimes two years, and I kept fining the District huge

7    amounts of money.

8          They were losing millions of dollars in the registry

9    of the court from sanctions that I imposed.  And what we agreed

10   was I'll forgive these sanctions if you use this $1 million to

11   buy the parts and fix the buses, I'll forgive some more

12   sanctions if you use this $1 million to buy X number of buses

13   by Y date, and yet another couple of million if you buy more

14   buses by that date.

15         And that's -- and then hiring drivers, paying them

16   enough.  And maybe you have some of the same problems today

17   too, but getting drivers is a hard problem always, and

18   particularly here when you're competing with more than two

19   other jurisdictions, Prince George's, Montgomery County,

20   Alexandria and Arlington.

21         And everyone agreed, including Mayor Fenty and General

22   Becton, I believe it was, we were at a crisis point.  And this

23   situation strikes me as being rather different.

24         MS. KELLEY:  Yes, Your Honor.  And thank you for that

25   background.  It is helpful.  And I am happy to report that the

1    situation is very different.

2         And one of the things that I wanted to turn to before

3    I step off here is plaintiffs' motion in support of the PI, ECF

4    4-1, and they have a few paragraphs explaining what best

5    practices these experts think we should be following.

6         So I'm at page 54.  It says, "Routes should be

7    scheduled to ensure students arrive within 10 to 30 minutes of

8    the start of the school day."  We agree.  That is already

9    OSSE's policy.  We do not think we should pay an expert to tell

10   us that again.  The problem is making it happen, which we are

11   actively doing.

12        Next paragraph, "Students should not be routed on

13   transportation for excessive periods of time."  Yes, we agree.

14        "Routes should deploy the safest vehicles appropriate

15   for student needs, which are school buses and not private

16   non-bus vehicles."  We don't necessarily agree, which is

17   something we pointed out in our motion.  Private routes have

18   been enormously successful in the district in the last year,

19   including for one of the plaintiffs, and at least two of the

20   putative class members.  It's really unclear if those people

21   want us to stop sending the private routes.  We don't want to

22   have to pay an expert to tell us this.

23        "Using modern technology for routing is best

24   practice."  Yes, we agree.  We are working very hard to change

25   that.  Again, it doesn't mean that the system is impossible

1    with the Trapeze technology that has been in place since

2    *Petties*.

3         I could go on, but my point here is that we don't want

4    to spend money on experts or monitors or special masters.  We

5    want to spend $10 million on new private routes.  We want to

6    accelerate the new routing system.  We don't need to be told

7    what to do here.

8         I also just want to briefly highlight the things that

9    had been done that we think will make this August very

10   different from two years prior.  OSSE has been working very

11   hard with the 70 different local LEAs to make sure that all of

12   the information that OSSE needs to make new routes this year is

13   in in a timely fashion.  We have to know which kids need

14   transportation.  We have to know who the parents are.  We have

15   to know what the address is.  All that comes through the

16   schools, and we have worked very, very hard to make sure that

17   comes in at the beginning of August instead of the end, which

18   is what happened in 2022.

19        It causes enormous delays if you don't get it right,

20   but we were, I think, 90 something percent on time last year

21   and it's looking good this year.

22        THE COURT:  We also know historically that children

23   move around.  Sometimes they are spending the summer with the

24   grandmother, then they go back to live with their mother and

25   father or when school year begins.  There are all sorts of

1    things that happen in homes, some of which are single family

2    homes, many of which are not, that make it difficult to know

3    where people are.

4            And, again, this is anecdotal from my past experience

5    in these cases, that it gets better later in August and after

6    Labor Day, they have accurate information on those issues, than

7    it is as you're preparing for the school year.

8            MS. KELLEY:  Yes.  Inevitably, even if we get the form

9    on time by the end of July, it will have changed by the end of

10   August, so there will always be rerouting.

11           THE COURT:  Can I ask you this.  I want to say more,

12   but you say the District has plans for improvements during the

13   school year and that they have plans for a new routing system.

14   Are those plans for improvement over all and specifically for

15   the routing system in written form that could be shared with

16   plaintiffs and/or shared with me so that we are not -- I don't

17   want to use this because it's pejorative -- taking it out of

18   faith that these improvements are in process and will be up and

19   running or many of them up and running when the school year

20   begins?

21           MS. KELLEY:  So first let me say the public hearing in

22   February that we cited to in our briefing, Superintendent Grant

23   has now left, but I would guess that was sworn testimony, and

24   she was very clear that the District is actively working on

25   procurement even now.  I think they were awaiting the end of

1    the budget cycle, which has happened.  I can't put my finger on

2    a document for you, but let me consult with the OSSE team

3    during the break to see what we can do.

4        THE COURT:  Unless you have other points you really

5    want to make, I would suggest the following.  We have been here

6    an hour and a half.  I'm assuming that the class action motion

7    is going to be a much shorter argument.  Why don't we take a

8    15-minute break.  Ms. Banner can have some rebuttal to what you

9    just said, and then we'll move directly into the class

10   certification argument.

11       Thanks, everyone.  We'll see you in 15 minutes.

12      (Recessed from 11:32 a.m. to 11:52 a.m.)

13       MS. BANNER:  Thank you, Your Honor.  I'll try to make

14   just a couple of brief points in response, and, of course,

15   happy to answer any questions.

16       I want to start with a very specific question.  Your

17   Honor asked if there are any cases where the Arc has been

18   organizational plaintiff in IDEA cases.  There is a case which

19   is cited in our briefs.  It's called *G.T. versus Kanawha*

20   *County*.  The cite for that is 2020 Westlaw 4018285.  It's a

21   case in West Virginia in the Fourth Circuit.  In that case, the

22   Arc was granted associational standing to bring IDEA claims on

23   behalf of its members and it did not exhaust, but, of course,

24   did have members who it asserted had standing.

25       Your Honor, I want to start by talking about what the

1   evidence today shows.  We are grateful and our clients are

2   grateful that the District is not in the same position that it

3   was when Your Honor appointed a receivership in *Petties, or*

4   *non-receivership*, as you explained.  We don't want the

5   transportation system to get there.  And we are hopeful that

6   with the relief from this Court that we don't have to end up in

7   that situation again.

8           The evidence that the plaintiffs have submitted shows

9   a problem -- a pattern of problems that is cyclical.  Parents

10  may receive transportation on time for some period of time, and

11  then it gets late again.  They get placed on private

12  transportation, and then the route changes.  And what's

13  consistent across all these declarations is that the buses are

14  not consistently arriving on time.

15          The data that the District cited saying that there was

16  only a minimal delay or their attempts to say that this is just

17  sort of occasional is not our clients' experience, nor is it

18  even in compliance with the district law.  So in DC, if you're

19  absent 5 percent of the time, you are considered chronically

20  truant.  So saying that students are only missing 5 percent or

21  getting to school late 5 percent still demonstrates there is a

22  problem.

23          Of course, as Dr. Livelli explains in his declaration,

24  we're not just talking about hours missed from school, but on

25  the impact to students with disabilities who rely on the

1    routines that they have to get to school and who may miss much

2    more and much more learning opportunities from being late one

3    day than a typically developing student.

4         And so the evidence that we have submitted in support

5    of this preliminary injunction does show that there is a

6    significant problem with the way that the transportation system

7    is being run and also shows that students are being irreparably

8    harmed by that.

9         I will highlight that one of the declarants that the

10   District discussed on behalf of Jamie Smith-Davis is a client

11   who is -- or is a parent who has filed for due process

12   complaints, and yet, as one of the declarations we will submit

13   later today shows, she is continuing to have problems.

14        So dealing with this on an individual basis, one by

15   one, is not solving the problem.  Our clients tried that, and

16   the District has had, since we filed those administrative due

17   process complaints and since March when we filed this

18   complaint, to start to take steps to fix those problems, and

19   yet they don't have a plan.

20        We are encouraged by the fact that the District is

21   making improvements, and we don't mean to suggest that we are

22   holding that against them, that they are investing in their

23   systems and making improvements, but yet they haven't submitted

24   a concrete plan with timelines about how that's going to

25   happen.  Instead, they have just said that they are working on

1   it.  And so if they are working on it, an injunction from this

2   Court will not harm them; it will help ensure that it happens

3   and hold them accountable to the promises that they are making.

4        We think here that a proposed order should require the

5   District to submit such a plan with concrete timelines and

6   steps that it will take to address its problems.  We believe

7   that the best way to do that that's efficient and that will

8   result in the best changes is by using a transportation

9   operations expert to consult with the District to make those

10  changes, but at a minimum, the plaintiffs request the

11  opportunity to review and comment on such a plan as part of the

12  injunctive relief here.

13       Lastly, I'll say about the evidence, to the extent

14  that the District says that it's only a small percentage of

15  buses that are late, that is based on their on-time departure

16  from the terminal.  So, again, that data doesn't say anything

17  about whether students are getting to school on time, they are

18  getting to home on time.  All it says is that the bus left the

19  terminal.

20       That number also doesn't say anything about whether or

21  not there was an attendant on the bus or whether it had the

22  required equipment.  Indeed, our clients have experienced buses

23  arriving at their home maybe on time, but without the

24  opportunity -- without the spot to secure a wheelchair, without

25  the safety harness or adaptive stroller, without a nurse or

 1    without a one-on-one aide.  So fact that a bus is leaving the

 2    terminal on time is no guarantee that the student can even

 3    board the bus, never mind get to school on time.

 4         So because of all of those factors, the plaintiffs

 5    believe they have met their burden for preliminary injunctive

 6    relief here and believe that that relief can be implemented and

 7    there are steps that can be taken in the short term to ensure

 8    that we don't start another school year with students having

 9    these significant delays.

10         THE COURT:  One thought with respect to your motion

11    for preliminary injunction.  I made some comments and asked

12    some questions about the breadth of it and the vagueness of it

13    and the 15-day timeline.  If you wanted to submit a revised

14    proposed order as I consider your motion, that would be fine.

15         MS. BANNER:  We would be happy to do so.  Thank you

16    for the invitation, Your Honor.  Thank you.

17         THE COURT:  Ms. Kelley, anything else you want to say

18    before we move on to the class certification question?

19         MS. WARNER:  May it please the Court, Peg Warner for

20    the plaintiffs.  Your Honor, given that class certification

21    does -- plaintiffs merge with the merits, I will address some

22    of the questions that the Court has made today and some other

23    points.

24         It's clear, Your Honor, that there are common

25    questions of fact and law that pervade this case and this

1  putative class.  We are talking about implementation of a

2  transportation system.  It is a systemic issue.  The fact that

3  the District is stating to the Court that this is not a

4  systemic issue, we need to talk about that right up front.

5       This is a systemic issue.  We are in a situation, as

6  counsel said, where we don't want this to get to the point

7  where it was in *Petties*.  And they are very specific steps that

8  we believe can be undertaken by the Court to ensure that that

9  does not happen.  But to say that this is not a systemic issue

10 is not dealing with the truth of the situation that we have

11 presented in our papers.

12      There is a systemic breakdown, a systemic procedural

13 and process breakdown at OSSE in the only student

14 transportation that it is required to deliver in the District

15 of Columbia.  These are the students that it is required to

16 transport to school safely, reliably, so that they can achieve

17 and have access to the education that is required under the

18 IDEA.

19      They are not delivering that system.  That is a

20 systemic problem.  The glue that holds this class together is

21 the harm that these students with disabilities are enduring and

22 their families are experiencing on a daily, weekly, monthly

23 basis.

24      This is exactly the kind of process deficiency that

25 the law says, one, needs to be remedied under the IDEA, and,

1    two, is particularly appropriate for class certification.

2          All the class factors are met.  I don't need to tell

3    the Court what those are.

4          Numerosity:  We have already talked about there is

5    more than 4,000 students with disabilities.

6          THE COURT:  Somewhere in the papers it says, in Docket

7    29-1 I wrote down, it says there are 40 people in the class.

8          MS. WARNER:  No, I think that was a reference, Your

9    Honor, to some case law that says if there are 40 people in a

10   putative class, that is sufficient for purposes of class

11   certification.

12         In fact, there are over 4,000 students, and the

13   government has already said that, that they are legally owed

14   access to education through transportation under the IDEA.

15         Commonality:  Common answers will not vary by

16   individuals here.  These are systemic deficiencies.  I point to

17   Judge Henderson's words in the *Brown* case in 2019, quote, "If a

18   certain outcome is legally mandated," and here that's access to

19   education under the IDEA, and, therefore, transportation, "and

20   an injunction provides each member of the class an increased

21   opportunity to achieve that outcome, Rule 23(b)(2) is

22   satisfied."

23         That's very important here, Your Honor, because each

24   member of the class will have increased opportunity to achieve

25   the educational benefits owed to them if this systemic problem

1    is remedied and if we start.

2        There is a famous quote:  "If not now, when?"

3        THE COURT:  I remember it.

4        MS. WARNER:  If not now, when, Your Honor?  I'll get

5    back to that in terms of the injunction.

6        Let's talk about commonality and the merger with the

7    merits.  What do we seek specifically?  There is a timeliness

8    problem.  There is a timeliness problem in picking up children

9    in the morning.

10        One of our plaintiffs -- main plaintiffs just arrived.

11    Her child was picked up approximately two hours late this

12    morning.  This child missed instruction, circle time, other

13    benefits of education.  Timeliness is a very systemic problem

14    here.

15        In the evening, you heard what Ms. Banner said about

16    the problems with children being on the buses for hours.  This

17    is a routing issue.  That is a systemic issue.  We're in the

18    21st century.  We can deal with routing with computer programs.

19    They have the ability to do this.

20        Second, commonality:  Personnel, drivers, nurses,

21    aides.  Yes, there is a bus driver shortage, but that doesn't

22    mean you can't try and you can't come up with a plan, a

23    specific plan.  I'll get back to that.

24        Communication:  Communication in our age is not

25    difficult.  These parents deserve to know when their children

are going to be picked up, where they are, and when they will
arrive back home.  This is not an impossible problem to solve
as was insinuated.  In the world we're in, with computers, with
texts, automatic texts, several personnel could achieve this
easily.  I'll get back to that.

Equipment:  This is not about what you had in *Petties*.
There is equipment.  Some of that equipment fails at times.  We
understand that.  That's the world.  But there has to be a
process through which those failures are dealt with.

And with regard to the private transportation, there
has to be a process to ensure that those private transports are
providing the necessary equipment for these children.

Typicality:  The declarations are clear.  Everyone is
basically having the same problem.  This process, procedural
failure with the delivery, timely, the personnel, and the
equipment.

Adequacy:  No question.

Your Honor, this is not about individual IEPs, this is
about the requirement under the law that access to education be
done through transportation.

We have requested a hybrid class, 23(b)(2) and
23(b)(3).  There is ample and robust precedent in the DC
Circuit for exactly what we're requesting.  In the DC Circuit,
the *Brown* case in 2019, the *D.L.* second case, 2017.  Judge
Tatel in his IDEA decision, I'll get back to that.  In the DDC,

1   your colleagues, in the *Coleman* case in 2015, Judge Sullivan.

2   *Charles H.* in 2021, Judge Nichols.  All of these cases

3   addressed the class certification vehicle and why it is

4   particularly appropriate in this type of case.

5           Specifically, let me go to 23(b)(3).  We need to show

6   predominance.  We need to show superiority.

7           Predominance:  There is common questions of fact and

8   law here.  It's clear in the papers.

9           Superiority:  The District's argument is that we

10  should be going back and burdening these five hearing officers

11  that handled these cases in the district.

12          THE COURT:  Are there only five total?

13          MS. WARNER:  Five.  Your Honor, that is simply an

14  improbable, unrealistic position.  That is exactly why 23(b)(3)

15  exists, why this is a superior vehicle.

16          On top of the fundamental problem there is not enough,

17  the cost to these individual plaintiffs, the cost of experts

18  would be enormous.

19          Let me address the other issue under 23(b)(3).  In the

20  *Coleman* case Judge Sullivan addressed one of the arguments that

21  the District is making here, and that was, oh, you couldn't

22  have a class because we have asked for compensatory education

23  and that's a damages issue and it's individual.  Judge Sullivan

24  hit this right straightforward.  "Individual damages

25  calculations are often formulaic.  The mere fact that a damage

1    award will require fact determinations is insufficient to

2    preclude class certification."  On page 86 of his opinion,

3    "These sorts of issues are a minor part of a strikingly common

4    class claim."  That's the same situation here.

5          And this is a prime candidate for a 23(b)(3) class

6    because these compensatory education claims are subsumed within

7    the greater common issues of law and fact.

8          Let me talk about the injunction, Your Honor.  I

9    understand completely the Court's concern.  Absolutely the

10   Court needs, and is required, to tailor an injunction, a clear

11   injunction and an achievable injunction.  And it needs to do it

12   within the realistic frame that it has here.  We submit that

13   can be done.  Let's talk about what can be done.

14         A narrow injunction:  Number one, as Ms. Banner said,

15   order the District to provide a plan.  If they have been

16   working on it since February, they should be able to provide it

17   to the Court and to us within two weeks, and let's see what's

18   in that plan.

19         Number two, order that an expert is to collaborate

20   with the District on how to use all this budget money that they

21   told us about in the declaration that was provided yesterday.

22   We are not asking for a receiver or non-receiver.  We are not

23   asking for anything other than an expert that understands

24   transportation for special needs students to collaborate with

25   the District, work with us and the Court to provide a plan that

1    can start to be implemented.

2          If not now, when?  There is no timeline to what they

3    discussed.  These children need help.  These families need

4    help.  There is clearly a systemic problem.

5          We have provided 20, 25 declarations.  We can provide

6    more.  We can bring people in and put them on the stand under

7    oath and they can say more, but it is clear that there is a

8    systemic problem with timeliness, personnel and equipment.

9          Your Honor, the private contractors, appropriately,

10    the District has said that they have been allotted more money

11    in the budget for private contractors.  That's great.  These

12    private contractors can be very helpful, but they need to be

13    helpful in an orderly manner so that we have children in proper

14    vehicles, with proper equipment, like harnesses, and we have

15    consistency in how these private companies are transporting

16    these children.  That can be the -- that can be part of a very

17    specific narrow statement in an injunction.

18          In the end, it's really about routing.  It's about

19    routing.  We know, and the Court has understood this morning,

20    that this is a situation where on one street there may be two

21    or three different requirements for these children.  That's a

22    routing issue.

23          There are experts that deal with this.  This is now in

24    our age a software issue, a computer issue, probably an

25    algorithm issue.  There are ways to deal with this that will

1   not unduly hamper the ability of the District and OSSE to run a

2   transportation system; in fact, it will enhance it.

3           So what we ask specifically is that you order that

4   there be a particular part of this plan that addresses how they

5   will deal with routing.  What we know for a fact is 94 percent

6   leaving the terminal has nothing to do with how many percent of

7   those children arrive to school on time.  Or 94 percent leaving

8   the terminal in the afternoon has nothing to do with how many

9   children are left on a bus for an hour and a half, two hours,

10  three hours, with no one to help them with their special needs.

11          So there has to be a specific plan drawn up by the

12  District with an expert who knows what is done in these

13  situations, that addresses this fundamental overarching issue

14  of routing.  If we don't fix routing, we don't fix

15  implementation of transportation, we don't have access to

16  education, we have an absolute failure under the IDEA.

17          So this can be done.  And the suggestions that I made

18  are specific items that we will put into our proposed order,

19  but the Court can issue a narrow injunction, a clear

20  injunction, an achievable injunction that begins the process.

21          Nobody here is kidding themselves that this is going

22  to be rectified by the beginning of the school year, but it can

23  be better for more children and more families and we need to

24  get to it now.  If not now, when?  Otherwise, we'll be

25  bothering you some time in the middle of the semester, the

1    spring semester, it will go on.  We both know it.  We know

2    that's the way it works.

3         There has to be some specific injunction that is

4    placed upon the District to remedy the systemic situation.  It

5    is not believable, Your Honor, that this is not a systemic

6    situation.

7         We have presented adequately our burden to demonstrate

8    that these common issues of law and fact permeate.  The only

9    way that the District will be able to focus on this is if there

10   is an injunction issued and if there is class certification,

11   provisional or otherwise.

12        THE COURT:  Did you submit a proposed order?

13        MS. WARNER:  We did submit a proposed order, but we

14   will submit a revised proposed order.

15        THE COURT:  On class certification?

16        MS. WARNER:  On class certification as well, yes.

17        THE COURT:  What do you say in your briefs or in the

18   order about notice to class members?

19        MS. WARNER:  We did not address that.

20        THE COURT:  We do have to do that, right?

21        MS. WARNER:  We do, and we don't believe it will be

22   unwieldy.  We're talking about 4,000 people in or around the

23   district.

24        THE COURT:  In your last sentence you said a

25   provisional class.  As I understand it, sometimes it's been

1    amended to eliminate that.

2            MS. WARNER:  I don't think you need to do that.  I'm

3    probably dating myself, Your Honor.

4            THE COURT:  Me too.

5            MS. WARNER:  And I think it's not necessary here,

6    because clearly the class action vehicle is the only way to

7    handle the situation that we have.

8            And I'll end with a quote from Judge Tatel on that.

9    Rule 23(b)(2) --

10           THE COURT:  Read his book.  I mean, I shouldn't be

11   trying to sell a book.  I just finished it last week and it's

12   worth it.  I'm digressing.

13           It is really good for non-lawyers to understand how

14   courts work, and how particularly appellate courts work and

15   that part is very interesting.  His early life is very

16   interesting.  Dealing with his blindness and trying not to deal

17   with it for decades is very interesting.  And the long chapter

18   on how guide dogs are trained -- and I have a friend who

19   participated in that at one point -- is fascinating.  And then

20   of course there are the two chapters criticizing the Supreme

21   Court.

22           But back to Judge Tatel's opinion.

23           MS. WARNER:  One other point on Judge Tatel, having

24   seen him so many times at several events, as you well know, I

25   admit that I was unaware for many years, and I think that tells

 1    us everything, doesn't it?

 2            So back to his opinion --

 3            THE COURT:  I have to tell you one story.  Maybe I

 4    shouldn't put this on the record.

 5            (Pause off record)

 6            MS. WARNER:  Your Honor, the words of Judge Tatel in

 7    *D.L.* two remain true and remain particularly appropriate here.

 8    That was an IDEA case as well.

 9            And I quote, "Rule 23(b)(2) exists so that parties and

10    courts, especially in civil rights cases like this, can avoid

11    piecemeal litigation when common claims arise from systemic

12    harms that demand injunctive relief."

13            That is exactly what we have here, Your Honor.  We

14    have common claims.  We have systemic harms, and they demand

15    injunctive relief, because without that relief, nothing will

16    improve in the bigger picture.

17            So we will submit a proposed order with regard to both

18    a tailored injunction and with regard to class certification.

19            THE COURT:  Thank you.

20            MS. KELLEY:  Okay.  First, I want to note I'm being

21    double-teamed here.  That was quite a lot.

22            I also feel like we have heard sort of a new class

23    motion, a lot of new arguments, although I want to be

24    efficient, so I would like to hand Your Honor a couple of

25    circuit cases that we think are -- if you read these, we win,

1    something like that, and I won't walk you through them.

2          But as to the systemic question, again, since we're

3    sort of on the PI, systemic can mean a lot of different things.

4    In the specific context of have they made a systemic claim that

5    need not be exhausted because it can't be resolved through due

6    process hearings, I would like to hand Your Honor *Student A*.

7    It's a Ninth Circuit decision from 2021.  It's cited in our

8    briefing, but we would really like you to read it.

9          And also as to the class, we have relied a lot on *In

10   Re Wright*, it's a 2023 decision from the DC Circuit.  We have

11   made arguments on each of the -- every piece of Rule 23, and

12   they seem to have scoffed at the typicality and adequacy

13   argument which says that the plaintiffs have exhausted and got

14   the relief they want in particular.

15         They say how can that be?  How can we ever get a

16   class?  We would say you're not entitled to be a class

17   representative.  If you get the relief that you need, you get

18   the relief that you need.  And *In Re Wright* in a separate

19   discussion says repeatedly that if the class plaintiffs get

20   what they want, they are not typical or adequate.

21         There is also an extended discussion of numerosity and

22   the concept of a fail-safe class, which isn't the words we

23   would want to see in an opinion because the DC Circuit is clear

24   that's not the rule, but it is a part of Rule 23.  At bottom,

25   Rule 23 says that the class has to be clear.  You have to be

1  able to tell who is in the class and who isn't, and at the end

2  of the day, if the class can be defined to have zero people

3  because it aligns completely with the legal violation, that

4  class is not so numerous that it should be certified.

5      There is also a lot of language in the opinion about

6  the importance of being able to tell who is in the class, and

7  this is -- again, we would not use the language ascertainable,

8  that's not a part of the rule, but you do have to know who is

9  bound and you do have to know what gets notice and you do have

10  to know what discovery looks like.  And there are some very

11  practical reasons.

12      So I'll hand those up at the end of my remarks.  But

13  we would submit that the current class definition, I can't tell

14  who is in this class and I haven't heard any of that from

15  plaintiffs.  I think Your Honor's confusion about whether there

16  is 40 or 4,000 members in the proposed class is telling,

17  because the plaintiffs can't put a number on it because they

18  can't tell who is in the class.

19      The definition says "have experienced and will

20  continue to experience defendant's failure to provide safe,

21  reliable and appropriate transportation."  What does that mean?

22  They have insisted throughout that it's a clear, common

23  question warranting a clear, common injunction, but even in her

24  arguments today I heard Ms. Warner mention six separate buckets

25  of common questions, which is new and telling.  Some of them

1    were not raised in the due process hearing.

2         So she talked about timeliness.  There is a lot of

3    emphasis on routing, which Ms. Warner explained the problem as

4    being children on the bus for hours.  There is no hearing

5    officer decision about children being on the bus for hours.

6    There is no argument about why that's a FAPE or what it has to

7    do with their IDEA violation.

8         Without going through each point again, plaintiffs

9    have a lot of concerns about the system, but they are not

10   uniform, systematic common concerns, and they have not

11   described a class that could be usefully adjudicated.

12        In reading through all of the cases on commonality, *In

13   Re Wright* says it can't be 30,000 feet, and it's really more

14   art than science, isn't it?  Like what is the right level of

15   generality, and I think one way to look at it is to read

16   through their questions and their proposed proof and ask, okay,

17   what's the plan for litigation here, what happens tomorrow,

18   what kinds of records are we going to request and how is that

19   going to come back and what's the question we're sending to the

20   jury.

21        And when I read through their questions, and I won't

22   take up all the time, but it sounds like they are starting at

23   zero.  Their common questions are, are defendants violating the

24   law, are there practices that deny children a FAPE, and are

25   there records that prove that.  That is not a class that is

1    ready to be certified.

2          I have more to say, but I would rather hear your

3    questions.

4          THE COURT:  I don't have very many questions.  I mean,

5    I obviously know what I have got to think about.  You have made

6    the point, again, that the named plaintiffs have gotten what

7    they have asked for and that that goes to typicality, among

8    other things.

9          And I guess the issue is on systemic violations.  I

10   mean, there could -- let me ask it this way:

11         If every named plaintiff has gotten all of the relief

12   that they asked for, could there still be a class certified, or

13   does at least one named plaintiff still have to be out there

14   uncompensated completely, hypothetically?

15         MS. KELLEY:  Yes.  I think *In Re Wright* speaks to

16   this, and I can pull up the quote, but, yes, of course, there

17   must be a plaintiff who needs relief.

18         THE COURT:  A named plaintiff?

19         MS. KELLEY:  A named plaintiff.

20         THE COURT:  For example, in this case, we have

21   declarations from the five named plaintiffs, but we also have

22   declarations from another 15 or 20 parents.  If I went through

23   all of those declarations and/or the hearing officer

24   determinations with respect to them and found some that haven't

25   been compensated, is the law that the class cannot be certified

1   because it must be a named plaintiff?

2          You don't have to answer that right now, because I

3   don't know whether *In Re Wright* says it or there are other

4   cases that have been cited I think by one or both sides on that

5   question.

6          MS. KELLEY:  So I would be happy to submit -- I don't

7   like volunteering to do more work, but if that is --

8          THE COURT:  Why don't you do that.  It may not take

9   much more work, because, we're all tired, it may already be in

10  your brief or it may be in some of the cases that you have

11  cited in your brief.  I have read the briefs and I just can't

12  remember off the top of my head if that's answered.

13         So it's kind of a bifurcated question.  One is if all

14  of the named plaintiffs have gotten the specific relief that

15  they have asked for, do the plaintiffs lose in their request

16  for class certification?

17         And then the second part of it, and it goes to what we

18  spent a lot of time arguing about earlier and Ms. Warner has

19  talked about again is, yes, but what if one of the declarations

20  of a named plaintiff also talks about systemic relief.

21         Your argument earlier was, well, they don't get

22  systemic relief for a variety of reasons, one of which is they

23  never asked for it, in your view, in the way that the

24  plaintiffs have now characterized the systemic relief as very

25  broad.  And I suspect that you would argue that they have

characterized the systemic relief as equally or even broader

for the alleged 4,000 -- everybody agrees there are 4,000

people transported roughly, but they are saying all of those

are the class and there is systemic relief.

And you would say, A, systemic relief as we understand

systemic relief in the 24 declarations, let alone all of the

assertions of systemic relief in the arguments for class.  I

don't want to put words in your mouth, but I think that flows

from what you said earlier, although you may want to put some

of that in writing with some cases that may already be in the

brief somewhere.

MS. KELLEY:  Yes, I don't think so.  And on the first

question, if all the plaintiffs already have -- like if all the

plaintiffs have complete relief, do they lose on class?  I will

cite you some more cases including *In Re Wright* here, but, yes,

even as a basic matter of standing, which we haven't raised, I

know for sure we have had many cases where if none of the named

plaintiffs have standing for injunctive relief, it does not go

forward.  And it's very similar.

I think the typicality and adequacy prongs get to the

same question, like do these people have a sufficient interest

alignment to go forward.  On the question of systemic relief,

yeah, you know, certainly at the class stage you're not also

considering the merits, and it's a little muddled because of

the PI.  I want to be very clear, even if a class is certified,

1    in order to get immediate preliminary relief, they have to meet

2    the higher evidentiary standard.  They have come nowhere close

3    to that.

4            THE COURT:  I am viewing this as two totally separate

5    questions we have been arguing today.

6            MS. KELLEY:  A couple of things I have to say.

7    Ms. Warner quoted from *D.L.* and noted that the DC Circuit has

8    said (b)(2) is satisfied if there is an increased opportunity

9    for the class members to get the benefit they seek.  Yes.

10   *Brown* says that as well.

11           But on the other side of the scale, all of the cases

12   about the basic rules of equitable relief, including *Califano*

13   *versus Yamasaki*, which we cited, you can't just blunderbuss

14   relief.  It has to be narrowly tailored to the legal violations

15   shown, and, even if doing something might help 4,000 children,

16   they still need to define a class at the end of the day where

17   they can show they suffered legal violations.

18           This proposed class is not like *D.L.*, because in order

19   to show that any individual class member has been denied a

20   FAPE, you will need to look very specifically, well, how many

21   times did the bus arrive late, how late was it, was that child

22   even on the bus that day, because I think we can take judicial

23   notice of the fact that kids don't go to school every day and

24   the parties agree that the standard for IDEA is basically a

25   ratio, right.  What's the number of services you should have

1    provided and how often did you do it?

2          So in an individual case, it's not even enough to look

3    just at the busing data, you to have look at the student's

4    attendance.  It's extremely individualized, and how they

5    propose to prove that for 4,000 kids, I don't know.

6          Ms. Warner also put a lot of emphasis on routing.  She

7    seemed very, very sure that this case is really about routing.

8    It's about routing.  And I would ask what in the record makes

9    Ms. Warner so sure of that.  I can find nothing that shows the

10   problem is routing.

11         She also expressed a lot of concern about private

12   contractors.  Again, what in the record shows that that is a

13   problem?  Nothing.

14         With respect to the (b)(3) class, she cited to *Coleman*

15   and said, quote, from that case, "individual damages awards are

16   often formulaic."  Sure.  That's not this case.  That is --

17   it's just very not this case.  I'm looking for the right

18   adjective here, but, again, the DC Circuit is very clear when

19   we're talking about compensatory education it's bespoke.  They

20   specifically rejected what they called the mechanical approach.

21         In *Reid*, the district judge in that case -- the

22   District said he missed 180 days of school, so give him one

23   hour for each day, and the plaintiff said, well, no, give him

24   eight hours for each day, and the district judge had to pick

25   between them.  And the DC Circuit said you can't do any of

1  that, you can't just pick a number.  You have to consider

2  exactly what it takes to put that child back in the place where

3  they should have been educationally.

4       So this isn't at all like *Coleman*, and this is not

5  appropriate for (b)(3).

6       I think you're ready to go, so are there any other

7  questions you have for me on this?

8       THE COURT:  No.  I'm done for the moment.  I'm done

9  for today, I think.

10      MS. KELLEY:  Can you give me one second and ask folks

11  at the table --

12      THE COURT:  Talk to your colleagues and see if there

13  is anything else you want to say.  Hand us the cases.

14      MS. KELLEY:  I'm going to hand these cases to

15  plaintiffs.

16      THE COURT:  And to us.  Thank you.

17   (Pause)

18      MS. KELLEY:  Your Honor asked if the District could

19  provide additional information about the timing of the routing

20  system, and OSSE is willing to do so.  We don't have it today,

21  but we can provide something in writing with an update maybe by

22  next week.

23      THE COURT:  That's fine.  I want to raise some other

24  things after Ms. Warner sits down with both of you about what

25  we're going to do next.

1         MS. KELLEY:  Okay.  Thank you.

2         MS. WARNER:  No forward looking relief was granted in

3    the proceedings at the due process hearings.

4         And the issue here I think legally is whether the

5    concerns are capable of repetition, but evading review, and

6    that is particularly applicable here.

7         I also would note, Your Honor, that the main

8    plaintiffs now have outstanding relief for violations since

9    their due process hearings.  Ms. Guerrero is one of the new

10   declarations that we'll be putting in this afternoon that lays

11   that out, so I think that goes directly to the arguments made

12   by the District.  Thank you.

13        THE COURT:  Okay.  Let me just review and then we

14   should leave.  So the plaintiffs are going to provide a

15   proposed order for class certification and/or revised proposed

16   order with respect to the preliminary injunction.

17        I would suggest that plaintiffs first find out whether

18   the defendants oppose the filing of the supplemental briefs.

19   You might be able to have a consent motion to let them be filed

20   and/or consent motion to let them be filed on the condition

21   they have some other filing they want to do.

22        I will be interested in having put on the docket,

23   Ms. Kelley, if it hasn't already been done, you talked about

24   the former superintendent having a colloquy with the city

25   council about these very matters and engaging in particular

1    with three council members.  Let's look at that testimony.  And

2    you can docket that.

3          I asked the question -- you just proposed that OSSE

4    could provide information about routing.  Is that what you were

5    proposing a minute ago, or was it about something else?

6          MS. KELLEY:  We are soliciting a new routing system

7    and new technology.

8          THE COURT:  There was some discussion about plans

9    going forward for the new school year and I asked whether those

10   plans with respect to new technology, with respect to routing,

11   with respect to a variety of things were in writing, and I

12   think you said no, but they could be, they could be put in

13   writing.  And I don't know what that is about, but what I

14   wanted to suggest is the following:

15         In addition to -- and then you're going to file

16   something supplemental on the matters we just discussed,

17   supplemental brief.  And the plaintiffs may want to respond to

18   that because it has to do with the questions I put to you about

19   class cert and systemic stuff and so forth.

20         If there are plans for the coming school year that are

21   in writing or could be put in writing concretely, concrete

22   plans instead of -- I said to you pejoratively, I don't want to

23   take all of this on faith, why don't you file it.  If it's

24   confidential you can file it under seal, but I want plaintiffs'

25   counsel to see it too, or if it's preliminary or whatever.

1          And then I would love to suggest, because I think that

2     there has been somewhat of a meeting of the minds here today,

3     believe it or not.  One is some acknowledgement on the part of

4     the District of violations of the statute.  It said it in the

5     briefs too, but it was very explicit today with the proffer

6     that things for the coming school year are quite a lot better

7     and they have plans in the works for that.

8          On the plaintiffs' side, I think that Ms. Banner

9     agreed, which is why you all were going to think about a

10    revised preliminary injunction proposed order, that 15 days is

11    a short time.  And without putting words in her mouth, she said

12    that a lot can be done to begin the process.  So what does a

13    revised order look like?

14         If you all talk to each other, if you all file this

15    stuff and collect this stuff and talk to each other, I think it

16    might be fruitful, given conversations that you could have, if

17    we had a status conference in two or three weeks.  And I'm very

18    unlikely on the current state of the record to rule on the

19    preliminary injunction motion any time soon.  That's why you

20    should talk to each other, one of the reasons you should talk

21    to each other.

22         And class certification, I think I need more -- I have

23    to think about that some more in view of some of Ms. Kelley's

24    arguments, which she will supplement.  I think if you begin or

25    continue some conversations, then maybe if we all got together

1  in two or three weeks, that might be fruitful and you could --

2  things that you will have filed on the record and/or

3  discussions you have, maybe there will be further narrowing of

4  the areas of dispute.  Maybe not, but maybe.

5      So that's my suggestion.  And today is the 11th.  The

6  week of the 22nd or the week of the 29th.  What do your

7  calendars look like, everybody?

8      MS. WARNER:  Your Honor, from the plaintiffs'

9  perspective, the week of the 22nd is better.

10      MS. KELLEY:  Same.

11      THE COURT:  You think you can make substantial

12  progress, file the stuff I want you to file and make some

13  progress on putting some of these plans for the future in

14  writing by the week of the 22nd?

15      MS. KELLEY:  I'm certain we can describe what is

16  already ongoing by then.  I can't say it is substantial

17  progress, but we will try with regard to talking.

18      THE COURT:  How is Friday, the 26th, to give everybody

19  a little more time?  How is the 23rd, which is a Tuesday?

20      MS. WARNER:  That's acceptable to the plaintiffs.

21      THE COURT:  Should we say 10:00 a.m. again?

22      MS. KELLEY:  I have a hearing at 9:00 a.m.  Maybe if

23  we set it at 11:00 a.m.

24      THE COURT:  You have a hearing at 9:00 a.m.

25      Would the afternoon of the 23rd be better for you or

1    first thing in the morning?

2            MS. KELLEY:  The afternoon is better.

3            THE COURT:  Do you want to say 2:00 p.m. on the 23rd?

4    All right.  Let's do that.  2:00 p.m. on Tuesday, the 23rd, and

5    hopefully progress -- in person.  I know somebody was on Zoom

6    today, and I don't know who that is or why, but we can make the

7    same accommodation I think.

8            So let's do that.  Thank you.

9        (Proceedings concluded at 12:46 p.m.)

10

11                        CERTIFICATE

12      I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
13   Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
14   record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
15   Judicial Conference of the United States.

16      Dated this 16th day of July, 2024.

17

18                        /s/ Sonja L. Reeves
                         SONJA L. REEVES, RDR-CRR
19                       FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

## $

**$10** [1] - 56:5

## '

**'25** [1] - 35:7

## /

**/s** [1] - 87:18

## 1

**1** [2] - 54:10, 54:12
**1,000** [1] - 47:13
**1.74** [1] - 48:14
**10** [1] - 55:7
**10.5** [3] - 35:8, 35:15, 35:19
**10:00** [1] - 86:21
**10:05** [2] - 1:11, 3:1
**11** [1] - 1:11
**11:00** [1] - 86:23
**11:32** [1] - 58:12
**11:52** [1] - 58:12
**11th** [1] - 86:5
**12** [2] - 12:11, 12:16
**12:46** [2] - 1:11, 87:9
**14** [1] - 11:5
**1415** [2] - 42:24, 43:18
**14th** [1] - 1:18
**15** [13] - 13:13, 13:18, 28:5, 28:8, 28:9, 28:22, 29:3, 31:23, 31:24, 38:7, 58:11, 77:22, 85:10
**15-day** [2] - 40:21, 62:13
**15-minute** [1] - 58:8
**16** [1] - 38:7
**16th** [1] - 87:16
**17** [1] - 7:18
**18** [3] - 13:3, 30:4, 48:10
**180** [1] - 81:22
**1:24-cv-00656-PLF** [1] - 1:5

## 2

**2** [1] - 48:12
**20** [6] - 7:17, 8:15, 42:24, 43:18, 69:5, 77:22
**20001** [2] - 1:24, 2:3
**20005** [2] - 1:15, 1:18
**2012** [1] - 12:17
**2015** [1] - 67:1
**2017** [1] - 66:24
**2019** [2] - 64:17, 66:24
**202** [3] - 1:15, 1:19, 2:4
**2020** [1] - 58:20
**2021** [3] - 50:23, 67:2, 74:7
**2022** [1] - 56:18
**2023** [5] - 17:4, 30:5, 33:14, 51:11, 74:10
**2024** [4] - 1:11, 17:4, 33:24, 87:16
**21st** [1] - 65:18
**22nd** [3] - 86:6, 86:9, 86:14
**23** [3] - 74:11, 74:24, 74:25
**23(b)(2** [4] - 64:21, 66:21, 72:9, 73:9
**23(b)(3** [2] - 67:14, 68:5
**23(b)(3)** [3] - 66:22, 67:5, 67:19
**23rd** [4] - 86:19, 86:25, 87:3, 87:4
**24** [1] - 79:6
**24-656** [1] - 3:2
**25** [1] - 69:5
**26th** [1] - 86:18
**28** [1] - 39:11
**28-1** [1] - 39:18
**29-1** [1] - 64:7
**29th** [1] - 86:6
**2:00** [1] - 87:3, 87:4

## 3

**3** [1] - 40:6
**3-28-24** [1] - 39:20
**30** [1] - 55:7
**30,000** [1] - 76:13
**31-7** [1] - 38:4
**319-1000** [1] - 1:19
**333** [1] - 1:24
**35-1** [1] - 47:17
**35-10** [1] - 50:6
**35-13** [1] - 51:2
**35-3** [2] - 33:22, 50:11
**35-6** [1] - 51:17
**35-8** [1] - 51:2
**35-9** [1] - 50:22

## 4

**4,000** [11] - 52:1, 52:6, 52:7, 64:5, 64:12, 71:22, 75:16, 79:2, 80:15, 81:5
**4-1** [1] - 55:4
**4-16** [3] - 39:10, 39:16, 39:21
**4-30** [1] - 49:10
**4-33** [1] - 49:14
**4-35** [1] - 49:20
**4-38** [1] - 51:10
**4-41** [1] - 50:1
**40** [4] - 52:8, 64:7, 64:9, 75:16
**400** [1] - 2:3
**4018285** [1] - 58:20
**438** [1] - 33:10
**450** [1] - 47:14
**47** [2] - 48:4, 48:11

## 5

**5** [5] - 35:14, 49:23, 59:19, 59:20, 59:21
**50,000** [1] - 48:7
**500** [1] - 1:14
**504** [9] - 9:15, 19:3, 21:9, 21:16, 21:22, 24:19, 26:25, 27:10, 43:20
**51,794** [1] - 48:11
**54** [1] - 55:6
**550** [1] - 47:19
**551** [1] - 48:10

## 6

**6** [1] - 50:5
**66** [1] - 38:10
**67** [1] - 38:17

## 7

**70** [1] - 56:11
**700** [2] - 1:18, 52:25
**724-7854** [1] - 2:4
**756-8228** [1] - 1:15

## 8

**8** [1] - 7:18
**86** [1] - 68:2

## 9

**90** [1] - 56:20
**905** [2] - 48:6, 48:12
**94** [5] - 12:3, 14:8, 14:12, 70:5, 70:7
**9:00** [2] - 86:22, 86:24

## A

**A.F** [5] - 8:15, 33:2, 33:3, 41:18, 41:23
**A.F.'s** [1] - 33:6
**a.m** [12] - 1:11, 3:1, 42:2, 49:23, 50:2, 50:12, 58:12, 86:21, 86:22, 86:23, 86:24
**abandoned** [1] - 26:5
**ability** [5] - 7:23, 19:17, 21:14, 65:19, 70:1
**able** [9] - 13:11, 31:18, 32:8, 53:25, 68:16, 71:9, 75:1, 75:6, 83:19
**above-entitled** [1] - 87:14
**absent** [1] - 59:19
**absentee** [1] - 12:5
**absolute** [1] - 70:16
**absolutely** [1] - 68:9
**accelerate** [1] - 56:6
**accept** [1] - 28:15
**acceptable** [1] - 86:20
**accepting** [1] - 4:18
**access** [14] - 7:23, 9:12, 9:17, 24:24, 25:1, 26:14, 26:18, 26:21, 27:8, 63:17, 64:14, 64:18, 66:19, 70:15
**accommodation** [1] - 87:7
**accommodations** [1] - 8:1
**accomplish** [1] - 15:11
**accordance** [1] - 18:4
**according** [2] - 33:13, 33:24
**accountable** [1] - 61:3
**accounts** [2] - 14:18, 33:14
**accurate** [4] - 12:8, 16:16, 57:6, 87:13
**accurately** [1] - 15:18
**achievable** [3] - 28:2, 68:11, 70:20
**achieve** [4] - 63:16, 64:21, 64:24, 66:4
**acknowledge** [1] - 9:19
**acknowledged** [1] - 12:23
**acknowledgement** [1] - 85:3
**Act** [10] - 9:14, 9:15, 9:16, 21:9, 21:17, 24:20, 27:1, 42:24
**acting** [1] - 53:24
**Action** [1] - 3:2
**action** [20] - 20:1, 40:18, 42:18, 42:21, 42:23, 43:19, 45:10, 45:17, 46:14, 58:6, 72:6
**actively** [2] - 55:11, 57:24
**activities** [1] - 10:18
**ADA** [8] - 21:9, 24:19, 24:20, 26:10, 26:22, 26:25, 42:10, 43:20
**adamantly** [1] - 53:12
**adaptive** [2] - 8:17, 61:25
**addition** [2] - 48:6, 84:15
**additional** [3] - 35:8, 35:19, 82:19
**address** [10] - 10:11, 21:8, 21:14, 24:7, 26:23, 56:15, 61:6, 62:21, 67:19, 71:19
**addressed** [7] - 21:20, 21:24, 33:6, 43:22, 45:25, 67:3, 67:20
**addresses** [3] - 37:5, 70:4, 70:13
**addressing** [1] - 32:24
**adequacy** [3] - 66:17, 74:12, 79:20
**adequate** [4] - 15:11, 17:20, 38:22, 74:20
**adequately** [1] - 71:7
**adhere** [1] - 12:8
**adjective** [1] - 81:18
**adjudicated** [1] - 76:11
**adjust** [1] - 30:9
**administrative** [9] - 17:5, 20:7, 20:9, 21:13, 22:2, 22:3, 22:7, 38:5, 60:16
**administrator** [1] - 53:19
**admit** [6] - 4:12, 5:17, 34:16, 48:16, 48:17, 72:25
**admits** [1] - 13:3
**Adrian** [1] - 53:11

**advocates** [1] - 6:24
**Affairs** [2] - 1:17, 3:22
**afternoon** [13] - 6:19, 9:1, 15:25, 16:9, 18:12, 18:17, 31:14, 31:15, 48:11, 70:8, 83:10, 86:25, 87:2
**afternoons** [1] - 9:5
**afterwards** [1] - 6:1
**age** [2] - 65:24, 69:24
**agency** [1] - 35:7
**aggrieved** [2] - 19:21, 42:12
**ago** [4] - 12:11, 12:16, 33:25, 84:5
**agree** [15] - 22:21, 23:15, 31:2, 33:4, 34:6, 36:12, 37:10, 47:3, 48:17, 55:8, 55:13, 55:16, 55:24, 80:24
**agreed** [5] - 53:6, 53:14, 54:9, 54:21, 85:9
**agreeing** [1] - 5:12
**agreement** [1] - 5:9
**agrees** [1] - 79:2
**ahead** [2] - 11:11, 22:13
**aide** [1] - 62:1
**aides** [2] - 7:25, 65:21
**air** [2] - 16:7, 28:9
**al** [2] - 1:4, 3:3
**Alexander** [1] - 30:23
**Alexandria** [1] - 54:20
**algorithm** [1] - 69:25
**alignment** [1] - 79:22
**aligns** [1] - 75:3
**alike** [1] - 10:2
**allegation** [1] - 34:9
**alleged** [2] - 34:12, 79:2
**allocated** [1] - 30:13
**allotted** [1] - 69:10
**allowed** [1] - 26:6
**alone** [1] - 79:6
**alternative** [1] - 20:14
**amended** [1] - 72:1
**America** [1] - 44:9
**Americans** [1] - 9:14
**amount** [2] - 34:3, 35:21
**amounts** [1] - 54:7
**ample** [2] - 40:23, 66:22
**analysis** [2] - 23:14,

40:11
**anecdotal** [1] - 57:4
**announced** [2] - 34:13, 35:8
**annoying** [1] - 36:23
**answer** [10] - 10:12, 11:12, 21:1, 24:18, 27:21, 29:4, 44:22, 53:18, 58:15, 78:2
**answered** [1] - 78:12
**answers** [1] - 64:15
**ante** [1] - 48:24
**anti** [1] - 22:23
**anti-discrimination** [1] - 22:23
**antidiscrimination** [2] - 21:8, 21:11
**apartment** [1] - 51:7
**apologetic** [1] - 25:15
**apologize** [1] - 7:15
**appear** [1] - 49:8
**appearances** [1] - 3:5
**appellate** [1] - 72:14
**applicable** [1] - 83:6
**appoint** [3] - 53:9, 53:16, 53:19
**appointed** [1] - 59:3
**appreciate** [1] - 7:14
**approach** [2] - 3:4, 81:20
**appropriate** [12] - 7:8, 8:1, 11:24, 27:19, 29:25, 38:13, 55:14, 64:1, 67:4, 73:7, 75:21, 82:5
**appropriately** [1] - 69:9
**approval** [1] - 32:3
**April** [2] - 33:24, 33:25
**Arc** [27] - 6:23, 10:15, 10:21, 10:22, 10:23, 11:18, 11:21, 11:22, 24:8, 24:11, 42:25, 43:3, 43:14, 43:18, 43:24, 44:23, 44:24, 45:4, 45:5, 45:17, 46:4, 46:16, 46:17, 58:17, 58:22
**Arc's** [2] - 11:13, 24:7
**areas** [1] - 86:4
**argue** [2] - 46:24, 78:25
**argued** [1] - 42:11
**arguing** [6] - 6:18, 43:14, 43:17, 78:18, 80:5

**argument** [16] - 19:10, 25:11, 25:15, 28:15, 36:20, 37:19, 42:5, 42:25, 46:14, 47:15, 58:7, 58:10, 67:9, 74:13, 76:6, 78:21
**arguments** [10] - 5:22, 20:14, 29:6, 67:20, 73:23, 74:11, 75:24, 79:7, 83:11, 85:24
**arise** [1] - 73:11
**Arlington** [1] - 54:20
**arrival** [1] - 49:9
**arrive** [12] - 8:11, 10:8, 15:17, 15:22, 15:24, 31:12, 45:24, 51:4, 55:7, 66:2, 70:7, 80:21
**arrived** [3] - 12:2, 36:10, 65:10
**arrives** [3] - 7:24, 8:1
**arriving** [6] - 15:20, 48:18, 50:12, 50:25, 59:14, 61:23
**art** [1] - 76:14
**Article** [3] - 43:6, 45:11, 46:4
**ascertainable** [1] - 75:7
**ASL** [6] - 9:3, 9:4, 34:1, 34:5, 34:8, 34:9
**asserted** [2] - 12:11, 58:24
**assertions** [1] - 79:7
**associate** [1] - 3:13
**associates** [1] - 3:14
**association** [2] - 43:16, 44:10
**association's** [1] - 45:22
**associational** [11] - 11:10, 24:9, 43:4, 43:9, 43:12, 44:4, 45:6, 45:14, 45:19, 46:22, 58:22
**associations** [1] - 44:4
**Associations** [1] - 44:14
**assuming** [2] - 29:5, 58:6
**attempt** [4] - 9:21, 21:4, 21:5, 21:23
**attempts** [1] - 59:16
**attendance** [1] - 81:4
**attendant** [3] - 48:21, 50:7, 61:21
**attendants** [1] - 7:25,

12:21
**attending** [1] - 7:3
**attorney** [1] - 51:20
**Attorney** [2] - 2:1, 4:4
**audience** [1] - 3:24
**August** [8] - 35:9, 36:4, 36:5, 51:11, 56:9, 56:17, 57:5, 57:10
**authority** [4] - 17:13, 19:12, 20:25, 31:3
**autism** [2] - 8:15, 14:23
**autistic** [1] - 15:4
**automatic** [1] - 66:4
**availability** [1] - 8:10
**available** [2] - 22:3, 34:8
**Avenue** [1] - 1:24
**avoid** [1] - 73:10
**awaiting** [1] - 57:25
**award** [1] - 68:1
**awards** [1] - 81:15

**B**

**b)(2** [1] - 80:8
**b)(3** [1] - 81:14
**b)(3)** [1] - 82:5
**B.D** [1] - 37:17
**B.R.C** [1] - 41:21
**background** [1] - 54:25
**backpacks** [1] - 16:8
**BANNER** [28] - 1:17, 3:20, 6:16, 7:15, 8:20, 10:20, 10:25, 11:5, 11:12, 11:23, 13:15, 14:11, 15:15, 17:23, 18:1, 19:5, 19:13, 21:2, 21:19, 22:14, 22:20, 25:8, 25:17, 29:9, 30:22, 32:19, 58:13, 62:15
**Banner** [2] - 3:20, 6:21
**banner** [17] - 32:24, 33:2, 33:9, 33:20, 34:2, 34:14, 36:6, 36:16, 37:20, 41:5, 41:17, 42:25, 52:16, 58:8, 65:15, 68:14, 85:8
**based** [2] - 6:23, 61:15
**basic** [2] - 79:16, 80:12
**basis** [6] - 9:23, 24:9, 24:22, 60:14, 63:23

**battery** [1] - 42:16
**became** [1] - 3:8
**becomes** [1] - 22:18
**Becton** [1] - 54:22
**BEFORE** [1] - 1:10
**began** [1] - 32:25
**begin** [4] - 28:16, 36:3, 85:12, 85:24
**beginning** [4] - 10:15, 28:18, 56:17, 70:22
**begins** [3] - 56:25, 57:20, 70:20
**behalf** [5] - 1:3, 3:22, 24:4, 58:23, 60:10
**believable** [1] - 71:5
**below** [2] - 38:2, 40:22
**benchmarks** [1] - 12:12
**benefit** [1] - 80:9
**benefits** [3] - 24:24, 64:25, 65:13
**bespoke** [1] - 81:19
**best** [8] - 17:1, 30:10, 30:15, 31:2, 55:4, 55:23, 61:7, 61:8
**BETH** [1] - 2:2
**better** [14] - 12:24, 13:1, 13:4, 16:25, 32:10, 34:16, 34:19, 57:5, 70:23, 85:6, 86:9, 86:25, 87:2
**between** [5] - 5:21, 21:22, 35:2, 45:11, 81:25
**beyond** [1] - 40:3
**bifurcated** [1] - 78:13
**big** [4] - 29:10, 47:13, 48:6, 49:14
**bigger** [1] - 73:14
**bit** [4] - 7:13, 19:15, 23:21, 24:8
**blindness** [1] - 72:16
**blunderbuss** [1] - 80:13
**board** [1] - 62:3
**book** [2] - 72:10, 72:11
**books** [1] - 22:6
**bothering** [1] - 70:25
**bottom** [1] - 74:24
**bound** [1] - 75:9
**breadth** [1] - 62:12
**break** [6] - 5:21, 5:24, 6:2, 32:21, 58:3, 58:8
**breakdown** [2] -

63:12, 63:13
**breakfast** [1] - 25:24
**brief** [6] - 5:3, 58:14,
78:10, 78:11, 79:11,
84:17
**briefing** [8] - 34:15,
42:3, 42:14, 45:7,
47:15, 52:12, 57:22,
74:8
**briefings** [1] - 47:13
**briefly** [5] - 22:14,
23:4, 24:7, 53:4, 56:8
**briefs** [6] - 4:22,
11:13, 18:23, 36:18,
58:19, 71:17, 78:11,
83:18, 85:5
**bring** [19] - 15:23,
21:5, 22:11, 42:16,
42:19, 43:4, 43:10,
43:18, 43:19, 43:20,
43:21, 43:24, 44:5,
44:10, 44:14, 45:12,
58:22, 69:6
**bringing** [1] - 30:16
**broad** [2] - 28:3,
47:10, 78:25
**broader** [2] - 41:20,
79:1
**broke** [1] - 52:24
**brought** [3] - 17:5,
19:14, 21:12
**brown** [1] - 80:10
**Brown** [2] - 64:17,
66:24
**buckets** [1] - 75:24
**budget** [7] - 4:13,
30:13, 34:23, 35:8,
58:1, 68:20, 69:11
**burden** [6] - 36:8,
37:15, 46:9, 47:8,
62:5, 71:7
**burdening** [1] -
67:10
**burdens** [1] - 16:3
**burdensome** [1] -
16:6
**bus** [37] - 7:4, 8:12,
8:25, 9:4, 9:5, 14:15,
14:16, 14:20, 14:25,
16:17, 26:3, 31:12,
31:13, 48:19, 48:20,
48:25, 49:20, 50:7,
50:12, 51:3, 51:4,
51:7, 51:19, 52:24,
55:16, 61:18, 61:21,
62:1, 62:3, 65:21,
70:9, 76:4, 76:5,
80:21, 80:22
**buses** [32] - 8:5,
12:22, 14:11, 14:14,

15:4, 15:9, 15:10,
15:11, 15:20, 15:22,
16:9, 28:7, 28:9,
28:25, 37:3, 45:24,
48:16, 50:25, 52:16,
52:20, 52:25, 53:22,
53:23, 54:11, 54:12,
54:14, 55:15, 59:13,
61:15, 61:22, 65:16
**busing** [3] - 7:4,
31:1, 81:3
**buy** [5] - 16:7, 28:7,
54:11, 54:12, 54:13
**BY** [3] - 1:14, 1:17,
2:2

## C

**C.S** [1] - 8:24
**calculations** [1] -
67:25
**calendars** [1] - 86:7
**Califano** [1] - 80:12
**callouts** [1] - 13:8
**cancellations** [1] -
10:4
**candidate** [1] - 68:5
**Cannon** [1] - 18:2
**Cannon-Clark** [1] -
18:2
**cannot** [5] - 8:4,
14:3, 37:6, 43:18,
77:25
**capabilities** [1] -
12:17
**capable** [1] - 83:5
**Capitol** [1] - 1:14
**care** [1] - 54:1
**careers** [1] - 16:5
**caregivers** [2] - 6:22,
7:17
**Carol** [1] - 4:6
**Caroline** [1] - 44:1
**carried** [1] - 46:9
**carry** [1] - 47:8
**case** [47] - 3:8, 3:15,
6:21, 7:7, 11:8, 11:25,
17:4, 19:13, 20:18,
20:21, 21:17, 21:25,
22:4, 22:22, 23:20,
24:18, 26:20, 30:24,
37:13, 37:17, 43:7,
44:8, 45:8, 45:12,
45:23, 46:17, 46:25,
54:2, 58:18, 58:21,
62:25, 64:9, 64:17,
66:24, 67:1, 67:4,
67:20, 73:8, 77:20,
81:2, 81:7, 81:15,
81:16, 81:17, 81:21

**CASE** [1] - 1:5
**cases** [27] - 17:10,
17:18, 18:1, 19:22,
20:3, 42:15, 43:2,
43:5, 44:12, 44:15,
45:9, 57:5, 58:17,
58:18, 67:2, 67:11,
73:10, 73:25, 76:12,
78:4, 78:10, 79:10,
79:15, 79:17, 80:11,
82:13, 82:14
**causes** [1] - 56:19
**causing** [2] - 10:4,
48:24
**cautioned** [1] - 9:25
**CDL** [1] - 34:7
**center** [1] - 16:10
**central** [2] - 34:12,
37:12
**century** [1] - 65:18
**cert** [1] - 84:18, 86:15
**certain** [3] - 18:21,
64:18, 86:15
**certainly** [3] - 37:11,
47:9, 79:23
**CERTIFICATE** [1] -
87:11
**certification** [16] -
6:19, 51:23, 58:10,
62:18, 62:20, 64:1,
64:11, 67:3, 68:2,
71:10, 71:15, 71:16,
73:18, 78:16, 83:15,
85:22
**certified** [7] - 12:6,
49:6, 75:4, 77:1,
77:12, 77:25, 79:25
**Certified** [1] - 1:23
**certify** [1] - 87:13
**cetera** [4] - 39:3,
40:8, 47:14, 52:21
**chains** [1] - 16:15
**challenge** [2] -
40:12, 44:15
**challenged** [1] -
45:15
**challenging** [1] -
23:2
**chance** [2] - 29:18,
32:11
**change** [1] - 55:24
**changed** [1] - 57:9
**changes** [12] - 17:6,
17:14, 19:7, 20:6,
20:15, 20:24, 28:18,
30:18, 31:4, 59:12,
61:8, 61:10
**chapter** [1] - 72:17
**chapters** [1] - 72:20
**characterized** [2] -

78:24, 79:1
**Charles** [1] - 67:2
**charter** [1] - 7:19
**Chelsea** [1] - 3:23
**child** [15] - 1:4, 8:2,
14:23, 20:2, 33:11,
33:18, 33:23, 40:9,
49:15, 49:25, 50:22,
65:11, 65:12, 80:21,
82:2
**child's** [1] - 31:14
**children** [31] - 8:5,
15:6, 16:13, 17:7,
17:8, 20:3, 20:16,
39:2, 39:4, 40:17,
46:12, 52:1, 52:5,
54:4, 54:5, 56:22,
65:8, 65:16, 65:25,
66:12, 69:3, 69:13,
69:16, 69:21, 70:7,
70:9, 70:23, 76:4,
76:5, 76:24, 80:15
**children's** [1] - 16:8
**choices** [1] - 13:24
**Chris** [1] - 3:13
**chronically** [1] -
59:19
**circle** [2] - 25:25,
65:12
**circuit** [2] - 19:15,
73:25
**Circuit** [13] - 11:8,
22:17, 37:13, 37:17,
58:21, 66:23, 74:7,
74:10, 74:23, 80:7,
81:18, 81:25
**cite** [4] - 43:2, 44:11,
58:20, 79:15
**cited** [11] - 43:5,
43:24, 52:22, 57:22,
58:19, 59:15, 74:7,
78:4, 78:11, 80:13,
81:14
**city** [1] - 83:24
**Civil** [3] - 1:16, 3:2,
3:21
**civil** [1] - 73:10
**claim** [15] - 37:14,
38:5, 40:13, 42:16,
43:1, 43:18, 43:20,
43:21, 43:24, 44:10,
45:13, 45:21, 68:4,
74:4
**claims** [34] - 19:13,
19:14, 19:23, 21:3,
21:5, 21:8, 21:9,
21:12, 21:16, 21:22,
22:1, 22:7, 22:11,
22:23, 24:4, 24:5,
24:19, 37:21, 37:23,

37:24, 40:25, 42:11,
42:13, 42:20, 43:4,
43:5, 43:19, 44:5,
45:16, 58:22, 68:6,
73:11, 73:14
**Clark** [4] - 3:17, 3:18,
7:2, 18:2
**CLARK** [1] - 3:19
**class** [77] - 4:20,
6:19, 20:1, 40:18,
41:19, 46:14, 49:3,
49:6, 49:8, 49:18,
50:19, 50:21, 51:23,
51:25, 52:8, 52:10,
52:13, 55:20, 58:6,
58:9, 62:18, 62:20,
63:1, 63:20, 64:1,
64:2, 64:7, 64:10,
64:20, 64:24, 66:21,
67:3, 67:22, 68:2,
68:4, 68:5, 71:10,
71:15, 71:16, 71:18,
71:25, 72:6, 73:18,
73:22, 74:9, 74:16,
74:19, 74:22, 74:25,
75:1, 75:2, 75:4, 75:6,
75:13, 75:14, 75:16,
75:18, 76:11, 76:25,
77:12, 77:25, 78:16,
79:4, 79:7, 79:14,
79:23, 79:25, 80:9,
80:16, 80:18, 80:19,
81:14, 83:15, 84:19,
85:22
**clear** [22] - 11:24,
19:15, 21:10, 28:1,
34:19, 37:10, 49:4,
49:7, 51:22, 57:24,
62:24, 66:13, 67:8,
68:10, 69:7, 70:19,
74:23, 74:25, 75:22,
75:23, 79:25, 81:18
**clearly** [3] - 26:21,
69:4, 72:6
**CLERK** [1] - 3:2
**client** [1] - 60:10
**clients** [19] - 4:19,
7:1, 7:2, 14:19, 18:5,
18:13, 19:6, 19:7,
22:2, 22:25, 24:2,
25:21, 28:23, 59:1,
60:15, 61:22
**clients'** [1] - 59:17
**close** [1] - 80:2
**closely** [1] - 44:21
**co** [1] - 3:8
**co-counsel** [1] - 3:8
**coincidence** [1] -
41:23
**Coleman** [5] - 50:6,

67:1, 67:20, 81:14, 82:4
**collaborate** [2] - 68:19, 68:24
**collaborations** [1] - 17:2
**collaboratively** [1] - 31:3
**colleagues** [3] - 28:22, 67:1, 82:12
**collect** [1] - 85:15
**colloquy** [1] - 83:24
**COLUMBIA** [2] - 1:1, 1:7
**Columbia** [7] - 2:1, 3:3, 4:3, 4:9, 19:25, 63:15, 87:13
**Colwill** [1] - 4:4
**COLWILL** [1] - 2:2
**coming** [7] - 14:2, 16:11, 29:19, 32:1, 54:3, 84:20, 85:6
**comment** [1] - 61:11
**commentary** [1] - 32:9
**comments** [1] - 62:11
**Commission** [1] - 11:9
**Committee** [2] - 1:16, 3:21
**common** [13] - 62:24, 64:15, 67:7, 68:3, 68:7, 71:8, 73:11, 73:14, 75:22, 75:23, 75:25, 76:10, 76:23
**commonality** [4] - 64:15, 65:6, 65:20, 76:12
**communicate** [3] - 9:3, 9:4, 16:17
**communication** [6] - 12:9, 16:16, 17:2, 49:21, 65:24
**communications** [2] - 31:10, 36:18
**Communications** [1] - 11:8
**communities** [1] - 26:9
**companies** [1] - 69:15
**compensated** [1] - 77:25
**compensation** [1] - 41:11
**compensatory** [5] - 17:17, 41:12, 67:22, 68:6, 81:19

**competing** [2] - 19:22, 54:18
**complain** [1] - 51:3
**complains** [2] - 36:16, 51:11
**complaint** [5] - 33:6, 38:25, 39:8, 50:24, 60:18
**complaints** [6] - 22:8, 33:12, 40:17, 51:15, 60:12, 60:17
**complete** [1] - 79:14
**completely** [4] - 47:3, 68:9, 75:3, 77:14
**complex** [1] - 51:7
**compliance** [2] - 45:24, 59:18
**complicated** [1] - 37:20
**complications** [1] - 8:25
**comply** [1] - 17:19
**complying** [1] - 54:3
**computer** [2] - 65:18, 69:24
**computers** [1] - 66:3
**concede** [1] - 34:17
**concept** [1] - 74:22
**concern** [2] - 68:9, 81:11
**concerning** [5] - 4:13, 14:6, 16:12, 34:9, 40:13
**concerns** [3] - 76:9, 76:10, 83:5
**concluded** [2] - 12:3, 87:9
**concrete** [4] - 32:25, 60:24, 61:5, 84:21
**concretely** [1] - 84:21
**condition** [2] - 28:9, 83:20
**conference** [1] - 85:17
**Conference** [1] - 87:15
**confidential** [1] - 84:24
**conformance** [1] - 87:14
**confused** [1] - 45:7
**confusion** [1] - 75:15
**consent** [5] - 5:7, 5:18, 12:12, 83:19, 83:20
**consider** [5] - 5:13, 5:15, 37:18, 62:14, 82:1

**considered** [1] - 59:19
**considering** [1] - 79:24
**consistency** [2] - 20:5, 69:15
**consistent** [7] - 7:21, 9:23, 18:3, 38:13, 38:23, 49:21, 59:13
**consistently** [1] - 59:14
**Constitution** [1] - 1:24
**consult** [2] - 58:2, 61:9
**consultants** [1] - 13:23
**context** [2] - 25:16, 74:4
**contingency** [1] - 31:13
**continue** [4] - 46:24, 46:25, 75:20, 85:25
**continued** [2] - 18:11, 18:14
**continuing** [1] - 60:13
**contractors** [4] - 69:9, 69:11, 69:12, 81:12
**contracts** [2] - 28:11, 31:17
**convenience** [1] - 33:10
**conversation** [4] - 32:24, 35:1, 52:15
**conversations** [5] - 30:22, 30:25, 31:1, 85:16, 85:25
**convince** [1] - 37:15
**core** [1] - 15:17
**correct** [2] - 3:9, 17:23
**cost** [4] - 16:21, 36:17, 67:17
**costs** [1] - 16:4
**council** [4] - 34:23, 35:2, 83:25, 84:1
**counsel** [7] - 3:4, 3:8, 3:22, 4:5, 4:24, 63:6, 84:25
**County** [2] - 54:19, 58:20
**couple** [7] - 8:14, 18:6, 43:2, 54:13, 58:14, 73:24, 80:6
**course** [13] - 9:8, 10:12, 16:12, 16:23, 18:7, 19:21, 32:4, 43:7, 58:14, 58:23,

59:23, 72:20, 77:16
**COURT** [94] - 1:1, 3:6, 3:10, 3:18, 4:1, 4:7, 5:4, 5:12, 5:20, 6:10, 6:13, 7:13, 8:19, 10:14, 10:24, 11:2, 11:7, 11:21, 13:12, 14:10, 14:22, 17:15, 17:24, 18:20, 19:10, 20:13, 21:15, 22:13, 22:16, 25:6, 25:10, 27:23, 30:20, 32:18, 32:20, 33:21, 35:11, 35:14, 35:16, 35:19, 36:3, 39:9, 39:11, 39:14, 39:18, 39:20, 39:22, 41:1, 42:9, 42:22, 43:9, 44:3, 45:4, 46:6, 48:13, 49:17, 50:15, 52:4, 52:8, 53:5, 56:22, 57:11, 58:4, 62:10, 62:17, 64:6, 65:3, 67:12, 71:12, 71:15, 71:17, 71:20, 71:24, 72:4, 72:10, 73:3, 73:19, 77:4, 77:18, 77:20, 78:8, 80:4, 82:8, 82:12, 82:16, 82:23, 83:13, 84:8, 86:11, 86:18, 86:21, 86:24, 87:3, 87:19
**court** [7] - 7:14, 9:10, 19:24, 24:6, 27:17, 44:9, 54:9
**Court** [31] - 1:23, 3:1, 4:18, 4:22, 9:25, 11:14, 21:10, 21:19, 21:24, 22:17, 27:15, 32:17, 40:4, 50:13, 53:20, 59:6, 61:2, 62:19, 62:22, 63:3, 63:8, 64:3, 68:10, 68:17, 68:25, 69:19, 70:19, 72:21, 87:12, 87:12
**Court's** [8] - 21:21, 22:10, 25:8, 27:20, 32:24, 33:10, 40:3, 68:9
**courthouse** [1] - 7:6
**courts** [4] - 27:17, 72:14, 73:10
**create** [1] - 31:7
**crisis** [5] - 30:17, 53:5, 53:9, 53:25, 54:22
**criteria** [1] - 11:9
**critical** [3] - 8:7, 10:5, 32:14

**criticizing** [1] - 72:20
**CRR** [1] - 87:18
**cry** [1] - 12:13
**CRYSTAL** [1] - 1:3
**Crystal** [1] - 3:2
**current** [4] - 27:9, 49:12, 75:13, 85:18
**cycle** [2] - 28:19, 58:1
**cyclical** [1] - 59:9

**D**

**D.L** [5] - 19:25, 66:24, 73:7, 80:7, 80:18
**D.R** [2] - 1:4, 41:21
**Daggett** [6] - 18:2, 18:10, 38:6, 47:17, 47:18, 47:24
**daily** [1] - 63:22
**damage** [1] - 67:25
**damages** [3] - 67:23, 67:24, 81:15
**data** [12] - 12:20, 17:2, 23:7, 30:9, 32:13, 32:14, 32:17, 47:12, 48:4, 59:15, 61:16, 81:3
**date** [3] - 49:24, 54:13, 54:14
**Dated** [1] - 87:16
**dated** [1] - 39:20
**dating** [1] - 72:3
**daughter** [2] - 8:24
**DAVID** [1] - 2:2
**David** [5] - 3:17, 4:4, 53:13, 53:14, 53:17
**Davis** [8] - 8:23, 33:9, 33:11, 33:12, 41:18, 51:10, 51:14, 60:10
**Davis'** [1] - 33:18
**Davis-Smith** [2] - 51:10, 51:14
**days** [17] - 13:13, 13:18, 26:4, 28:5, 28:8, 28:9, 28:22, 29:3, 31:23, 31:24, 48:4, 48:11, 50:5, 54:4, 54:5, 81:22, 85:10
**DC** [23] - 1:12, 1:15, 1:18, 1:24, 2:3, 9:15, 11:8, 18:8, 21:9, 21:16, 22:17, 24:20, 26:25, 37:12, 37:17, 59:18, 66:22, 66:23, 74:10, 74:23, 80:7, 81:18, 81:25

**DCPS** [3] - 4:9, 7:19, 49:25
**DDC** [1] - 66:25
**deaf** [2] - 9:3, 33:23
**deal** [9] - 6:7, 20:24, 20:25, 46:21, 65:18, 69:23, 69:25, 70:5, 72:16
**dealing** [5] - 20:1, 21:11, 60:14, 63:10, 72:16
**dealt** [1] - 66:9
**debate** [1] - 46:15
**decades** [1] - 72:17
**decide** [1] - 46:18
**deciding** [1] - 37:13
**decision** [12] - 6:12, 21:25, 39:24, 39:25, 40:4, 41:11, 46:4, 66:25, 74:7, 74:10, 76:5
**decisions** [7] - 21:3, 27:20, 36:12, 36:22, 37:11, 37:19, 42:4
**declarant** [7] - 33:9, 49:10, 49:14, 49:20, 50:1, 50:6, 50:11
**Declarant** [3] - 33:20, 51:10, 51:17
**declarants** [5] - 11:18, 14:19, 37:2, 41:18, 60:9
**Declarants** [1] - 51:2
**declaration** [27] - 4:12, 8:23, 10:21, 12:18, 13:8, 18:10, 24:15, 30:12, 30:24, 32:6, 33:10, 33:13, 33:15, 33:24, 34:1, 35:6, 35:11, 35:16, 44:17, 47:17, 48:3, 48:4, 48:9, 49:13, 51:15, 59:23, 68:21
**declarations** [43] - 4:19, 4:20, 5:1, 5:2, 5:5, 5:11, 5:13, 5:14, 5:16, 5:19, 6:15, 7:17, 7:21, 8:15, 8:19, 8:21, 11:17, 16:20, 16:24, 18:16, 23:9, 23:13, 24:14, 26:16, 29:6, 31:19, 44:20, 44:22, 49:3, 49:8, 50:19, 51:24, 52:2, 59:13, 60:12, 66:13, 69:5, 77:21, 77:22, 77:23, 78:19, 79:6, 83:10
**decree** [1] - 12:12
**dedicated** [1] - 36:1
**Defendant** [1] - 1:8

**DEFENDANT** [1] - 2:1
**defendant** [2] - 4:3, 6:2
**defendant's** [1] - 75:20
**defendants** [7] - 10:6, 22:21, 25:3, 26:12, 26:14, 76:23, 83:18
**deficiencies** [1] - 64:16
**deficiency** [1] - 63:24
**define** [1] - 80:16
**defined** [2] - 75:2
**definition** [2] - 75:13, 75:19
**delay** [7] - 29:12, 47:22, 47:23, 47:25, 48:12, 48:25, 59:16
**delayed** [8] - 8:25, 16:6, 16:9, 25:22, 26:3, 47:21, 48:6, 48:17
**delays** [8] - 10:3, 18:18, 31:11, 47:14, 48:24, 56:19, 62:9
**deliver** [2] - 39:2, 63:14
**delivering** [2] - 14:20, 63:19
**delivery** [1] - 66:15
**demand** [2] - 73:12, 73:14
**demonstrate** [1] - 71:7
**demonstrates** [2] - 10:2, 59:21
**denial** [4] - 33:4, 38:10, 38:17, 42:1
**denied** [6] - 17:12, 27:3, 27:8, 40:20, 80:19
**deny** [1] - 76:24
**denying** [2] - 24:24, 26:14
**departure** [1] - 61:15
**deploy** [1] - 55:14
**deputy** [1] - 4:12
**DEPUTY** [1] - 3:2
**describe** [1] - 86:15
**described** [3] - 33:2, 34:21, 76:11
**deserve** [1] - 65:25
**despite** [1] - 32:5
**determinations** [3] - 18:24, 68:1, 77:24
**develop** [1] - 38:21
**developing** [1] - 60:3

**developmental** [1] - 6:25
**difference** [2] - 45:11, 45:18
**different** [16] - 14:8, 15:2, 15:5, 15:7, 34:11, 43:7, 47:19, 51:9, 51:13, 53:3, 54:23, 55:1, 56:10, 56:11, 69:21, 74:3
**difficult** [2] - 57:2, 65:25
**digressing** [1] - 72:12
**Diplomate** [1] - 1:22
**directed** [1] - 14:14
**directly** [3] - 35:25, 58:9, 83:11
**director** [1] - 10:21
**Disabilities** [2] - 9:13, 9:14
**disabilities** [23] - 6:22, 6:25, 7:9, 7:20, 9:12, 9:16, 9:24, 10:4, 10:8, 14:24, 15:7, 16:13, 18:8, 23:1, 24:25, 25:1, 25:17, 26:8, 26:12, 27:6, 59:25, 63:21, 64:5
**disability** [4] - 44:22, 42:10, 42:20, 45:16
**disabled** [3] - 25:18, 25:24, 26:19
**disagree** [2] - 19:11, 37:11
**disagrees** [1] - 46:21
**discovery** [1] - 75:10
**discriminated** [2] - 27:2, 27:4
**discriminating** [2] - 24:21, 24:23
**discrimination** [5] - 22:23, 26:25, 42:11, 42:20, 45:16
**discuss** [1] - 11:17
**discussed** [6] - 6:7, 6:15, 24:3, 60:10, 69:3, 84:16
**discussion** [6] - 5:7, 36:18, 46:7, 74:19, 74:21, 84:8
**discussions** [1] - 86:3
**dismiss** [5] - 21:3, 39:6, 40:2, 46:17, 47:1
**dismissal** [1] - 42:12
**dismissed** [1] - 22:8
**disorder** [1] - 8:16
**dispute** [2] - 50:24,

86:4
**disputes** [2] - 26:12, 26:13
**disputing** [2] - 36:11, 45:14
**District** [85] - 2:1, 3:3, 4:3, 4:9, 4:24, 6:15, 7:10, 9:10, 9:21, 11:23, 12:10, 12:15, 12:23, 13:3, 13:9, 13:17, 13:23, 13:25, 14:7, 15:13, 15:19, 16:1, 17:6, 17:11, 18:3, 18:21, 19:25, 22:24, 23:4, 23:8, 23:12, 23:15, 23:23, 24:21, 24:23, 27:13, 28:10, 29:23, 30:3, 30:11, 30:15, 30:17, 30:25, 31:5, 31:7, 31:8, 31:16, 31:20, 32:1, 32:4, 34:15, 34:20, 34:21, 35:24, 36:16, 40:2, 54:6, 57:12, 57:24, 59:2, 59:15, 60:10, 60:16, 60:20, 61:5, 61:9, 61:14, 63:3, 63:14, 67:21, 68:15, 68:20, 68:25, 69:10, 70:1, 70:12, 71:4, 71:9, 81:22, 82:18, 83:12, 85:4, 87:12
**district** [7] - 27:17, 55:18, 59:18, 67:11, 71:23, 81:21, 81:24
**DISTRICT** [4] - 1:1, 1:1, 1:7, 1:10
**District's** [17] - 7:7, 7:22, 8:6, 9:18, 10:2, 12:18, 13:8, 15:17, 20:1, 24:1, 25:2, 27:9, 36:7, 36:8, 38:4, 39:6, 67:9
**Docket** [2] - 39:11, 64:6
**docket** [2] - 83:22, 84:2
**doctrine** [1] - 45:20
**document** [1] - 58:2
**Document** [2] - 39:16, 39:21
**dogs** [1] - 72:18
**dollars** [1] - 54:8
**done** [17] - 13:5, 28:5, 28:20, 28:21, 29:3, 31:20, 44:18, 56:9, 66:20, 68:13, 70:12, 70:17, 82:8, 83:23, 85:12

**door** [3] - 51:5
**double** [1] - 73:21
**double-teamed** [1] - 73:21
**down** [6] - 7:6, 14:24, 47:21, 52:24, 64:7, 82:24
**dozen** [1] - 7:18
**Dr** [2] - 24:15, 59:23
**drafted** [1] - 22:25
**drawn** [1] - 70:11
**Dreban** [1] - 3:15
**drive** [4] - 8:18, 16:3, 16:19, 51:7
**driver** [8] - 34:1, 34:2, 34:4, 34:7, 48:21, 50:7, 50:10, 65:21
**drivers** [9] - 12:6, 12:21, 13:6, 13:10, 30:8, 53:24, 54:15, 54:17, 65:20
**driving** [2] - 16:22, 50:22
**dropoffs** [1] - 42:2
**due** [14] - 17:5, 22:7, 33:6, 33:12, 38:5, 40:17, 40:22, 51:14, 60:11, 60:16, 74:5, 76:1, 83:3, 83:9
**during** [4] - 5:23, 6:1, 57:12, 58:3
**duty** [1] - 15:17
**déjà** [1] - 4:9

**E**

**early** [5] - 17:4, 34:4, 50:12, 51:12, 72:15
**easily** [1] - 66:5
**ECF** [17] - 33:10, 33:22, 38:4, 38:7, 39:10, 47:17, 49:10, 49:14, 49:20, 50:1, 50:6, 50:11, 50:22, 51:2, 51:10, 51:17, 55:3
**ECHA** [1] - 26:5
**ed** [1] - 37:4
**educated** [1] - 25:5
**education** [26] - 7:23, 9:13, 9:17, 11:25, 12:13, 13:16, 14:5, 17:17, 17:20, 20:1, 25:1, 25:18, 26:19, 26:21, 27:8, 41:12, 63:17, 64:14, 64:19, 65:13, 66:19, 67:22, 68:6, 70:16, 81:19

**Education** [1] - 9:14
**educational** [1] - 64:25
**educationally** [1] - 82:3
**effective** [1] - 38:22
**efficient** [2] - 61:7, 73:24
**effort** [1] - 34:22
**eight** [3] - 50:1, 50:4, 81:24
**either** [4] - 20:24, 44:23, 46:21, 47:22
**element** [1] - 45:20
**eligible** [1] - 27:6
**eliminate** [1] - 72:1
**Elizabeth** [2] - 38:6, 47:17
**Emery** [1] - 1:13
**emotional** [1] - 8:10
**emphasis** [3] - 40:9, 76:3, 81:6
**employees** [1] - 13:7
**encouraged** [1] - 60:20
**end** [15] - 5:24, 28:13, 36:4, 47:1, 56:17, 57:9, 57:25, 59:6, 69:18, 72:8, 75:1, 75:12, 80:16
**ended** [1] - 28:12
**enduring** [1] - 63:21
**engaged** [1] - 34:23
**engaging** [1] - 83:25
**enhance** [1] - 70:2
**enjoined** [1] - 28:1
**enormous** [3] - 36:12, 56:19, 67:18
**enormously** [1] - 55:18
**Enriquez** [1] - 4:6
**ensure** [13] - 10:6, 29:23, 30:14, 30:18, 31:10, 31:18, 32:10, 35:9, 55:7, 61:2, 62:7, 63:8, 66:11
**ensuring** [2] - 7:11, 12:1
**enter** [1] - 13:13
**entire** [1] - 34:10
**entitled** [5] - 8:7, 46:19, 46:20, 74:16, 87:14
**entity** [1] - 28:1
**environmental** [1] - 44:14
**Epstein** [1] - 4:6
**equal** [6] - 9:17, 24:24, 26:14, 26:18, 26:20, 26:21

**equally** [1] - 79:1
**equipment** [9] - 48:22, 61:22, 66:6, 66:7, 66:12, 66:16, 69:8, 69:14
**equitable** [1] - 80:12
**err** [1] - 19:4
**erred** [1] - 18:24
**error** [1] - 37:16
**especially** [1] - 73:10
**essentially** [7] - 13:3, 14:13, 17:19, 22:16, 29:21, 38:12, 38:25
**estimate** [2] - 49:24, 52:5
**et** [6] - 1:4, 3:3, 39:3, 40:8, 47:14, 52:20
**evading** [1] - 83:5
**evaluation** [1] - 40:8
**evening** [1] - 65:15
**events** [2] - 11:22, 72:24
**evidence** [26] - 6:3, 9:22, 10:2, 10:10, 10:16, 10:20, 15:20, 15:21, 23:5, 23:7, 23:13, 23:16, 23:21, 33:7, 33:8, 34:10, 36:7, 36:9, 47:15, 48:15, 49:7, 52:21, 59:1, 59:8, 60:4, 61:13
**evidentiary** [1] - 80:2
**ex** [1] - 48:24
**ex-ante** [1] - 48:24
**exact** [2] - 10:25, 21:21
**exactly** [9] - 10:17, 15:15, 38:20, 51:8, 63:24, 66:23, 67:14, 73:13, 82:2
**example** [7] - 13:22, 18:5, 19:25, 25:21, 27:6, 36:11, 77:20
**examples** [4] - 8:14, 32:25, 41:3
**exception** [1] - 43:25
**excessive** [1] - 55:13
**excuse** [1] - 50:21
**executive** [1] - 10:21
**exempt** [2] - 19:23, 20:16
**exemption** [1] - 37:24
**exemptions** [1] - 37:21
**exhaust** [15] - 20:20, 20:23, 21:6, 21:12, 21:17, 21:18, 21:23,

22:1, 24:10, 42:19, 43:1, 43:14, 43:15, 43:16, 58:23
**exhausted** [9] - 22:10, 24:3, 24:4, 24:11, 36:22, 40:2, 46:1, 74:5, 74:13
**exhausting** [1] - 19:24
**exhaustion** [5] - 19:23, 20:4, 20:17, 37:10, 37:21
**exhibit** [2] - 11:1, 11:3
**Exhibit** [1] - 11:5, 38:5
**existing** [1] - 28:9
**exists** [2] - 67:15, 73:9
**expand** [1] - 31:16
**experience** [4] - 14:18, 57:4, 59:17, 75:20
**experienced** [2] - 61:22, 75:19
**experiencing** [1] - 63:22
**expert** [17] - 13:22, 16:24, 23:13, 24:14, 30:11, 30:16, 30:20, 31:2, 31:25, 32:8, 51:13, 55:9, 55:22, 61:9, 68:19, 68:23, 70:12
**experts** [6] - 30:21, 30:23, 55:5, 56:4, 67:17, 69:23
**explain** [1] - 24:15
**explained** [2] - 59:4, 76:3
**explaining** [2] - 18:17, 55:4
**explains** [1] - 16:24, 35:5, 59:23
**explicit** [1] - 85:5
**explore** [1] - 40:23
**expressed** [1] - 81:11
**expressly** [1] - 42:1
**extended** [2] - 35:1, 74:21
**extent** [4] - 16:1, 17:24, 18:21, 61:13
**extraordinary** [2] - 36:8, 36:14
**extremely** [2] - 47:10, 81:4

### F

**faces** [1] - 51:5
**facing** [1] - 30:18
**fact** [23] - 4:14, 9:7, 11:14, 11:17, 18:16, 19:5, 27:5, 32:5, 33:17, 37:5, 60:20, 62:1, 62:25, 63:2, 64:12, 67:7, 67:25, 68:1, 68:7, 70:2, 70:5, 71:8, 80:23
**factor** [1] - 22:19
**factors** [7] - 10:11, 11:9, 11:13, 22:14, 26:10, 62:4, 64:2
**facts** [1] - 21:10
**factual** [1] - 21:22
**fail** [1] - 74:22
**fail-safe** [1] - 74:22
**failed** [3] - 17:11, 45:2, 47:8
**failing** [5] - 7:10, 9:11, 10:3, 26:1, 34:18
**failings** [1] - 9:19
**fails** [1] - 66:7
**failure** [13] - 7:8, 7:22, 17:12, 19:20, 20:2, 23:2, 23:17, 24:16, 34:12, 36:7, 66:15, 70:16, 75:20
**failures** [9] - 7:3, 8:6, 8:9, 25:2, 25:4, 25:20, 26:8, 26:18, 66:9
**faith** [2] - 57:18, 84:23
**fall** [2] - 17:4, 49:15
**familiar** [1] - 9:9
**families** [5] - 16:5, 33:1, 63:22, 69:3, 70:23
**family** [1] - 34:2, 57:1
**famous** [1] - 65:2
**FAPE** [15] - 17:12, 23:18, 23:24, 27:3, 33:4, 38:10, 38:17, 40:9, 41:8, 42:1, 50:4, 76:6, 76:24, 80:20
**far** [1] - 12:13
**fascinating** [1] - 72:19
**fashion** [2] - 5:14, 56:13
**father** [1] - 56:25
**fault** [1] - 34:15
**February** [4] - 34:24, 35:2, 57:22, 68:16
**federal** [2] - 1:23, 8:8

**Federal** [2] - 11:8, 87:12
**FEDERAL** [1] - 87:19
**federally** [1] - 37:6
**feet** [3] - 6:5, 29:4, 76:13
**felt** [1] - 20:8
**Fenty** [2] - 53:12, 54:21
**few** [4] - 25:12, 32:22, 35:12, 55:4
**fewer** [2] - 15:4, 15:8, 18:6
**field** [1] - 7:5
**figure** [3] - 29:7, 30:5, 30:17
**file** [11] - 5:8, 5:9, 6:4, 47:16, 84:15, 84:23, 84:24, 85:14, 86:12
**filed** [15] - 5:2, 33:12, 48:1, 48:2, 48:5, 49:22, 50:19, 51:14, 51:24, 60:11, 60:16, 60:17, 83:19, 83:20, 86:2
**filing** [4] - 4:21, 6:4, 83:18, 83:21
**filings** [1] - 52:9
**finance** [1] - 10:18
**financial** [1] - 17:18
**findings** [2] - 20:10, 36:11
**fine** [2] - 62:14, 82:23
**finger** [1] - 58:1
**fining** [1] - 54:6
**finished** [1] - 72:11
**first** [18] - 5:23, 6:8, 6:18, 19:20, 22:20, 22:22, 33:2, 36:19, 38:20, 40:11, 43:6, 45:1, 47:6, 57:21, 73:20, 79:12, 83:17, 87:1
**fiscal** [3] - 28:12, 28:14, 35:7
**five** [14] - 6:22, 17:5, 17:16, 17:21, 20:21, 40:22, 41:4, 41:20, 44:20, 50:18, 67:10, 67:12, 67:13, 77:21
**fix** [10] - 9:21, 12:25, 13:20, 28:25, 40:21, 53:24, 54:11, 60:18, 70:14
**fixes** [1] - 13:18
**fixing** [1] - 31:17
**fleet** [5] - 12:6, 17:1, 52:17, 52:19, 52:25

**Floor** [1] - 1:18
**flows** [1] - 79:8
**Floyd** [1] - 51:17
**fluent** [3] - 34:1, 34:5, 34:8
**focus** [1] - 71:9
**folks** [2] - 3:24, 82:10
**following** [3] - 55:5, 58:5, 84:14
**FOR** [3] - 1:1, 1:13, 2:1
**forced** [1] - 25:24
**foregoing** [1] - 87:13
**forgive** [2] - 54:10, 54:11
**form** [5] - 41:11, 41:12, 44:11, 57:8, 57:15
**format** [1] - 87:14
**former** [1] - 83:24
**formulaic** [2] - 67:25, 81:16
**forth** [1] - 84:19
**forum** [2] - 21:13, 22:3
**forums** [1] - 40:18
**forward** [8] - 18:13, 41:7, 41:9, 41:13, 79:19, 79:22, 83:2, 84:9
**forward-looking** [1] - 41:7
**founded** [1] - 40:14
**four** [2] - 33:12, 51:14
**Fourth** [2] - 1:18, 58:21
**fragile** [3] - 8:24, 33:11, 33:18
**frame** [1] - 68:12
**framing** [3] - 22:21, 23:21, 26:19
**frankly** [1] - 19:14
**free** [1] - 17:20
**frequent** [1] - 13:9
**Friday** [1] - 86:18
**FRIEDMAN** [1] - 1:10
**friend** [1] - 72:18
**front** [4] - 35:16, 38:3, 51:5, 63:4
**fruitful** [2] - 85:16, 86:1
**Fry** [2] - 21:19, 27:20
**fulfill** [1] - 30:21
**full** [1] - 12:5
**fully** [3] - 21:5, 22:10, 36:1
**functioning** [4] - 7:22, 11:25, 12:6,

29:14
**fundamental** [3] - 23:21, 67:16, 70:13
**fundamentally** [1] - 9:18
**futile** [4] - 19:24, 20:19, 21:4
**futility** [2] - 20:4, 37:25
**future** [1] - 86:13

## G

**G.T** [1] - 58:19
**Gene** [1] - 3:13
**General** [3] - 2:1, 4:4, 54:21
**general** [2] - 4:5, 43:3
**generality** [1] - 76:15
**generally** [1] - 38:21
**generously** [1] - 30:4
**George's** [1] - 54:19
**Gilmore** [3] - 53:13, 53:14, 53:17
**given** [3] - 34:25, 62:20, 85:16
**glue** [1] - 63:20
**Goldman** [1] - 3:13
**government** [3] - 15:3, 34:22, 64:13
**GPS** [1] - 12:19
**grandmother** [1] - 56:24
**Grant** [1] - 57:22
**grant** [4] - 5:13, 28:17, 40:17, 46:18
**granted** [4] - 4:11, 41:7, 44:11, 58:22, 83:2
**granting** [1] - 39:6
**grateful** [2] - 59:1, 59:2
**Gray** [1] - 53:11
**great** [4] - 16:4, 49:2, 53:14, 69:11
**greater** [1] - 68:7
**Gregory** [3] - 4:4, 50:21, 50:22
**GREGORY** [1] - 2:2
**grounds** [1] - 46:4
**guarantee** [2] - 9:16, 62:2
**guardian** [1] - 18:8
**Guerrero** [4] - 8:21, 18:12, 18:17, 83:9
**guess** [5] - 15:12, 22:16, 34:4, 57:23, 77:9
**guide** [1] - 10:18,

72:18

## H

**H.D** [4] - 38:10, 38:18, 38:22, 41:21
**half** [3] - 5:23, 58:6, 70:9
**hamper** [1] - 70:1
**hand** [6] - 48:22, 73:24, 74:6, 75:12, 82:13, 82:14
**handle** [2] - 6:17, 72:7
**handled** [1] - 67:11
**handwritten** [1] - 12:21
**HANLEY** [1] - 1:14
**happy** [11] - 10:12, 22:20, 24:18, 27:21, 34:2, 37:22, 44:23, 54:25, 58:15, 62:15, 78:6
**hard** [5] - 34:18, 54:17, 55:24, 56:11, 56:16
**harder** [1] - 46:22
**hardly** [1] - 50:13
**harkens** [1] - 26:4
**harm** [7] - 24:12, 24:13, 24:16, 45:2, 46:22, 61:2, 63:21
**harmed** [6] - 18:22, 43:11, 43:13, 44:18, 46:12, 60:8
**harms** [4] - 27:25, 31:11, 73:12, 73:14
**harness** [3] - 8:17, 33:3, 61:25
**harnesses** [1] - 69:14
**head** [1] - 78:12
**heading** [1] - 38:16
**headings** [1] - 38:9
**hear** [2] - 44:24, 77:2
**heard** [4] - 65:15, 73:22, 75:14, 75:24
**hearing** [52] - 5:19, 14:24, 15:6, 17:10, 17:13, 17:15, 18:3, 18:13, 18:22, 18:24, 19:6, 19:11, 19:16, 19:19, 20:4, 20:7, 20:9, 20:10, 20:24, 21:2, 21:13, 22:5, 22:8, 34:24, 36:12, 36:21, 37:11, 37:14, 38:2, 38:11, 39:5, 39:9, 39:12, 39:24, 40:4, 40:7, 40:11,

40:16, 41:6, 41:10, 41:22, 41:25, 42:6, 42:12, 42:16, 57:21, 67:10, 76:1, 76:4, 77:23, 86:22, 86:24
**Hearing** [1] - 39:7
**HEARING** [1] - 1:10
**hearings** [6] - 17:6, 37:9, 40:23, 74:6, 83:3, 83:9
**heightened** [2] - 26:24, 27:13
**held** [1] - 34:20
**help** [9] - 8:17, 13:22, 30:16, 53:15, 61:2, 69:3, 69:4, 70:10, 80:15
**helpful** [6] - 11:1, 22:15, 29:18, 54:25, 69:12, 69:13
**Henderson's** [1] - 64:17
**hereby** [1] - 87:13
**herself** [2] - 1:3, 50:22
**higher** [1] - 80:2
**highlight** [2] - 56:8, 60:9
**hire** [1] - 13:9
**hiring** [2] - 31:25, 54:15
**historically** [1] - 56:22
**history** [2] - 54:1
**hit** [1] - 67:24
**hold** [1] - 61:3
**holding** [1] - 60:22
**holds** [1] - 63:20
**hole** [2] - 44:2, 44:12, 44:13
**home** [8] - 8:11, 16:11, 17:8, 26:3, 32:15, 34:13, 36:10, 37:5, 61:18, 61:23, 66:2
**homes** [3] - 26:6, 57:1, 57:2
**Honor** [55] - 3:9, 3:13, 4:2, 4:17, 5:6, 5:17, 6:11, 6:16, 6:20, 7:7, 8:20, 8:21, 9:8, 10:13, 11:1, 11:23, 13:22, 19:5, 19:15, 20:8, 21:7, 22:12, 22:15, 23:25, 26:22, 26:23, 29:9, 29:11, 37:22, 38:15, 47:3, 54:24, 58:13, 58:17, 58:25, 59:3, 62:16, 62:20, 62:24, 64:9,

64:23, 65:4, 66:18, 67:13, 68:8, 69:9, 71:5, 72:3, 73:6, 73:13, 73:24, 74:6, 82:18, 83:7, 86:8
**Honor's** [2] - 32:3, 75:15
**HONORABLE** [1] - 1:10
**hopeful** [1] - 59:5
**hopefully** [1] - 87:5
**hour** [3] - 58:6, 70:9, 81:23
**hours** [12] - 7:5, 8:11, 16:11, 18:19, 59:24, 65:11, 65:16, 70:9, 70:10, 76:4, 76:5, 81:24
**houses** [1] - 15:1
**huge** [2] - 34:3, 54:6
**Human** [5] - 9:15, 21:9, 21:16, 24:20, 26:25
**hungry** [1] - 8:12
**Hunt** [1] - 11:14
**hurt** [2] - 44:6, 44:7
**hybrid** [1] - 66:21
**hypothetically** [1] - 77:14

## I

**IDEA** [45] - 17:19, 21:11, 21:16, 21:22, 22:22, 23:15, 23:18, 24:18, 26:4, 26:17, 27:6, 27:10, 27:16, 36:21, 37:14, 40:10, 40:17, 42:17, 42:19, 42:21, 42:23, 42:24, 43:1, 43:4, 43:5, 43:7, 43:19, 43:21, 43:23, 44:10, 45:9, 45:18, 46:2, 58:18, 58:22, 63:18, 63:25, 64:14, 64:19, 66:25, 70:16, 73:8, 76:7, 80:24
**idea** [1] - 11:24, 40:20, 52:16
**identification** [1] - 40:8
**identified** [3] - 27:25, 30:20, 53:13
**identify** [1] - 20:2
**IEP** [1] - 45:25
**IEPs** [12] - 18:4, 22:25, 23:1, 23:2, 23:16, 23:17, 29:23, 36:1, 37:5, 52:7, 54:3, 66:18

**III** [3] - 43:6, 45:11, 46:4
**illegal** [1] - 37:4
**imagine** [1] - 5:18
**immediate** [3] - 33:17, 51:23, 80:1
**immediately** [2] - 29:18, 34:8
**impact** [3] - 8:9, 27:7, 59:25
**impacts** [1] - 7:23
**implement** [6] - 12:25, 22:24, 23:3, 23:16, 29:23, 38:21
**implementation** [3] - 13:1, 63:1, 70:15
**implemented** [4] - 17:25, 23:11, 62:6, 69:1
**implementing** [1] - 23:17
**implicated** [1] - 27:11
**importance** [1] - 75:6
**important** [3] - 15:16, 20:8, 64:23
**imposed** [1] - 54:9
**impossible** [2] - 55:25, 66:2
**improbable** [1] - 67:14
**improve** [4] - 14:1, 32:1, 32:5, 73:16
**improved** [4] - 9:9, 18:5, 31:22, 32:9
**improvement** [2] - 49:2, 57:14
**improvements** [6] - 16:2, 29:17, 57:12, 57:18, 60:21, 60:23
**improving** [1] - 30:13
**inadequate** [1] - 20:19
**include** [4] - 6:21, 11:14, 32:16, 52:22
**included** [1] - 22:7
**includes** [1] - 12:5
**including** [9] - 7:19, 31:25, 35:22, 36:25, 38:20, 54:21, 55:19, 79:15, 80:12
**inconsistent** [1] - 27:14
**increase** [1] - 29:18
**increased** [3] - 64:20, 64:24, 80:8
**indeed** [3] - 12:10, 14:18, 61:22

**indicate** [1] - 52:25
**indicates** [1] - 43:24
**individual** [19] - 11:17, 17:5, 24:5, 38:9, 39:1, 44:6, 45:22, 45:25, 46:2, 46:11, 60:14, 66:18, 67:17, 67:23, 67:24, 80:19, 81:2, 81:15
**individualized** [4] - 40:10, 42:5, 43:22, 81:4
**individuals** [3] - 5:1, 26:11, 64:16
**Individuals** [1] - 9:13
**inevitably** [1] - 57:8
**information** [8] - 8:4, 15:19, 16:11, 37:6, 56:12, 57:6, 82:19, 84:4
**initial** [1] - 11:5
**injunction** [39] - 6:17, 10:6, 10:12, 11:6, 13:14, 22:15, 27:23, 28:3, 28:17, 28:23, 29:21, 29:22, 32:16, 46:9, 46:18, 46:19, 46:20, 60:5, 61:1, 62:11, 64:20, 68:11, 68:14, 69:17, 70:19, 70:20, 71:3, 71:10, 73:18, 75:23, 83:16, 85:10, 85:19
**injunctions** [1] - 27:24
**injunctive** [6] - 11:19, 61:12, 62:5, 73:12, 73:15, 79:18
**input** [1] - 31:4
**insinuated** [1] - 66:3
**insisted** [1] - 75:22
**instance** [2] - 50:11, 50:12
**instances** [6] - 48:6, 48:12, 49:22, 50:1, 50:4, 50:8
**instead** [4] - 15:21, 56:17, 60:25, 84:22
**institutions** [1] - 26:6
**instruction** [3] - 8:7, 10:5, 65:12
**insufficient** [2] - 53:22, 68:1
**integrated** [1] - 26:9
**integration** [1] - 12:20
**intellectual** [1] - 6:25
**intend** [2] - 32:4,

32:8
**intent** [2] - 26:24, 27:13
**interest** [2] - 34:25, 79:21
**interested** [1] - 83:22
**interesting** [4] - 52:14, 72:15, 72:16, 72:17
**interim** [3] - 13:24, 31:6, 31:22
**intermittent** [1] - 13:10
**interrupt** [1] - 46:6
**intervention** [1] - 9:10
**introduce** [1] - 3:16
**invest** [1] - 13:19
**investing** [1] - 60:22
**invitation** [1] - 62:16
**invite** [2] - 30:25, 31:8
**involve** [1] - 46:5
**irreparable** [4] - 24:12, 24:13, 24:16, 45:2
**irreparably** [1] - 60:7
**issue** [17] - 26:22, 63:2, 63:4, 63:5, 63:9, 65:17, 67:19, 67:23, 69:22, 69:24, 69:25, 70:13, 70:19, 77:9, 83:4
**issued** [1] - 71:10
**issues** [11] - 4:21, 33:16, 40:24, 45:23, 49:9, 49:12, 51:22, 57:6, 68:3, 68:7, 71:8
**items** [1] - 70:18
**itself** [2] - 43:3, 43:23

**J**

**J.C** [2] - 41:23, 41:25
**Jamie** [1] - 60:10
**January** [2] - 30:5, 49:16
**job** [2] - 53:13, 53:14
**joined** [2] - 4:3, 7:1
**Judge** [10] - 64:17, 66:24, 67:1, 67:2, 67:20, 67:23, 72:8, 72:22, 72:23, 73:6
**judge** [4] - 3:8, 37:15, 81:21, 81:24
**JUDGE** [1] - 1:10
**Judicial** [1] - 87:15
**judicial** [2] - 53:2, 80:22

**July** [3] - 1:11, 57:9, 87:16
**June** [1] - 34:4
**jurisdiction** [9] - 19:2, 19:3, 20:11, 20:15, 20:18, 27:17, 40:3, 40:7, 40:13
**jurisdictions** [2] - 17:1, 54:19
**jury** [1] - 76:20

**K**

**Kaitlin** [2] - 3:20, 6:20
**KAITLIN** [1] - 1:17
**Kanawha** [1] - 58:19
**Keith** [3] - 39:7, 39:10, 41:22
**Kelley** [7] - 4:2, 5:4, 25:11, 28:22, 32:21, 62:17, 83:23
**KELLEY** [48] - 2:2, 4:2, 5:6, 5:17, 6:9, 32:22, 33:22, 35:12, 35:15, 35:18, 35:24, 36:4, 39:10, 39:13, 39:16, 39:19, 39:21, 39:23, 41:16, 42:10, 42:23, 43:17, 44:25, 45:5, 47:3, 48:14, 49:18, 50:17, 52:6, 52:12, 54:24, 57:8, 57:21, 73:20, 77:15, 77:19, 78:6, 79:12, 80:6, 82:10, 82:14, 82:18, 83:1, 84:6, 86:10, 86:15, 86:22, 87:2
**Kelley's** [1] - 85:23
**kept** [1] - 54:6
**Ketcham** [1] - 4:4
**KETCHAM** [1] - 2:2
**Ketcham-Colwill** [1] - 4:4
**KETCHAM-COLWILL** [1] - 2:2
**kidding** [1] - 70:21
**kidney** [1] - 14:25
**kids** [6] - 15:5, 37:4, 56:13, 80:23, 81:5
**kind** [14] - 4:9, 5:21, 11:19, 19:17, 20:6, 37:1, 37:23, 43:21, 45:21, 47:9, 47:10, 51:23, 63:24, 78:13
**kinds** [1] - 76:18
**knows** [5] - 18:9, 25:11, 25:14, 28:1, 70:12

**Kouma** [1] - 50:1

**L**

**Labor** [1] - 57:6
**language** [7] - 21:21, 27:14, 28:4, 28:17, 41:10, 75:5, 75:7
**largely** [1] - 29:6
**larger** [1] - 52:11
**last** [17] - 4:11, 5:2, 18:9, 30:4, 35:7, 36:4, 36:13, 42:2, 49:2, 49:10, 49:11, 49:15, 51:17, 55:18, 56:20, 71:24, 72:11
**lastly** [1] - 32:13, 61:13
**late** [19] - 7:5, 7:24, 9:5, 16:12, 18:19, 36:10, 48:16, 49:23, 50:1, 50:8, 50:12, 51:19, 59:11, 59:21, 60:2, 61:15, 65:11, 80:21
**law** [22] - 3:7, 8:8, 19:13, 19:16, 20:18, 21:17, 22:4, 22:24, 23:23, 36:24, 37:8, 45:8, 59:18, 62:25, 63:25, 64:9, 66:19, 67:8, 68:7, 71:8, 76:24, 77:25
**laws** [2] - 21:11, 26:13
**lawsuit** [1] - 43:10
**lawyers** [1] - 72:13
**Lawyers** [1] - 3:21
**Lawyers'** [1] - 1:16
**lay** [1] - 11:13
**lays** [2] - 11:9, 83:10
**leadership** [1] - 10:19
**leading** [1] - 26:8
**learn** [1] - 8:10
**learned** [1] - 35:13
**learning** [1] - 60:2
**LEAs** [1] - 56:11
**least** [9] - 17:21, 20:21, 31:10, 34:23, 44:25, 46:11, 47:25, 55:19, 77:13
**leave** [8] - 3:10, 6:13, 14:14, 32:23, 46:23, 47:4, 48:19, 83:14
**leaves** [2] - 14:15, 14:20
**leaving** [6] - 14:11, 14:12, 15:13, 62:1, 70:6, 70:7

**left** [4] - 6:16, 57:23, 61:18, 70:9
**legal** [3] - 75:3, 80:14, 80:17
**legally** [3] - 64:13, 64:18, 83:4
**less** [3] - 48:12, 49:23, 52:2
**level** [2] - 27:17, 76:14
**Lewis** [5] - 33:20, 33:22, 33:23, 41:19, 50:11
**Lewis's** [2] - 9:2, 33:22
**licensed** [1] - 34:7
**life** [1] - 72:15
**likelihood** [1] - 22:18
**likely** [1] - 46:12
**limited** [1] - 40:7
**line** [2] - 11:15, 20:3
**list** [4] - 31:7, 38:12, 38:20, 47:19
**litigation** [5] - 9:8, 12:3, 14:9, 73:11, 76:17
**live** [4] - 14:23, 15:1, 45:12, 56:24
**Livelli** [2] - 24:15, 59:23
**LLP** [1] - 1:13
**local** [1] - 56:11
**long-term** [2] - 13:19, 31:21
**look** [16] - 5:23, 11:3, 11:7, 11:10, 19:22, 27:16, 38:3, 39:5, 47:21, 76:15, 80:20, 81:2, 81:3, 84:1, 85:13, 86:7
**looked** [4] - 12:1, 44:19, 44:21
**looking** [7] - 18:14, 39:23, 41:7, 45:10, 56:21, 81:17, 83:2
**looks** [2] - 11:24, 75:10
**looming** [1] - 37:9
**lose** [2] - 78:15, 79:14
**losing** [3] - 8:6, 54:5, 54:8
**loss** [1] - 5:17
**lost** [2] - 12:16, 42:8
**loud** [1] - 20:22
**love** [1] - 85:1
**low** [1] - 12:5

**M**

**M.L** [1] - 9:2
**main** [3] - 24:1, 65:10, 83:7
**maintained** [1] - 52:20
**Maltz** [1] - 49:20
**mandated** [1] - 64:18
**manner** [2] - 39:3, 69:13
**March** [4] - 17:22, 49:22, 60:17
**MARGARET** [1] - 1:14
**master** [1] - 53:10
**masters** [1] - 56:4
**material** [1] - 50:4
**Mateya** [1] - 4:2
**MATEYA** [1] - 2:2
**math** [2] - 15:8, 49:23
**matter** [5] - 28:16, 40:7, 40:12, 79:16, 87:14
**matters** [2] - 83:25, 84:16
**mayor** [4] - 34:22, 53:6, 53:11, 53:17
**Mayor** [1] - 54:21
**McCray** [2] - 18:12, 18:18
**McDermott** [1] - 1:13
**mean** [5] - 5:24, 18:25, 19:1, 25:6, 26:18, 28:7, 36:13, 43:15, 52:6, 55:25, 60:21, 65:22, 72:10, 74:3, 75:21, 77:4, 77:10
**meaningful** [1] - 49:1
**meaningless** [2] - 14:13, 48:19
**means** [6] - 10:17, 12:16, 14:13, 23:19, 29:25, 33:18
**meant** [1] - 7:5
**measure** [2] - 14:13, 15:18
**measures** [1] - 13:11
**mechanical** [1] - 81:20
**medically** [3] - 8:24, 33:11, 33:18
**medication** [1] - 8:13
**meet** [4] - 26:11, 27:12, 49:7, 80:1
**meeting** [6] - 11:13, 12:11, 14:7, 14:10, 25:25, 85:2

**meets** [1] - 12:7
**member** [10] - 11:16, 44:18, 45:22, 46:3, 46:5, 50:21, 64:20, 64:24, 80:19
**members** [22] - 4:19, 10:17, 11:18, 24:10, 24:13, 34:23, 35:2, 41:19, 43:10, 43:12, 43:15, 44:6, 49:4, 49:19, 55:20, 58:23, 58:24, 71:18, 75:16, 80:9, 84:1
**membership** [3] - 6:23, 10:16, 10:22
**membership-based** [1] - 6:23
**mention** [2] - 4:14, 75:24
**mentioned** [3] - 4:24, 7:1, 41:6
**mere** [1] - 67:25
**merge** [1] - 62:21
**merger** [1] - 65:6
**merits** [7] - 22:18, 23:20, 39:24, 46:13, 62:21, 65:7, 79:24
**met** [2] - 62:5, 64:2
**middle** [1] - 70:25
**might** [17] - 4:14, 6:1, 16:18, 20:11, 27:5, 27:22, 28:8, 28:10, 28:15, 37:24, 39:23, 80:15, 83:19, 85:16, 86:1
**million** [8] - 35:8, 35:14, 35:15, 35:19, 54:10, 54:12, 54:13, 56:5
**millions** [1] - 54:8
**mind** [2] - 11:2, 62:3
**minds** [1] - 85:2
**minimal** [2] - 49:9, 59:16
**minimum** [1] - 61:10
**minor** [3] - 1:3, 47:4, 68:3
**minute** [1] - 84:5
**minutes** [1] - 55:7, 58:11
**mirrors** [1] - 9:7
**misfunction** [1] - 14:25
**miss** [5] - 10:4, 25:4, 25:20, 26:8, 60:1
**missed** [1] - 40:2
**missing** [4] - 8:13, 13:16, 25:23, 59:20

**mission** [2] - 10:22, 11:15
**Mitchell** [2] - 49:14, 49:18
**mitigate** [1] - 31:11
**modern** [1] - 55:23
**modernized** [2] - 12:15, 30:7
**moment** [2] - 42:8, 82:8
**money** [8] - 30:13, 35:6, 36:1, 41:12, 54:7, 56:4, 68:20, 69:10
**monitors** [1] - 56:4
**Montgomery** [1] - 54:19
**monthly** [1] - 63:22
**months** [6] - 8:16, 13:3, 18:7, 25:12, 30:4, 33:2
**months-long** [1] - 33:2
**moreover** [1] - 16:1
**morning** [20] - 3:18, 3:19, 3:20, 4:2, 4:7, 4:16, 5:21, 5:23, 6:6, 6:20, 7:3, 18:19, 25:23, 25:25, 47:20, 48:10, 65:9, 65:12, 69:19, 87:1
**most** [5] - 12:14, 22:18, 23:25, 33:14, 47:14
**mother** [1] - 56:24
**MOTION** [1] - 1:10
**motion** [27] - 4:11, 4:14, 4:15, 4:17, 5:13, 6:17, 6:19, 7:16, 11:5, 12:12, 34:22, 37:12, 39:6, 46:16, 48:1, 48:5, 52:22, 55:3, 55:17, 58:6, 62:10, 62:14, 73:23, 83:19, 83:20, 85:19
**motions** [3] - 5:20, 5:25, 6:5
**mouth** [2] - 79:8, 85:11
**movant** [1] - 37:15
**move** [4] - 47:1, 56:23, 58:9, 62:18
**moved** [1] - 40:2
**moving** [1] - 6:6
**MR** [1] - 3:19
**MS** [94] - 3:9, 3:11, 3:20, 4:2, 4:17, 5:6, 5:17, 6:9, 6:11, 6:14, 6:16, 7:15, 8:20, 10:20, 10:25, 11:5,

11:12, 11:23, 13:15, 14:11, 15:15, 17:23, 18:1, 19:5, 19:13, 21:2, 21:19, 22:14, 22:20, 25:8, 25:17, 29:9, 30:22, 32:19, 32:22, 33:22, 35:12, 35:15, 35:18, 35:24, 36:4, 39:10, 39:13, 39:16, 39:19, 39:21, 39:23, 41:16, 42:10, 42:23, 43:17, 44:25, 45:5, 47:3, 48:14, 49:18, 50:17, 52:6, 52:12, 54:24, 57:8, 57:21, 58:13, 62:15, 62:19, 64:8, 65:4, 67:13, 71:13, 71:16, 71:19, 71:21, 72:2, 72:5, 72:23, 73:6, 73:20, 77:15, 77:19, 78:6, 79:12, 80:6, 82:10, 82:14, 82:18, 83:1, 83:2, 84:6, 86:8, 86:10, 86:15, 86:20, 86:22, 87:2
**muddled** [1] - 79:24
**multiple** [1] - 51:18
**must** [4] - 9:19, 39:2, 77:17, 78:1

**N**

**N-e-a-s** [1] - 10:25
**name** [5] - 6:20, 10:24, 33:21, 39:12, 39:14
**named** [17] - 3:16, 8:22, 17:16, 20:21, 41:4, 44:20, 46:11, 77:6, 77:11, 77:13, 77:18, 77:19, 77:21, 78:1, 78:14, 78:20, 79:17
**narrow** [4] - 28:16, 68:14, 69:17, 70:19
**narrowing** [1] - 86:3
**narrowly** [2] - 27:24, 80:14
**nature** [1] - 40:10
**Neas** [1] - 10:25
**Neas's** [1] - 10:21
**necessarily** [2] - 15:14, 55:16
**necessary** [3] - 7:24, 66:12, 72:5
**need** [50] - 9:11, 11:20, 13:20, 19:9, 21:12, 22:1, 24:10, 24:11, 26:11, 26:24,

27:12, 28:8, 28:25, 29:1, 29:25, 30:1, 30:7, 30:8, 30:9, 30:18, 34:16, 35:4, 37:22, 40:21, 42:18, 43:1, 45:21, 46:5, 47:6, 47:8, 50:13, 56:6, 56:13, 63:4, 64:2, 67:5, 67:6, 69:3, 69:12, 70:23, 72:2, 74:5, 74:17, 74:18, 80:16, 80:20, 85:22

**needed** [4] - 20:6, 35:10, 53:6, 53:15

**needs** [18] - 7:25, 12:7, 12:23, 13:4, 24:13, 29:23, 35:21, 35:22, 44:1, 52:4, 55:15, 56:12, 63:25, 68:10, 68:11, 68:24, 70:10, 77:17

**neighborhoods** [2] - 15:5, 15:7

**never** [3] - 40:22, 62:3, 78:23

**new** [16] - 13:2, 29:11, 34:17, 35:3, 56:5, 56:6, 56:12, 57:13, 73:22, 73:23, 75:25, 83:9, 84:6, 84:7, 84:9, 84:10

**next** [12] - 4:13, 13:18, 25:12, 28:14, 28:19, 28:20, 28:21, 30:19, 38:16, 55:12, 82:22, 82:25

**Nichols** [1] - 67:2

**night** [1] - 4:11

**Ninth** [1] - 74:7

**NO** [1] - 1:5

**Noah** [1] - 3:14

**nobody** [3] - 26:12, 26:13, 70:21

**non** [9] - 7:19, 21:16, 25:18, 25:24, 26:19, 55:16, 59:4, 68:22, 72:13

**non-bus** [1] - 55:16

**non-disabled** [3] - 25:18, 25:24, 26:19

**non-IDEA** [1] - 21:16

**non-lawyers** [1] - 72:13

**non-public** [1] - 7:19

**non-receiver** [1] - 68:22

**non-receivership** [1] - 59:4

**none** [6] - 36:21, 36:22, 40:24, 49:15,

51:22, 79:17

**North** [1] - 1:14

**note** [1] - 41:25, 45:19, 73:20, 83:7

**noted** [2] - 29:11, 80:7

**notes** [2] - 37:2, 42:8

**nothing** [12] - 9:18, 23:12, 42:3, 43:22, 43:23, 50:25, 51:13, 70:6, 70:8, 73:15, 81:9, 81:13

**notice** [3] - 71:18, 75:9, 80:23

**nowhere** [2] - 31:8, 80:2

**number** [20] - 11:1, 11:3, 15:11, 25:21, 47:22, 47:24, 48:7, 48:9, 48:18, 52:9, 53:22, 54:4, 54:5, 54:12, 61:20, 68:14, 68:19, 75:17, 80:25, 82:1

**numbers** [2] - 47:13, 49:1

**numerosity** [2] - 64:4, 74:21

**numerous** [1] - 75:4

**nurse** [1] - 61:25

**nurses** [2] - 8:1, 65:20

**NW** [4] - 1:14, 1:18, 1:24, 2:3

## O

**oath** [1] - 69:7

**obvious** [1] - 51:6

**obviously** [2] - 6:12, 77:5

**occasion** [1] - 27:18

**occasional** [1] - 59:17

**OF** [3] - 1:1, 1:7, 1:10

**offer** [3] - 17:1, 18:16, 32:8

**offering** [1] - 16:18

**offers** [2] - 9:22, 23:13

**Office** [2] - 2:1, 4:3

**office** [2] - 3:23, 20:9

**officer** [24] - 18:3, 18:13, 18:22, 19:19, 20:10, 22:8, 36:12, 36:21, 37:11, 37:14, 38:11, 38:19, 39:5, 39:9, 39:12, 40:12, 40:16, 41:6, 41:22, 42:1, 42:6, 42:17,

76:5, 77:23

**Officer** [1] - 39:7

**officer's** [5] - 21:3, 39:24, 40:4, 41:11, 42:12

**officers** [13] - 17:10, 17:13, 17:16, 18:24, 19:6, 19:11, 19:16, 20:5, 20:24, 21:13, 22:5, 40:7, 67:10

**OFFICIAL** [1] - 87:19

**Official** [2] - 1:23, 87:12

**often** [8] - 14:20, 16:2, 16:4, 16:6, 25:20, 67:25, 81:1, 81:16

**oftentimes** [2] - 16:11, 18:9

**old** [1] - 7:18

**Olmstead** [4] - 25:9, 25:10, 25:12, 25:15

**on-time** [2] - 14:8, 15:24, 61:15

**once** [1] - 50:16

**one** [63] - 3:16, 6:7, 7:1, 7:2, 8:19, 8:20, 8:21, 10:14, 11:16, 18:16, 19:19, 20:14, 30:23, 33:14, 33:21, 37:1, 38:20, 39:5, 40:5, 40:9, 41:17, 41:25, 43:6, 44:3, 44:5, 46:11, 50:9, 50:11, 50:12, 51:17, 52:22, 52:23, 55:2, 55:19, 60:2, 60:9, 60:12, 60:14, 60:15, 62:1, 62:10, 63:25, 65:10, 67:20, 68:14, 69:20, 70:10, 72:19, 72:23, 73:3, 76:15, 77:13, 78:4, 78:13, 78:19, 78:22, 81:22, 82:10, 83:9, 85:3, 85:20

**One** [1] - 24:24

**one-on-one** [1] - 62:1

**ongoing** [4] - 4:21, 5:2, 7:8, 86:16

**online** [2] - 47:13, 47:18

**open** [2] - 31:4, 37:3

**operate** [1] - 13:4

**operated** [1] - 49:11

**operating** [1] - 7:10

**operations** [2] - 4:13, 30:16, 61:9

**opinion** [6] - 25:13,

68:2, 72:22, 73:2, 74:23, 75:5

**opportunities** [4] - 25:4, 25:21, 26:9, 60:2

**opportunity** [9] - 5:9, 9:17, 10:8, 40:23, 61:11, 61:24, 64:21, 64:24, 80:8

**oppose** [1] - 83:18

**opposed** [1] - 53:12

**opposite** [1] - 48:15

**opposition** [3] - 9:18, 24:1, 36:20

**option** [1] - 19:19

**options** [2] - 20:14

**orally** [1] - 5:25

**Order** [1] - 3:1

**order** [34] - 17:14, 17:20, 18:3, 18:13, 19:17, 20:5, 20:11, 20:15, 22:9, 38:12, 38:14, 38:21, 39:1, 39:5, 42:5, 48:19, 61:4, 62:14, 68:15, 68:19, 70:3, 70:18, 71:12, 71:13, 71:14, 71:18, 73:17, 80:1, 80:18, 83:15, 83:16, 85:10, 85:13

**ordered** [4] - 17:17, 19:20, 22:5

**ordering** [1] - 28:24

**orderly** [1] - 69:13

**orders** [2] - 17:25, 42:6

**organization** [5] - 6:24, 10:16, 10:18, 24:12, 43:16

**organization's** [1] - 11:15

**organizational** [2] - 24:9, 58:18

**organizations** [1] - 43:25

**original** [1] - 87:13

**OSSE** [21] - 4:5, 14:14, 16:16, 16:18, 35:4, 38:12, 38:21, 39:1, 39:2, 47:12, 47:19, 48:7, 51:4, 52:5, 56:10, 56:12, 58:2, 63:13, 70:1, 82:20, 84:3

**OSSE's** [10] - 16:9, 23:2, 33:19, 36:1, 38:10, 38:17, 40:12, 50:14, 50:23, 55:9

**otherwise** [5] - 9:19, 28:19, 46:25, 70:24,

71:11

**outcome** [2] - 64:18, 64:21

**outdated** [1] - 7:10

**outside** [1] - 53:7

**outstanding** [1] - 83:8

**overarching** [1] - 70:13

**overbroad** [1] - 28:4

**overlapping** [1] - 21:10

**overlaps** [1] - 21:22

**owed** [2] - 64:13, 64:25

**own** [5] - 8:12, 16:3, 24:12, 26:6, 30:6

**owns** [1] - 14:1

## P

**p.m** [4] - 1:11, 87:3, 87:4, 87:9

**page** [6] - 38:16, 39:15, 40:6, 55:6, 68:2, 87:14

**pages** [1] - 38:7

**paper** [1] - 12:21

**papers** [3] - 63:11, 64:6, 67:8

**paragraph** [5] - 38:10, 38:17, 39:20, 48:10, 55:12

**paragraphs** [2] - 35:13, 55:4

**parent** [10] - 8:18, 14:19, 16:10, 16:12, 18:8, 18:18, 36:18, 36:23, 49:17, 60:11

**parents** [24] - 6:22, 7:17, 8:4, 12:9, 16:3, 16:7, 16:13, 16:17, 16:19, 16:21, 17:3, 20:6, 20:9, 20:16, 21:11, 31:10, 31:11, 36:17, 41:17, 56:14, 59:9, 65:25, 77:22

**Parents** [1] - 16:15

**parents'** [2] - 23:9, 23:12

**Park's** [1] - 35:11

**park's** [1] - 48:9

**part** [13] - 17:24, 31:1, 35:11, 54:2, 61:11, 68:3, 69:16, 70:4, 72:15, 74:24, 75:8, 78:17, 85:3

**participated** [1] - 72:19

**participation** [3] -

11:20, 45:21, 46:2
**particular** [6] -
14:23, 44:18, 47:9,
70:4, 74:14, 83:25
**particularly** [10] -
16:13, 18:11, 24:15,
25:22, 54:18, 64:1,
67:4, 72:14, 73:7,
83:6
**parties** [4] - 6:6,
31:2, 73:9, 80:24
**partner** [1] - 3:13
**parts** [3] - 29:21,
53:24, 54:11
**party** [2] - 46:21,
47:2
**past** [3] - 9:20, 18:6,
57:4
**pattern** [1] - 59:9
**PAUL** [1] - 1:10
**Pause** [3] - 11:4,
73:5, 82:17
**pay** [2] - 55:9, 55:22
**paying** [1] - 54:15
**peers** [4] - 25:18,
25:24, 26:2, 26:19
**Peg** [1] - 62:19
**peg** [1] - 3:12
**peg/round** [1] - 44:2
**pegs** [2] - 44:12,
44:13
**pejorative** [1] - 57:17
**pejoratively** [1] -
84:22
**people** [11] - 15:5,
30:25, 55:20, 57:3,
64:7, 64:9, 69:6,
71:22, 75:2, 79:3,
79:21
**peoples** [1] - 6:24
**percent** [15] - 12:3,
14:8, 14:12, 48:12,
48:14, 49:24, 50:5,
52:3, 56:20, 59:19,
59:20, 59:21, 70:5,
70:6, 70:7
**percentage** [1] -
61:14
**Perez** [3] - 21:25,
22:10, 27:20
**perfect** [2] - 29:15,
30:14
**perhaps** [3] - 12:14,
41:22, 46:11
**period** [2] - 48:8,
59:10
**periods** [1] - 55:13
**permeate** [1] - 71:8
**persistent** [1] - 10:3
**person** [4] - 14:24,

53:7, 53:12, 87:5
**personal** [1] - 16:4
**personnel** [4] -
65:20, 66:4, 66:15,
69:8
**perspective** [2] -
50:3, 86:9
**persuaded** [1] -
40:12
**pervade** [1] - 62:25
**petitioner** [2] -
38:11, 38:18
**petitioner's** [1] -
40:13
**Petties** [15] - 9:8,
11:25, 12:2, 12:12,
14:9, 14:22, 50:18,
52:10, 52:14, 52:18,
54:2, 56:2, 59:3, 63:7,
66:6
**ph** [2] - 3:14, 3:15
**phone** [1] - 37:3
**physical** [1] - 8:11
**PI** [7] - 48:1, 48:5,
49:5, 49:7, 55:3, 74:3,
79:25
**pick** [6] - 7:4, 14:16,
15:22, 37:12, 81:24,
82:1
**picked** [2] - 65:11,
66:1
**picking** [2] - 15:4,
65:8
**pickup** [3] - 50:8,
50:12, 51:11
**pickups** [2] - 49:23,
50:2
**picture** [1] - 73:16
**piece** [1] - 74:11
**piecemeal** [1] -
73:11
**piloted** [1] - 37:2
**place** [6] - 19:20,
20:2, 31:25, 42:8,
56:1, 82:2
**placed** [2] - 59:11,
71:4
**placing** [1] - 54:4
**plain** [1] - 46:1
**plaintiff** [17] - 10:1,
19:14, 24:14, 33:2,
41:18, 46:11, 46:20,
50:21, 58:18, 77:11,
77:13, 77:17, 77:18,
77:19, 78:1, 78:20,
81:23
**Plaintiff** [1] - 47:17
**plaintiffs** [78] - 3:12,
3:17, 3:22, 5:7, 5:22,
6:2, 6:3, 6:6, 6:13,

6:21, 8:22, 11:18,
15:21, 17:5, 17:17,
19:21, 20:22, 21:23,
22:1, 22:11, 22:21,
24:5, 24:22, 26:11,
27:2, 34:12, 36:9,
36:10, 37:1, 37:10,
38:2, 40:1, 40:19,
41:4, 41:16, 41:20,
41:21, 41:23, 42:11,
43:23, 44:20, 47:6,
47:16, 48:2, 48:16,
48:23, 49:19, 50:3,
52:23, 55:19, 57:16,
59:8, 61:10, 62:4,
62:20, 62:21, 65:10,
67:17, 74:13, 74:19,
75:15, 75:17, 76:8,
77:6, 77:21, 78:14,
78:15, 78:24, 79:13,
79:14, 79:18, 82:15,
83:8, 83:14, 83:17,
84:17, 86:20
**Plaintiffs** [1] - 1:5
**PLAINTIFFS** [1] -
1:13
**plaintiffs'** [9] - 7:16,
16:24, 37:23, 42:3,
49:3, 55:3, 84:24,
85:8, 86:8
**plan** [17] - 29:13,
31:25, 32:4, 32:7,
60:19, 60:24, 61:5,
61:11, 65:22, 65:23,
68:15, 68:18, 68:25,
70:4, 70:11, 76:17
**planned** [1] - 12:7
**planning** [1] - 7:2
**plans** [11] - 14:1,
31:13, 57:12, 57:13,
57:14, 84:8, 84:10,
84:20, 84:22, 85:7,
86:13
**pledged** [1] - 34:24
**podium** [1] - 3:4
**point** [22] - 32:23,
33:5, 34:14, 35:12,
37:12, 38:1, 39:25,
41:2, 45:18, 46:17,
47:4, 47:12, 53:5,
53:10, 54:22, 56:3,
63:6, 64:16, 72:19,
72:23, 76:8, 77:6
**pointed** [4] - 33:9,
36:19, 38:15, 55:17
**points** [6] - 23:7,
47:5, 52:23, 58:4,
58:14, 62:23
**policies** [4] - 17:7,
19:8, 20:2, 38:22

**policy** [1] - 55:9
**population** [1] - 52:3
**position** [4] - 19:5,
42:15, 59:2, 67:14
**possible** [2] - 25:19,
29:16
**post** [1] - 4:21
**posts** [1] - 47:12
**potential** [1] - 30:21
**potentially** [2] - 32:3,
36:25
**practical** [1] - 75:11
**practice** [1] - 55:24
**practices** [5] - 17:1,
17:7, 19:8, 55:5,
76:24
**practicing** [1] - 3:7
**praises** [1] - 49:20
**prayer** [1] - 38:8
**precedent** [4] -
22:10, 25:8, 27:15,
66:22
**precisely** [1] - 28:23
**preclude** [1] - 68:2
**predict** [1] - 15:16
**predominance** [2] -
67:6, 67:7
**preference** [2] - 6:8,
6:11
**preliminary** [20] -
6:17, 10:6, 10:12,
11:6, 13:13, 22:15,
30:24, 46:9, 46:18,
46:19, 46:20, 49:6,
60:5, 62:5, 62:11,
80:1, 83:16, 84:25,
85:10, 85:19
**preparing** [1] - 57:7
**presented** [5] -
10:11, 15:19, 40:22,
63:11, 71:7
**presently** [1] - 50:25
**pretty** [1] - 23:22
**primarily** [1] - 51:3
**prime** [1] - 68:5
**Prince** [1] - 54:19
**private** [17] - 13:24,
31:17, 35:9, 35:19,
51:10, 55:15, 55:17,
55:21, 56:5, 59:11,
66:10, 66:11, 69:9,
69:11, 69:12, 69:15,
81:11
**privately** [1] - 49:11
**problem** [47] - 5:2,
13:20, 14:3, 29:10,
30:19, 31:21, 33:3,
33:4, 33:7, 33:8, 34:3,
34:6, 34:11, 34:12,
35:5, 36:22, 48:15,

51:9, 51:12, 51:13,
51:21, 52:17, 52:19,
52:21, 53:1, 53:3,
54:17, 55:10, 59:9,
59:22, 60:6, 60:15,
63:20, 64:25, 65:8,
65:13, 66:2, 66:14,
67:16, 69:4, 69:8,
76:3, 81:10, 81:13
**problems** [20] - 13:1,
18:6, 18:11, 18:15,
18:18, 19:2, 23:7,
23:14, 33:1, 33:16,
33:19, 36:13, 48:23,
49:14, 54:16, 59:9,
60:13, 60:18, 61:6,
65:16
**procedural** [3] -
24:1, 63:12, 66:14
**procedures** [2] -
38:22, 42:19
**proceed** [1] - 6:3
**proceeding** [2] -
39:25, 43:22
**Proceedings** [1] -
87:9
**proceedings** [2] -
46:1, 83:3
**process** [26] - 17:6,
20:7, 22:2, 22:7,
29:17, 33:6, 33:12,
35:3, 38:5, 40:17,
40:22, 51:15, 57:18,
60:11, 60:17, 63:13,
63:24, 66:9, 66:11,
66:14, 70:20, 74:6,
76:1, 83:3, 83:9,
85:12
**procurement** [3] -
35:1, 35:3, 57:25
**Produced** [1] - 1:25
**professional** [1] -
53:25
**proffer** [1] - 85:5
**programs** [1] - 65:18
**progress** [4] - 86:12,
86:13, 86:17, 87:5
**prohibit** [1] - 24:21
**promise** [2] - 25:13
**promises** [2] - 10:1,
61:3
**prongs** [1] - 79:20
**proof** [3] - 49:4,
51:22, 76:16
**proper** [3] - 8:16,
69:13, 69:14
**properly** [3] - 24:2,
24:4, 24:5
**propose** [1] - 81:5
**proposed** [14] - 61:4,

62:14, 70:18, 71:12, 71:13, 71:14, 73:17, 75:16, 76:16, 80:18, 83:15, 84:3, 85:10
**proposing** [1] - 84:5
**proposition** [1] - 43:3
**prospective** [3] - 41:21, 41:24, 42:5
**protected** [1] - 37:6
**prove** [2] - 76:25, 81:5
**provide** [26] - 7:8, 9:11, 9:22, 10:7, 15:2, 16:10, 17:11, 17:20, 18:3, 23:18, 24:16, 26:1, 38:13, 38:22, 41:8, 41:9, 41:14, 68:15, 68:16, 68:25, 69:5, 75:20, 82:19, 82:21, 83:14, 84:4
**provided** [5] - 41:11, 42:6, 68:21, 69:5, 81:1
**provides** [1] - 64:20
**providing** [3] - 6:14, 23:23, 66:12
**provision** [1] - 40:9
**provisional** [2] - 71:11, 71:25
**public** [4] - 7:19, 17:20, 57:21
**pull** [2] - 10:25, 77:16
**pulling** [1] - 38:4
**purported** [1] - 52:8
**purposes** [2] - 46:23, 64:10
**put** [17] - 15:10, 16:7, 36:7, 50:3, 58:1, 69:6, 70:18, 73:4, 75:17, 79:8, 79:9, 81:6, 82:2, 83:22, 84:12, 84:18, 84:21
**putative** [10] - 4:20, 41:19, 49:3, 49:8, 49:18, 50:19, 50:21, 55:20, 63:1, 64:10
**putting** [4] - 5:1, 83:10, 85:11, 86:13

## Q

**qualified** [1] - 26:11
**quarter** [1] - 52:3
**questions** [22] - 10:13, 24:18, 26:23, 27:21, 28:24, 37:21, 46:8, 46:22, 58:15, 62:12, 62:22, 62:25,

67:7, 75:25, 76:16, 76:21, 76:23, 77:3, 77:4, 80:5, 82:7, 84:18
**quick** [1] - 13:15
**quickly** [1] - 50:18
**quite** [4] - 14:6, 23:21, 73:21, 85:6
**quote** [9] - 37:16, 45:9, 50:7, 64:17, 65:2, 72:8, 73:9, 77:16, 81:15
**quoted** [1] - 80:7

## R

**raise** [1] - 82:23
**raised** [5] - 33:6, 36:21, 45:22, 76:1, 79:16
**ran** [1] - 48:7
**rate** [3] - 14:8, 14:10
**rates** [1] - 12:5
**rather** [4] - 12:25, 27:3, 54:23, 77:2
**ratio** [1] - 80:25
**RDR** [1] - 87:18
**RDR-CRR** [1] - 87:18
**Re** [6] - 74:10, 74:18, 76:13, 77:15, 78:3, 79:15
**read** [12] - 5:11, 33:15, 38:12, 38:19, 39:7, 52:8, 72:10, 73:25, 74:8, 76:15, 76:21, 78:11
**reading** [4] - 18:23, 38:25, 52:12, 76:12
**reads** [1] - 40:4
**ready** [4] - 32:20, 36:1, 77:1, 82:6
**real** [6] - 7:3, 13:21, 28:10, 29:7, 30:10, 49:7
**real-time** [1] - 7:3
**realistic** [5] - 13:14, 14:16, 28:6, 29:3, 68:12
**really** [17] - 19:10, 27:15, 31:3, 32:7, 43:14, 43:17, 45:10, 47:6, 51:20, 53:25, 55:20, 58:4, 69:18, 72:13, 74:8, 76:13, 81:7
**Realtime** [1] - 1:23
**reason** [1] - 27:1
**reasons** [5] - 26:16, 37:7, 75:11, 78:22, 85:20

**rebut** [1] - 23:13
**rebuttal** [1] - 58:8
**receive** [2] - 41:23, 59:10
**received** [2] - 35:5, 41:21
**receiver** [6] - 53:9, 53:12, 53:18, 68:22
**receivership** [2] - 59:3, 59:4
**receiving** [1] - 14:5
**recent** [3] - 27:15, 27:20, 33:14
**recently** [1] - 21:24
**Recessed** [1] - 58:12
**recognize** [1] - 31:23
**recognizing** [1] - 20:11
**recollection** [1] - 14:22
**recommendations** [1] - 23:14
**Record** [1] - 1:25
**record** [17] - 3:5, 6:14, 10:16, 10:20, 20:23, 23:21, 34:10, 39:7, 40:5, 53:8, 73:4, 73:5, 81:8, 81:12, 85:18, 86:2, 87:14
**records** [2] - 76:18, 76:25
**rectified** [1] - 70:22
**redesign** [1] - 29:1
**Reeves** [2] - 87:12, 87:18
**REEVES** [2] - 1:22, 87:18
**refer** [1] - 5:22
**reference** [1] - 64:8
**references** [1] - 36:6
**reflected** [1] - 53:8
**reform** [1] - 10:1
**refute** [1] - 23:12
**regard** [4] - 66:10, 73:17, 73:18, 86:17
**regardless** [3] - 27:10, 47:1, 49:5
**Registered** [1] - 1:22
**registry** [1] - 54:8
**regular** [1] - 12:8
**regularly** [1] - 50:8
**regulations** [2] - 44:16, 87:14
**Rehab** [1] - 42:24
**Rehabilitation** [2] - 9:15, 24:20
**Reid** [2] - 37:17, 81:21
**reimbursement** [2] - 16:5, 50:24

**rejected** [1] - 81:20
**related** [2] - 41:2, 41:14
**relating** [1] - 40:8
**reliable** [9] - 7:8, 8:4, 9:11, 9:23, 29:24, 38:13, 38:23, 39:3, 75:21
**reliably** [1] - 63:16
**relied** [1] - 74:9
**relief** [61] - 11:19, 18:14, 18:21, 19:8, 19:17, 20:12, 22:5, 22:9, 29:13, 33:17, 36:8, 36:14, 38:8, 38:9, 38:10, 38:16, 38:17, 39:1, 39:3, 40:1, 40:17, 40:20, 41:7, 41:21, 41:24, 42:5, 44:11, 47:6, 47:9, 47:10, 49:6, 51:23, 59:6, 61:12, 62:6, 73:12, 73:15, 74:14, 74:17, 74:18, 77:11, 77:17, 78:14, 78:20, 78:22, 78:24, 79:1, 79:4, 79:5, 79:6, 79:7, 79:14, 79:18, 79:22, 80:1, 80:12, 80:14, 83:2, 83:8
**rely** [1] - 59:25
**remain** [2] - 73:7
**remarks** [1] - 75:12
**remedied** [2] - 63:25, 65:1
**remedies** [1] - 22:2
**remedy** [2] - 51:14, 71:4
**remember** [3] - 33:23, 65:3, 78:12
**remembering** [1] - 20:22
**remuneration** [1] - 17:18
**repeatedly** [2] - 47:12, 74:19
**repetition** [1] - 83:5
**reply** [7] - 4:21, 5:3, 5:10, 18:11, 43:2, 47:16, 50:20
**report** [5] - 13:11, 37:22, 50:8, 53:20, 54:25
**reported** [1] - 49:12
**Reporter** [4] - 1:22, 1:23, 1:23, 87:12
**reporter** [1] - 7:14
**REPORTER** [1] - 87:19
**reporting** [2] - 32:14,

32:17
**reports** [7] - 14:7, 34:1, 48:1, 49:14, 49:21, 50:6, 50:11
**represent** [1] - 48:12
**representative** [1] - 74:17
**represented** [1] - 4:5
**representing** [1] - 6:21
**represents** [1] - 34:2
**request** [8] - 4:22, 5:9, 38:8, 38:9, 42:4, 61:10, 76:18, 78:15
**requested** [4] - 35:7, 39:1, 47:11, 66:21
**requesting** [1] - 66:23
**requests** [2] - 38:11, 38:19
**require** [4] - 16:21, 52:7, 61:4, 68:1
**required** [8] - 23:15, 23:22, 49:5, 61:22, 63:14, 63:15, 63:17, 68:10
**requirement** [2] - 20:17, 66:19
**requirements** [2] - 19:23, 69:21
**requires** [5] - 12:20, 22:24, 27:16, 45:20, 46:2
**requisite** [2] - 54:4, 54:5
**rerouting** [1] - 57:10
**reserve** [1] - 5:15
**resolve** [2] - 5:25, 37:22
**resolved** [2] - 51:16, 74:5
**resource** [1] - 16:10
**resources** [1] - 30:15
**respect** [15] - 17:16, 18:1, 20:23, 21:8, 21:16, 45:4, 45:5, 45:15, 62:10, 77:24, 81:14, 83:16, 84:10, 84:11
**respectfully** [3] - 4:22, 38:11, 38:19
**respects** [1] - 28:3
**respond** [3] - 5:14, 50:20, 84:17
**response** [2] - 5:10, 58:14
**responsible** [2] - 35:25, 52:5
**restraint** [1] - 8:2
**result** [2] - 16:2, 61:8

**results** [1] - 24:16
**retained** [1] - 51:20
**review** [4] - 6:4,
61:11, 83:5, 83:13
**revised** [5] - 62:13,
71:14, 83:15, 85:10,
85:13
**RFPs** [1] - 28:11
**ride** [2] - 8:17, 29:25
**rights** [2] - 6:24,
73:10
**Rights** [7] - 1:16,
3:21, 9:15, 21:9,
21:17, 24:20, 27:1
**rigorous** [1] - 9:9
**ripe** [1] - 46:16
**risk** [2] - 8:24, 14:4
**Robertson** [3] - 3:3,
18:2, 18:6
**ROBERTSON** [1] -
1:3
**Robinson** [1] - 30:23
**robust** [1] - 66:22
**role** [1] - 30:21
**rolling** [2] - 48:20,
48:25
**ROSE** [1] - 1:17
**roughly** [2] - 49:25,
79:3
**round** [2] - 44:12,
44:13
**route** [7] - 34:9,
47:21, 48:22, 49:11,
51:11, 59:12
**routed** [1] - 55:12
**routes** [15] - 12:7,
29:1, 35:9, 47:19,
47:24, 48:6, 48:7,
48:10, 48:11, 49:16,
55:14, 55:17, 55:21,
56:5, 56:12
**Routes** [1] - 55:6
**routines** [1] - 60:1
**routing** [24] - 14:1,
17:2, 35:3, 55:23,
56:6, 57:13, 57:15,
65:17, 65:18, 69:18,
69:19, 69:22, 70:5,
70:14, 76:3, 81:6,
81:7, 81:8, 81:10,
82:19, 84:4, 84:6,
84:10
**Rule** [5] - 64:21,
73:9, 74:11, 74:24,
74:25
**rule** [4] - 72:9, 74:24,
75:8, 85:18
**rules** [1] - 80:12
**run** [4] - 48:11, 53:7,
60:7, 70:1

**running** [3] - 52:20,
57:19

**S**

**safe** [9] - 7:8, 9:11,
9:22, 17:11, 29:24,
38:23, 39:2, 74:22,
75:20
**safely** [5] - 7:11,
8:17, 17:9, 29:19,
63:16
**safest** [1] - 55:14
**safety** [4] - 8:2,
31:14, 37:7, 61:25
**sanctions** [3] - 54:9,
54:10, 54:12
**satisfied** [2] - 64:22,
80:8
**scale** [2] - 22:17,
80:11
**scheduled** [1] - 55:7
**school** [76] - 7:4,
7:11, 8:18, 10:9, 12:2,
13:19, 14:2, 14:17,
14:21, 14:25, 15:6,
15:8, 15:18, 15:20,
15:21, 15:23, 16:4,
16:22, 17:8, 18:19,
23:5, 23:8, 23:10,
26:7, 26:9, 28:16,
28:19, 28:21, 29:11,
29:15, 29:19, 30:2,
30:19, 31:18, 32:2,
32:11, 32:15, 34:13,
36:2, 36:3, 36:13,
38:14, 38:24, 39:2,
42:2, 48:4, 48:18,
49:10, 49:12, 49:22,
50:5, 50:9, 50:22,
51:12, 51:18, 55:8,
55:15, 56:25, 57:7,
57:13, 57:19, 59:21,
59:24, 60:1, 61:17,
62:3, 62:8, 63:16,
70:7, 70:22, 80:23,
81:22, 84:9, 84:20,
85:6
**schooldays** [1] -
49:24
**schools** [8] - 7:18,
7:19, 7:20, 15:2, 26:1,
49:16, 56:16
**science** [1] - 76:14
**scoffed** [1] - 74:12
**seal** [1] - 84:24
**Seat** [2] - 39:7, 41:22
**seat** [3] - 39:10,
39:13, 39:22
**second** [7] - 22:23,

43:7, 43:9, 65:20,
66:24, 78:17, 82:10
**Section** [2] - 9:15,
19:3
**secure** [3] - 8:2,
19:8, 61:24
**see** [16] - 5:19, 5:24,
13:21, 26:7, 33:16,
36:20, 37:3, 37:19,
42:14, 51:3, 58:3,
58:11, 68:17, 74:23,
82:12, 84:25
**seeing** [2] - 4:8, 4:9
**seek** [3] - 16:5, 65:7,
80:9
**seeking** [7] - 11:19,
19:7, 19:18, 22:3,
22:6, 24:8, 36:14
**seem** [6] - 13:10,
15:2, 15:18, 51:14,
51:15, 74:12
**seemingly** [1] -
50:24
**segregated** [1] - 26:2
**segregating** [3] -
25:3, 25:7, 26:15
**seizure** [1] - 8:16
**select** [1] - 10:18
**sell** [1] - 72:11
**semester** [2] - 70:25,
71:1
**sending** [1] - 55:21,
76:19
**sense** [3] - 41:7,
42:15, 42:18
**sentence** [2] - 40:11,
71:24
**Seon** [1] - 12:24
**separate** [4] - 38:8,
74:18, 75:24, 80:4
**separately** [1] - 27:4
**September** [1] -
33:14
**serious** [2] - 8:25,
28:24
**serve** [1] - 7:20
**service** [1] - 41:14
**services** [7] - 7:9,
10:7, 23:1, 23:11,
29:24, 35:20, 80:25
**set** [3] - 11:14, 16:15,
86:23
**sets** [1] - 38:8
**settings** [1] - 25:18
**settled** [1] - 33:13
**several** [2] - 66:4,
72:24
**share** [1] - 37:6
**shared** [2] - 57:15,
57:16

**Sherard** [1] - 3:14
**shifted** [1] - 36:17
**shifting** [1] - 16:2
**shocking** [1] - 12:14
**Shoemaker** [1] -
3:14
**short** [6] - 13:18,
31:23, 32:9, 40:21,
62:7, 85:11
**short-term** [2] -
13:18, 40:21
**shortage** [1] - 65:21
**shorter** [1] - 58:7
**show** [23] - 8:5,
14:19, 24:12, 24:13,
26:24, 26:25, 36:8,
37:24, 43:12, 44:17,
45:2, 46:10, 46:23,
47:8, 49:9, 50:3, 53:1,
60:5, 67:5, 67:6,
80:17, 80:19
**showed** [2] - 7:4,
26:17
**showing** [3] - 26:17,
49:4, 49:7
**shown** [2] - 30:4,
49:1, 80:15
**shows** [12] - 23:16,
33:15, 48:4, 48:5,
50:13, 51:19, 59:1,
59:8, 60:7, 60:13,
81:9, 81:12
**side** [5] - 4:15, 5:4,
44:23, 80:11, 85:8
**sides** [2] - 43:11,
78:4
**sidewalk** [1] - 51:6
**significant** [7] - 10:3,
18:14, 18:17, 22:19,
28:18, 60:6, 62:9
**significantly** [1] -
52:11
**similar** [1] - 79:19
**similarly** [5] - 21:7,
24:11, 38:18, 40:13,
49:3
**simple** [3] - 15:8,
23:22, 48:5
**simply** [1] - 67:13
**single** [1] - 57:1
**sits** [1] - 82:24
**situated** [2] - 38:18,
40:14
**situation** [10] -
54:23, 55:1, 59:7,
63:5, 63:10, 68:4,
69:20, 71:4, 71:6,
72:7
**situations** [1] - 70:13
**six** [5] - 29:12, 49:8,

49:22, 50:8, 75:24
**Sixth** [1] - 2:3
**skip** [1] - 40:6
**sliding** [1] - 22:17
**slower** [1] - 7:13
**small** [1] - 61:14
**smart** [1] - 13:23
**Smith** [4] - 8:23,
51:10, 51:14, 60:10
**Smith-Davis** [2] -
8:23, 60:10
**soaked** [1] - 8:12
**software** [2] - 14:1,
69:24
**soliciting** [1] - 84:6
**solution** [2] - 31:21,
31:22
**solutions** [1] - 13:20
**solve** [2] - 35:4, 66:2
**solved** [1] - 14:3
**solving** [1] - 60:15
**sometimes** [7] -
8:12, 25:24, 48:16,
51:6, 54:6, 56:23,
71:25
**somewhat** [2] - 18:5,
85:2
**somewhere** [2] -
64:6, 79:11
**son** [2] - 7:4, 9:2
**son's** [1] - 51:19
**SONJA** [1] - 1:22,
87:18
**Sonja** [2] - 87:12,
87:18
**soon** [2] - 28:13,
85:19
**sort** [11] - 5:10,
19:22, 22:10, 26:4,
26:10, 31:7, 37:3,
37:20, 59:17, 73:22,
74:3
**sorts** [4] - 44:5,
44:15, 56:25, 68:3
**sounds** [1] - 76:22
**speaking** [1] - 49:25
**speaks** [2] - 9:4,
77:15
**special** [10] - 20:1,
35:21, 35:22, 37:4,
43:25, 52:4, 53:10,
56:4, 68:24, 70:10
**specific** [9] - 58:16,
63:7, 65:23, 69:17,
70:11, 70:18, 71:3,
74:4, 78:14
**specifically** [9] -
33:5, 38:1, 41:13,
57:14, 65:7, 67:5,
70:3, 80:20, 81:20

**speculate** [1] - 48:23
**speed** [1] - 35:3
**spend** [5] - 16:21,
32:5, 37:7, 56:4, 56:5
**spending** [1] - 56:23
**spent** [1] - 78:18
**spot** [1] - 61:24
**spots** [1] - 8:2
**spring** [1] - 71:1
**square** [3] - 44:2,
44:12
**staff** [1] - 7:25
**staffing** [3] - 12:5,
13:7, 17:2
**stage** [2] - 49:5,
79:23
**stand** [2] - 28:12,
69:6
**standard** [8] - 26:24,
27:13, 27:18, 27:19,
37:13, 49:7, 80:2,
80:24
**standards** [3] - 12:8,
29:25, 44:4
**standing** [31] -
11:10, 11:16, 24:2,
24:7, 24:8, 24:10,
29:4, 43:4, 43:6,
43:10, 43:12, 44:4,
44:10, 44:14, 44:15,
44:17, 45:6, 45:7,
45:10, 45:11, 45:15,
45:19, 45:22, 46:5,
46:16, 46:22, 58:22,
58:24, 79:16, 79:18
**start** [17] - 13:7,
13:19, 28:8, 28:10,
29:15, 29:17, 30:19,
31:24, 32:11, 32:24,
55:8, 58:16, 58:25,
60:18, 62:8, 65:1,
69:1
**starting** [4] - 29:12,
29:13, 76:22
**starts** [1] - 50:2
**state** [2] - 3:4, 85:18
**statement** [1] - 69:17
**STATES** [1] - 1:1
**States** [4] - 6:23,
44:9, 87:12, 87:15
**stating** [1] - 63:3
**status** [1] - 85:17
**statute** [2] - 27:15,
85:4
**stenographic** [1] -
87:13
**Stenographic** [1] -
1:25
**step** [1] - 55:3
**steps** [4] - 60:18,

61:6, 62:7, 63:7
**stick** [1] - 5:8
**still** [7] - 13:2, 27:8,
37:10, 59:21, 77:12,
77:13, 80:16
**stipend** [1] - 16:18
**stipends** [1] - 16:20
**stop** [2] - 40:15,
55:21
**stops** [1] - 51:4
**storage** [1] - 53:23
**story** [1] - 73:3
**straightforward** [1] -
67:24
**street** [3] - 14:23,
14:24, 69:20
**Street** [3] - 1:14,
1:18, 2:3
**strikes** [2] - 46:7,
54:23
**strikingly** [1] - 68:3
**striving** [1] - 34:21
**stroller** [2] - 8:17,
61:25
**structural** [2] -
36:14, 47:9
**stuck** [3] - 9:5, 26:2,
26:3
**Student** [1] - 74:6
**student** [12] - 8:15,
9:2, 18:8, 18:19, 27:7,
39:14, 46:3, 50:7,
55:15, 60:3, 62:2,
63:13
**student's** [1] - 81:3
**students** [64] - 6:22,
7:9, 7:11, 7:17, 7:20,
8:6, 8:11, 9:12, 9:16,
9:23, 10:4, 10:7, 12:1,
12:7, 13:16, 13:25,
14:4, 14:17, 15:17,
16:3, 16:11, 16:19,
16:22, 23:5, 23:8,
23:10, 24:25, 25:1,
25:3, 25:7, 25:17,
25:19, 25:22, 26:5,
26:8, 26:18, 27:5,
29:19, 30:1, 31:18,
32:10, 32:14, 33:1,
35:21, 35:22, 35:25,
38:18, 38:23, 40:14,
41:3, 41:17, 50:14,
55:7, 59:20, 59:25,
60:7, 61:17, 62:8,
63:15, 63:21, 64:5,
64:12, 68:24
**Students** [1] - 55:12
**students'** [6] - 7:25,
8:9, 22:24, 23:16,
23:17, 29:23

**stuff** [4] - 84:19,
85:15, 86:12
**subject** [5] - 6:3,
26:13, 40:12
**submit** [14] - 23:22,
32:4, 34:7, 48:14,
60:12, 61:5, 62:13,
68:12, 71:12, 71:13,
71:14, 73:17, 75:13,
78:6
**submits** [1] - 23:12
**submitted** [8] -
18:10, 23:5, 30:12,
30:23, 52:2, 59:8,
60:4, 60:23
**substantial** [3] -
49:4, 86:11, 86:16
**substantive** [1] -
29:6
**substitute** [1] - 50:10
**subsumed** [1] - 68:6
**succeed** [1] - 46:12
**success** [2] - 13:11,
22:18
**successful** [1] -
55:18
**sue** [1] - 42:23
**suffered** [1] - 80:17
**sufficient** [4] - 13:6,
35:9, 64:10, 79:21
**suggest** [5] - 58:5,
60:21, 83:17, 84:14,
85:1
**suggesting** [1] - 27:1
**suggestion** [1] - 86:5
**suggestions** [1] -
70:17
**suggests** [2] - 27:13,
51:13
**Sullivan** [4] - 3:23,
67:1, 67:20, 67:23
**summarize** [1] -
10:10
**summer** [2] - 3:14,
56:23
**Superintendent** [1] -
57:22
**superintendent** [7] -
4:12, 35:2, 53:6,
53:14, 53:16, 53:21,
83:24
**superior** [1] - 67:15
**superiority** [2] -
67:6, 67:9
**supervision** [2] -
9:10, 53:3
**supplement** [1] -
85:24
**supplemental** [4] -
47:16, 83:18, 84:16,

84:17
**support** [6] - 7:25,
20:18, 21:4, 43:3,
55:3, 60:4
**supported** [1] - 7:16
**supporting** [1] -
42:15
**suppose** [2] - 28:10,
44:8
**supposed** [5] -
27:24, 27:25, 28:2,
51:25
**Supreme** [12] - 9:25,
11:14, 21:9, 21:19,
21:21, 21:24, 22:9,
22:17, 25:8, 27:15,
27:20, 72:20
**sur** [1] - 5:10
**sur-reply** [1] - 5:10
**suspect** [1] - 78:25
**sustainability** [1] -
13:21
**swearing** [1] - 4:20
**switched** [1] - 49:16
**sworn** [1] - 57:23
**system** [37] - 7:4,
7:10, 7:22, 9:22, 12:1,
12:13, 12:18, 12:24,
13:1, 13:2, 13:4,
16:23, 23:6, 23:7,
27:9, 29:14, 31:4,
31:18, 31:22, 34:17,
35:4, 37:1, 50:23,
53:2, 53:7, 55:25,
56:6, 57:13, 57:15,
59:5, 60:6, 63:2,
63:19, 70:2, 76:9,
82:20, 84:6
**systematic** [1] -
76:10
**systemic** [57] -
17:14, 19:2, 19:13,
19:17, 19:22, 20:6,
20:12, 20:15, 20:23,
33:8, 33:17, 33:18,
34:11, 37:21, 37:24,
38:16, 39:3, 40:1,
40:23, 40:24, 47:6,
47:9, 48:15, 51:22,
52:1, 63:2, 63:4, 63:5,
63:9, 63:12, 63:20,
64:16, 64:25, 65:13,
65:17, 69:4, 69:8,
71:4, 71:5, 73:11,
73:14, 74:2, 74:3,
74:4, 77:9, 78:20,
78:22, 78:24, 79:1,
79:4, 79:5, 79:6, 79:7,
79:22, 84:19
**systems** [6] - 8:2,

12:15, 14:2, 30:7,
30:13, 60:23

**T**

**table** [7] - 3:23, 31:8,
36:24, 47:4, 48:2,
50:15, 82:11
**tags** [1] - 16:7
**tailor** [1] - 68:10
**tailored** [3] - 27:24,
73:18, 80:14
**takeover** [1] - 47:10
**talks** [3] - 10:22,
12:18, 78:20
**targeted** [1] - 35:21
**task** [2] - 7:11, 29:16
**Tatel** [4] - 66:25,
72:8, 72:23, 73:6
**Tatel's** [1] - 72:22
**team** [2] - 49:20,
58:2
**teamed** [1] - 73:21
**technology** [4] -
55:23, 56:1, 84:7,
84:10
**temporarily** [1] -
31:17
**term** [6] - 13:18,
13:19, 31:21, 32:10,
40:21, 62:7
**terminal** [11] - 14:11,
14:12, 14:20, 15:13,
48:19, 48:25, 61:16,
61:19, 62:2, 70:6,
70:8
**terms** [2] - 49:9, 65:5
**testimony** [2] -
57:23, 84:1
**text** [3] - 16:15,
43:23, 46:1
**texts** [3] - 50:8, 66:4
**textual** [1] - 27:16
**THE** [96] - 1:1, 1:10,
1:13, 2:1, 3:6, 3:10,
3:18, 4:1, 4:7, 5:4,
5:12, 5:20, 6:10, 6:13,
7:13, 8:19, 10:14,
10:24, 11:2, 11:7,
11:21, 13:12, 14:10,
14:22, 17:15, 17:24,
18:20, 19:10, 20:13,
21:15, 22:13, 22:16,
25:6, 25:10, 27:23,
30:20, 32:18, 32:20,
33:21, 35:11, 35:14,
35:16, 35:19, 36:3,
39:9, 39:11, 39:14,
39:18, 39:20, 39:22,
41:1, 42:9, 42:22,

43:9, 44:3, 45:4, 46:6, 48:13, 49:17, 50:15, 52:4, 52:8, 53:5, 56:22, 57:11, 58:4, 62:10, 62:17, 64:6, 65:3, 67:12, 71:12, 71:15, 71:17, 71:20, 71:24, 72:4, 72:10, 73:3, 73:19, 77:4, 77:18, 77:20, 78:8, 80:4, 82:8, 82:12, 82:16, 82:23, 83:13, 84:8, 86:11, 86:18, 86:21, 86:24, 87:3
**themselves** [3] - 16:4, 16:19, 70:21
**therapies** [1] - 8:7
**therefore** [3] - 42:17, 46:3, 64:19
**thinking** [1] - 20:22
**third** [3] - 20:17, 33:21, 45:20
**thirsty** [1] - 8:12
**thoughts** [1] - 44:25
**three** [24] - 4:19, 6:15, 15:4, 17:18, 17:21, 17:25, 18:1, 20:13, 20:14, 26:10, 32:25, 34:23, 41:3, 41:5, 41:6, 41:16, 41:17, 44:25, 50:9, 69:21, 70:10, 84:1, 85:17, 86:1
**thrive** [1] - 10:9
**throughout** [2] - 40:9, 75:22
**tickets** [1] - 12:21
**timeframe** [1] - 31:24
**timeline** [3] - 13:15, 62:13, 69:2
**timelines** [1] - 60:24, 61:5
**timeliness** [1] - 65:7, 65:8, 65:13, 69:8, 76:2
**timely** [3] - 49:9, 56:13, 66:15
**timing** [1] - 82:19
**tired** [1] - 78:9
**today** [29] - 3:12, 3:24, 5:10, 5:25, 7:1, 7:5, 7:16, 10:10, 12:13, 32:23, 44:22, 45:1, 46:8, 47:1, 47:7, 52:21, 54:16, 59:1, 60:13, 62:22, 75:24, 80:5, 82:9, 82:20, 85:2, 85:5, 86:5, 87:6
**today's** [2] - 9:7, 46:23

**together** [2] - 63:20, 85:25
**tomorrow** [1] - 76:17
**top** [2] - 67:16, 78:12
**total** [1] - 67:12
**totally** [1] - 80:4
**touch** [2] - 37:20, 50:18
**tout** [1] - 9:20
**touts** [1] - 16:1
**track** [3] - 12:22, 15:19, 30:9
**tracking** [3] - 12:20, 30:1, 47:24
**traffic** [1] - 14:18
**trained** [2] - 12:6, 72:18
**TRANSCRIPT** [1] - 1:10
**transcript** [3] - 87:13, 87:13, 87:14
**Transcript** [1] - 1:25
**transport** [3] - 13:25, 25:2, 63:16
**transportation** [65] - 4:21, 7:9, 7:22, 7:23, 8:9, 9:7, 9:11, 9:21, 9:23, 10:2, 10:7, 11:24, 12:1, 13:4, 13:20, 13:24, 16:23, 17:7, 17:12, 18:4, 23:1, 23:11, 24:16, 25:4, 25:20, 25:22, 26:1, 26:7, 26:17, 26:20, 27:9, 29:14, 29:24, 30:16, 32:1, 32:5, 33:19, 35:20, 36:2, 38:13, 38:24, 41:9, 41:14, 50:14, 50:23, 52:7, 53:2, 53:19, 55:13, 56:14, 59:5, 59:10, 59:12, 60:6, 61:23, 63:2, 63:14, 64:14, 64:19, 66:10, 66:20, 68:24, 70:2, 70:15, 75:21
**transported** [1] - 79:3
**transporting** [2] - 35:25, 69:15
**transports** [1] - 66:11
**Trapeze** [3] - 12:19, 13:2, 56:1
**tried** [1] - 12:24, 42:16, 60:15
**trip** [1] - 7:5
**trouble** [1] - 29:7
**truant** [1] - 59:20
**true** [7] - 33:3, 33:11,

36:11, 40:3, 42:18, 73:7, 87:13
**truth** [1] - 63:10
**try** [6] - 20:19, 20:23, 21:18, 58:13, 65:22, 86:17
**trying** [7] - 13:9, 29:7, 34:15, 34:17, 40:16, 72:11, 72:16
**Tuesday** [3] - 35:13, 86:19, 87:4
**turn** [3] - 10:11, 24:19, 55:2
**turning** [2] - 37:9, 38:7
**two** [32] - 5:20, 5:21, 6:5, 7:4, 9:20, 18:13, 18:19, 24:23, 29:21, 33:13, 38:8, 39:22, 41:4, 41:10, 41:13, 41:18, 46:8, 54:6, 54:18, 55:19, 56:10, 64:1, 65:11, 68:17, 68:19, 69:20, 70:9, 72:20, 73:7, 80:4, 85:17, 86:1
**type** [1] - 67:4
**types** [1] - 17:14
**typical** [1] - 74:20
**typicality** [4] - 66:13, 74:12, 77:7, 79:20
**typically** [1] - 60:3

## U

**U.S.C** [2] - 42:24, 43:18
**unable** [1] - 7:6
**unanimous** [1] - 21:25
**unaware** [1] - 72:25
**unclear** [4] - 29:2, 35:20, 51:20, 55:20
**uncompensated** [1] - 77:14
**under** [32] - 8:8, 22:9, 23:15, 23:18, 23:22, 25:8, 26:10, 26:17, 26:22, 26:25, 27:9, 27:19, 38:8, 38:16, 42:23, 42:24, 43:12, 43:18, 45:13, 45:17, 46:1, 46:4, 53:2, 63:17, 63:25, 64:14, 64:19, 66:19, 67:19, 69:6, 70:16, 84:24
**understandable** [1] - 29:9
**understood** [1] -

69:19
**undertaken** [1] - 63:8
**unduly** [1] - 70:1
**unfortunate** [1] - 53:2
**unfortunately** [1] - 9:7
**uniform** [1] - 76:10
**uniquely** [1] - 16:14
**United** [4] - 6:23, 44:9, 87:12, 87:15
**UNITED** [1] - 1:1
**universally** [1] - 17:10
**unless** [2] - 46:21, 58:4
**unlikely** [2] - 5:25, 85:18
**unnecessarily** [2] - 25:3, 26:14
**unopposed** [1] - 4:12
**unrealistic** [1] - 67:14
**unrebutted** [4] - 15:22, 23:9, 29:7, 36:10
**unsettled** [2] - 19:15, 22:4
**unsupported** [2] - 43:2, 47:14
**unwieldy** [1] - 71:22
**up** [34] - 5:22, 6:10, 6:13, 6:16, 7:4, 7:10, 8:5, 14:16, 15:4, 15:22, 16:15, 16:20, 28:12, 37:12, 37:14, 38:4, 42:3, 51:7, 51:19, 52:16, 54:3, 57:18, 57:19, 59:6, 63:4, 65:8, 65:11, 65:22, 66:1, 70:11, 75:12, 76:22, 77:16
**upcoming** [1] - 36:2
**update** [1] - 82:21
**Urban** [2] - 1:17, 3:21
**urgent** [1] - 29:11
**urine** [1] - 8:12
**useful** [1] - 27:19
**usefully** [1] - 76:11
**uses** [1] - 9:3
**utterly** [1] - 47:7

## V

**vacate** [1] - 12:12
**vague** [1] - 28:4
**vagueness** [1] -

62:12
**variety** [2] - 78:22, 84:11
**various** [1] - 9:20
**vary** [1] - 64:15
**vehicle** [4] - 45:13, 67:3, 67:15, 72:6
**vehicles** [5] - 12:7, 30:8, 55:14, 55:16, 69:14
**versus** [5] - 3:3, 19:25, 45:12, 58:19, 80:13
**Viasat** [1] - 11:8
**view** [6] - 21:3, 30:14, 32:7, 38:21, 78:23, 85:23
**viewing** [1] - 80:4
**Vincent** [2] - 4:6, 53:11
**violate** [1] - 27:10
**violates** [2] - 9:13, 36:20
**violating** [1] - 76:23
**violation** [7] - 23:18, 23:24, 36:24, 37:8, 50:4, 75:3, 76:7
**violations** [6] - 54:3, 77:9, 80:14, 80:17, 83:8, 85:4
**Virginia** [1] - 58:21
**volunteering** [1] - 78:7
**vs** [1] - 1:6
**vu** [1] - 4:9
**vulnerable** [1] - 16:14

## W

**wait** [4] - 14:3, 14:4, 28:13, 43:9
**walk** [1] - 74:1
**wants** [1] - 44:23
**WARNER** [21] - 1:14, 3:9, 3:11, 4:17, 6:11, 6:14, 62:19, 64:8, 65:4, 67:13, 71:13, 71:16, 71:19, 71:21, 72:2, 72:5, 72:23, 73:6, 83:2, 86:8, 86:20
**Warner** [1] - 3:12, 4:8, 6:18, 62:19, 75:24, 76:3, 78:18, 80:7, 81:6, 81:9, 82:24
**warrant** [1] - 37:24
**warranted** [2] - 36:9, 36:15

**warranting** [2] - 51:23, 75:23

**Washington** [7] - 1:12, 1:15, 1:16, 1:18, 1:24, 2:3, 3:21

**WASSERSTEIN** [1] - 2:2

**Wasserstein** [1] - 4:5

**Watts** [1] - 51:2

**ways** [7] - 4:8, 13:17, 16:25, 24:23, 31:9, 53:25, 69:25

**website** [1] - 47:18

**week** [9] - 25:14, 36:4, 50:9, 72:11, 82:22, 86:6, 86:9, 86:14

**weekly** [1] - 63:22

**weeks** [4] - 29:12, 68:17, 85:17, 86:1

**well-founded** [1] - 40:14

**wellbeing** [2] - 8:10, 8:11

**West** [1] - 58:21

**Westlaw** [1] - 58:20

**Whatley** [1] - 51:2

**wheelchair** [2] - 27:7, 61:24

**wheelchairs** [1] - 8:3

**whole** [4] - 34:22, 46:7, 46:15, 50:9

**wholly** [1] - 43:1

**willing** [1] - 82:20

**win** [2] - 23:20, 73:25

**windows** [1] - 15:24

**Winter** [1] - 22:16

**wondered** [1] - 52:9

**wonderful** [2] - 33:25, 50:7

**Woods** [1] - 49:10

**word** [2] - 45:6, 53:10

**words** [6] - 5:12, 64:17, 73:6, 74:22, 79:8, 85:11

**works** [3] - 31:2, 71:2, 85:7

**world** [3] - 28:11, 66:3, 66:8

**worried** [1] - 31:14

**worth** [1] - 72:12

**Wright** [6] - 74:10, 74:18, 76:13, 77:15, 78:3, 79:15

**writing** [7] - 79:10, 82:21, 84:11, 84:13, 84:21, 86:14

**written** [1] - 57:15

**wrote** [1] - 64:7

## Y

**Yamasaki** [1] - 80:13

**year** [42] - 13:19, 14:2, 28:12, 28:14, 28:16, 28:19, 28:21, 29:11, 29:15, 29:20, 30:19, 32:2, 32:12, 35:7, 36:2, 36:3, 36:13, 42:2, 49:2, 49:10, 49:11, 49:12, 49:15, 49:22, 50:9, 51:18, 52:24, 54:5, 55:18, 56:12, 56:20, 56:21, 56:25, 57:7, 57:13, 57:19, 62:8, 70:22, 84:9, 84:20, 85:6

**year's** [2] - 4:13, 30:13

**years** [8] - 9:9, 9:20, 12:11, 12:16, 18:7, 54:6, 56:10, 72:25

**yesterday** [3] - 35:6, 35:8, 68:21

**young** [1] - 7:18

**youngest** [1] - 20:3

## Z

**zero** [2] - 75:2, 76:23

**Zoom** [1] - 87:5