## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CRYSTAL ROBERTSON, on behalf of herself
and her minor child D.R.;

ELIZABETH DAGGETT, on behalf of herself
and her minor child H.D.;

JOANN MCCRAY, on behalf of herself and her
minor child J.C.;

VERONICA GUERRERO, on behalf of herself
and her minor child A.F.;

MARCIA CANNON-CLARK AND DAVID
CLARK, on behalf of themselves and their
minor child B.R.C; and

THE ARC OF THE UNITED STATES,

       Plaintiffs,

    v.

DISTRICT OF COLUMBIA,

       Defendant.

Case No.  1:24-cv-00656 (PLF)

PLAINTIFFS' SUPPLEMENTAL
BRIEF ON CLASS CERTIFICATION

**PLAINTIFFS' SUPPLEMENTAL BRIEF ON CLASS CERTIFICATION**

Students with disabilities and their families rely on school bus transportation to ensure their timely arrival at school. Instead of running buses that are safe and reliable, OSSE's[1] buses are routinely late and unsafe, causing students with disabilities to miss instruction, services, and valuable time with their non-disabled peers.  Since the close of class certification briefing on June 21, 2024 (*see* ECF No. 41), Plaintiffs' counsel have conferred with parents and guardians of students with disabilities who continue to experience the same failures in the District's

---

[1] Plaintiffs incorporate all abbreviations as defined in their Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification (ECF No. 29-1).

1

transportation system that Plaintiffs allege in their Complaint, many of which can be inferred to also affect their numerous peers assigned to the same bus routes. Data produced by the District (at this Court's Order) confirms families' experiences: a snapshot of trip tickets for October 2024 demonstrates that nearly 300 buses arrived at school late at least once a week. With this supplemental brief, Plaintiffs seek to update the Court on this testimony and data, which show that these failures continue to jeopardize the educational and emotional wellbeing of Plaintiffs and the putative class. The Court should grant class certification to ensure that Plaintiffs can obtain meaningful relief for all students with disabilities impacted by the District's violations of state and federal law.

## PROCEDURAL BACKGROUND

Over a year ago, on May 3, 2024, Plaintiffs filed a motion seeking to certify a class under Federal Rule of Civil Procedure 23(b)(2) and (b)(3)[2] comprised of the following:

> All students with disabilities aged 3-22 who, from March 7, 2022, until judgment is issued in this case, require transportation from the District of Columbia to attend school and have experienced and will continue to experience Defendant's failure to provide safe, reliable, and appropriate transportation.

See ECF No. 29-1 at 11; see also ECF No. 48-2 (Revised Proposed Order on Class Certification). As described in Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification (ECF No. 29-1), the putative class readily satisfies the Rule 23(a) and (b) requirements for class certification.

For one, the putative class is too numerous for individualized litigation to be practicable; the District is required to transport over 4,000 students to and from school, and each student is impacted by the District's failing system. Commonality is also satisfied because the District's

---

[2] On January 16, 2025, this Court partially granted Defendant's Motion to Dismiss as it related to the named Plaintiffs' claims for compensatory education. See ECF No. 76 at 17-18. As a result, Plaintiffs understand that the Court is unlikely to certify a (b)(3) class.

policy and practice of maintaining a deficient transportation system amounts to a systemic failure to implement students' Individualized Education Programs ("IEPs"), a fact the Court recognized in its Opinion and Order on Defendant's Motion to Dismiss. *See* ECF No. 76 at 12-15. Additionally, the claims of the putative class representatives are typical of the claims of the class because the class representatives have alleged the same claims and suffer the same, ongoing injury as all putative class members. And, finally, the putative class representatives will fairly and adequately protect the interests of the class because (i) their interests are aligned and (ii) the putative class representatives have already demonstrated a willingness – through two years of protracted litigation – to vigorously pursue their claims on behalf of the class.

During a March 31, 2025 status conference regarding the District's production of trip tickets, the Court expressed uncertainty about whether Plaintiffs could demonstrate numerosity with respect to the putative class without further information exclusively in the District's possession. *See* March 31, 2025 Hearing Transcript at 37:11-13 ("[U]ntil [Plaintiffs] have more information, I'm suggesting that they may not be able to persuade me on the numerosity point."). Additionally, during the November 7, 2024 hearing on the District's Motion to Dismiss, the Court further suggested that it needs additional information regarding the systemic nature of the District's failures to evaluate numerosity. *See* November 7, 2024 Hearing Transcript at 53:5-9 ("[T]hey're trying to show that – and this, I guess, really goes to their class – [] their class certification motion and their argument about systemic problems, is to show that the problems are sufficiently grave or sufficiently numerous.").

In light of the foregoing, the Court ordered the production of a limited set of trip tickets to further evaluate whether the Plaintiffs' claims were appropriate for class treatment. After many months, and considerable negotiations, the District produced trip tickets for bus routes that ran

from August 26, 2024 through November 30, 2024.[3] *See* ECF No. 106 at 3. These trip tickets, however, do not include information for approximately 1,500 students out of the approximately 4,000 students who use transportation; when one student on a route objected to their data being disclosed, the District withheld the entire route's information, including that of students who did not object, asserting it was too burdensome to redact just the single student's information. *See* ECF No. 97 at 2.

Analysis of just a percentage of the District's own trip tickets demonstrates the breadth of the problem and the number of students impacted. Plaintiffs' counsel have also spoken with dozens of parents and guardians of students with disabilities in the interim, and those conversations plainly demonstrate that numerosity is satisfied.

**ARGUMENT**

**A.     Legal Standard**

Under Federal Rule of Civil Procedure 23(a), one or more members of a class may sue as representative parties on behalf of all members if, among other things, the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Demonstrating impracticability of joinder "does not mandate that joinder of all parties be impossible – only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *DL v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) (quotation omitted), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017). Generally, courts recognize that there is "no specific threshold that must be surpassed" to demonstrate impracticability. *Taylor v. D.C. Water & Sewer Authority*, 241 F.R.D. 33, 37 (D.D.C. 2007) (citing *General Telephone Company of the Northwest v. EEOC*, 446 U.S.

---

[3] Trip tickets are a daily document that bus drivers fill out indicating who rode the bus and whether the bus was timely, and are the only method that the District uses to track its bus routes.

318, 330 (1980)). However, a class with more than forty members "creates a presumption that joinder is impracticable." *Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1, 15 (D.D.C. 2018).

Thus, numerosity of a class is typically satisfied "when a proposed class has at least forty members." *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015) (quoting *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013)). And the Court need only find an "approximation of the size of the class, not 'an exact number of putative class members.'" *Id.* at 76 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998)).

**B.      The Putative Class is So Numerous that Joinder of All Members is Impracticable.**

Plaintiffs' proposed class numbers well over forty members. As described in greater detail in Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification (ECF No. 29-1), there are over 4,000 students with disabilities in the District of Columbia whose IEPs require that the District provide them with transportation to and from school. *See* ECF No. 4-48 at 223. And because students can become eligible for special education transportation at any time, there is also an unknown number of future class members. *See* Off. of the State Superintendent, *Special Education Handbook*, 4-10 (2023), https://osse.dc.gov/sites/default/files/dc/sites/osse/service_content/attachments/OSSE%20Special %20Education%20Process%20Handbook%20%28Sept%202023%29.pdf (describing eligibility determinations for IEPs); *see also J.D. v. Azar,* 925 F.3d 1291, 1322 (D.C. Cir. 2019) (noting that "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'") (quoting 1 Rubenstein, Newberg on Class Actions § 3.15); *DL v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) ("[F]uture members make joinder inherently impracticable because there is no way to know who they will be.") (internal quotation marks and citations omitted).

To be sure, a plaintiff need not provide dispositive evidence that a putative class numbers well over 40 members. Rather, Plaintiffs must only provide "*some*" evidence that a class is numerous, and the Court may draw "reasonable inferences from the facts presented to find the requisite numerosity." *In re McCormick & Company*, 422 Supp.3d 194, 235 (emphasis added) (quoting *Coleman*, 306 F.R.D. at 76). The numerosity requirement can therefore be satisfied "so long as there is a *reasonable basis* for the estimate provided." *Hoyte v. District of Columbia*, 325 F.R.D. 485, 490 (D.D.C. 2017) (quoting *Feinman v. FBI*, 269 F.R.D. 44, 50 (D.D.C. 2010)) (emphasis in original).

In the 17 months since Plaintiffs first sought class certification in this matter, Plaintiffs' evidence in support of numerosity has only grown. Plaintiffs first sought and analyzed trip ticket data produced by the District from August 2024 to November 2024. Given the volume of documents and the form in which the District produced them, Plaintiffs' expert, Bates White Economic Consulting, LLC ("Bates White"), focused on analyzing trip tickets for the month of October, which allowed a timely analysis to the Court and also allowed the District a grace period to work out any kinks at the start of the school year.  When looking at unredacted trip tickets for October 2024, the data show that 296 students "would have arrived late to school approximately once a week or more, on average, if they rode the bus to school."  Exhibit A, Decl. of Benjamin M. Wolfert ("Bates White Decl.") ¶ 21.  Of that group, 197 students "arrived at school after the start of instruction at least eight days in October," approximately twice a week. *Id.*[4] "If the unredacted routes are representative, or statistically similar to, the redacted routes then the total number of students arriving late at least once a week would be somewhere between 592 and 888,

---

[4] This data is only extrapolated from unredacted trip tickets and does not account for the approximate 60% of all trip tickets that were redacted by the District. Bates White Declaration ¶ 21.

and the number of students arriving late at least twice a week would be somewhere between 394 and 591." *Id.*

Incredibly, the trip tickets reveal that the District also has a serious flaw in its route design. According to the trip tickets, a significant number of routes are designed in such a way that the drop-off time is after school starts. "24 of the unredacted daily drop-offs observed in October, or 9% of the total unredacted drop-offs observed, had expected drop-off times *after* the start of the instructional time listed. Put another way, 24 drop-offs were designed such that, if the route was running as planned, students would still be dropped off after class began every day of the week. Among these drop-offs the typical expected drop-off was 15 minutes after the start of class*." Id.* ¶ 16. If the redacted routes are comparable, this number of routes arriving to school after the start of the bell time would be around two to three times the observed results (or between 48 to 72 routes total). *See id.* at Figure 3.

Bates White also analyzed the District's own public facing data in comparison to the trip ticket data, looking at the publicly posted data available to parents about whether the buses left the terminal on time.[5]  *See id.* ¶¶ 17-19. Bates White found that this data was unreliable at best and untrue at worst. See *id.* ¶ 19 ("[T]here were a significant number of bus routes that left the terminal at least ten or fifteen minutes after their expected departure but that did not have a recorded disruption on the Daily DOT Update webpage."). For example, in October 2024, there were 400 buses that left the terminal at least 15 minutes after the expected departure time, but only 21 departures were marked on the OSSE DOT Update webpage as being disrupted. *Id.* ¶ 18. Thus,

---

[5] The District's public dashboard shares only whether a bus has left the bus terminal on time, not whether it will arrive on time to pick up a student or whether it will get the student to school on time. Ex. A, Bates White Declaration ¶ 7 n. 12.

7

even the limited data that OSSE does collect and publicly share is not reliable; the Court should therefore not rely on it in making its class certification determination.

Overall, the District's trip tickets demonstrate that *hundreds* of students would arrive late to school at least once a week or more if they rode the bus to school. *Id.* ¶ 21. A family never knows when it will be their turn to be on the late bus because it is not always the same buses that are late and they cannot rely on the District's public-facing daily reports. The fact that the District's Daily DOT Updates webpage is inaccurate and unreliable adds to a family's confusion every day. *See id.* ¶¶ 17-19. Students and their families must constantly deal with the uncertainty of whether their bus today will run on time or face delays.

The trip ticket analysis matches the experience of parents and guardians of students with disabilities who receive transportation from the District. Plaintiffs submit 16 declarations from parents and guardians of 18 students that demonstrate their experiences with the District's transportation system during the 2024-2025 school year, 2025 extended school year, and the beginning of this current school year. These declarations represent not only the experiences of the individual students, but of several other students riding on the same route; when a student arrived late to school, so did the other students on their bus. In addition to the students named in the declarations, at least 71 students rode the bus with them. *See e.g.* Exhibit B, Decl. of Malerie Goodman ¶ 6 (10 other students on the bus); Exhibit C, Decl. of Stephanie Maltz ¶ 5 (5 other students on the bus); Exhibit D, Decl. of Elizabeth Mitchell ¶ 10 (12-13 other students on the bus); Exhibit E, Decl. of Cathy Miler ¶ 6 (6-8 other students on the bus); Exhibit F, Decl. of Max Skolnik ¶ 5 (6 other students on the bus); Exhibit G, Decl. of Pamela Leake ¶ 6 (3-4 other students on the bus); Exhibit H, Decl. of Michele Walker ¶ 29 (14 other students on the bus); Exhibit I, Decl. of Miryam Koumba ¶ 6 (8 other students on the bus). **In short, these supplemental declarations**

**from parents and guardians demonstrate that not only did 18 students with disabilities experience the failures of the District's transportation system at issue in this action, but each experience described was compounded approximately four-fold because of other students sharing the same bus route—a fact that effectively provides *de facto* support for numerosity under Rule 23.**

Parents and guardians continue to experience the exact failures in Plaintiffs' complaint: OSSE's buses regularly are late in the mornings and afternoons (or never arrive at all); OSSE's buses drop students off at school late, causing them to miss instruction; and OSSE's buses lack the staff and accommodations students need to ride safely.

First, parents and guardians report that buses regularly arrive late to pick up students or never arrive at all, often with no notice to families. All 18 students, and presumably at least 71 additional students, experienced times when the bus arrived late in the morning and afternoons, dropped them off at school late, and/or the bus never arrived to pick them up at all. For example, K.M.'s bus was late in the mornings and afternoons approximately twice a week during the 2024-2025 school year. Exhibit I, Decl. of Miryam Koumba ¶¶ 16, 21. Similarly, in the afternoon, G.L. frequently arrived home late, often not returning until after 5:00 PM—two hours after school ended—which caused him to miss therapy appointments. Exhibit G, Decl. of Pamela Leake ¶ 12. Because of transportation issues, five declarations describe their students missing school entirely. For example, A.B. missed picture day because the bus never arrived. Exhibit J, Decl. of Ebony McBeth ¶ 11. During the 2024-2025 school year, M.C. failed her first period class and missed one to two days a week due to transportation issues. Exhibit K, Decl. of Michelle Carter ¶ 17. S.S. had to miss school on four or five occasions during the 2024–2025 school year because the bus arrived

without functioning air conditioning, creating unsafe conditions due to his risk of heat-induced seizures. Exhibit E, Decl. of Cathy Miler ¶ 7.

In the afternoon, the District has left students stranded at school, leaving families responsible for transporting them home, often on short notice or with no advanced notice. For six families, it caused additional stress and concern when their child did not arrive home on the bus. For example, Ms. Koumba became worried when K.M. was not home by 4:30 PM. Exhibit I, Decl. of Miryam Koumba ¶ 23. She received no notification from OSSE; rather, she called the school to learn the bus did not come. *Id.* K.M. was at school until 5:00 PM waiting for someone to pick him up. *Id.* C.M. waited over an hour after school ended before his parents were informed by the school, not OSSE, that a bus was not coming. *See* Exhibit L, Decl. of Andy McKinley ¶ 13. Jennifer Lewis was notified seven minutes before school ended that there was no afternoon transportation because there was no nurse available for K.L. causing K.L. to wait after school until someone could pick her up. Exhibit M, Decl. of Jennifer Lewis ¶ 19. *See also* Exhibit K, Decl. of Michelle Carter ¶ 11 (K.H. was left at school three times before Ms. Carter was notified from the school or K.H. himself that the bus was not coming); Exhibit D, Decl. of Elizabeth Mitchell ¶ 9 (Ms. Mitchell had to leave work in the middle of the workday to pick up J.M. after his school informed her that his bus had not arrived at the school); Exhibit N, Decl. of Elizabeth Ehrhardt ¶ 18 (C.G. was left at school with no transportation home on at least six different occasions).

Additionally, long delays and hours spent on the bus can cause students to become dysregulated and impacts their ability to transition to/from school and home. During the first week of the current school year, C.S. was picked up at 6:00 AM, about an hour before her scheduled pick-up time, and dropped off in the afternoon twelve hours later between 6:00 and 6:30 PM, again about an hour after her scheduled drop-off time. *See* Exhibit F, Decl. of Max Skolnik ¶¶ 5-6. C.S.'s

six-hour roundtrip caused her to become emotionally dysregulated and have difficulty focusing when she arrived at school and home. *See id.* ¶ 14; *see also* Exhibit H, Decl. of Michele Walker ¶¶ 19-20 (two-hour long bus rides home in the afternoon caused J.W. to come home exhausted and resistant to do his homework or ABA therapy). These are hours spent on buses often without working air conditioning or the necessary personnel. *See e.g.*, Exhibit E, Decl. of Cathy Miler ¶ 11 (S.S. arrived home on a bus without air conditioning which triggered his allergies and put him at risk for a seizure).

Second, when the buses eventually arrive to pick up students, the bus has dropped them off at school late and they miss their instruction. For E.M., "the bus came around two hours late almost every day" during the first half of the 2024-2025 school year. Exhibit O, Decl. of Tamera Rhone-Miller ¶ 7. This continued into the second half of the year when he continued to be picked up around 9:00 or 10:00 AM, instead of his scheduled pickup time between 7:15-7:30 AM, causing him to miss hours of instructional time. *Id.* ¶¶ 8, 11. Similarly, K.G. was late to school twelve times between February 2025 to April 2025 when his bus arrived an hour late. Exhibit B, Decl. of Malerie Goodman ¶ 9*; see also*, Exhibit M, Decl. of Jennifer Lewis ¶ 8 (despite living 3.7 miles from the school, K.L. was repeatedly picked up late and dropped off at school after the bell time); Exhibit P, Decl. of Joann McCray ¶¶ 8, 13, 18, 19 (repeated instances of J.C. being anywhere from 10 to 50 minutes late to school); Exhibit L, Decl. of Andy McKinley ¶¶ 9-12 (C.M. was repeatedly late to school during the first week of school, including arriving at nearly 11:00 AM, two hours past the start of the school day); Exhibit Q, Decl. of Marcia Cannon-Clark ¶ 9 (within the first six days B.R.C. attended school, she was late for half of them and missed instructional time). For some students, they are pulled early from class to get the bus. For example, during the 2024-2025 school year K.G. arrived home between 3:15 to 3:30 PM, although dismissal was 3:15 PM. *See* Exhibit

11

B, Decl. of Malerie Goodman ¶ 12. It was later discovered that K.G. was pulled early from class and brought to the bus at 3:00 PM causing him to miss one of the only times he was in class with his non-disabled peers. *Id.* ¶ 14. He became ostracized by his other classmates and frustrated by the situation. *Id.*; *see also* Exhibit N, Decl. of Elizabeth Ehrhardt ¶ 16 (C.G. was pulled from class 10-15 minutes before dismissal to wait for the bus).

Finally, students' accommodations on their IEPs are repeatedly not followed. For three students, the District violated their IEPs when they were not picked up last and dropped off first in the morning and afternoon. For J.W., the time spent on the bus exacerbated his back pain from his severe scoliosis and caused meltdowns and exhaustion. *See* Exhibit H, Decl. of Michele Walker ¶¶ 11, 20; *see also* Exhibit N, Decl. of Elizabeth Ehrhardt ¶¶ 10, 29, 31 (issues with M.G. and C.G. being picked up last and/or dropped off first in accordance with their IEPs). For others, safety equipment was not properly used and required personnel were unavailable. *See* Exhibit C, Decl. of Stephanie Maltz ¶¶ 11, 12 (despite two students requiring 1:1 dedicated aides, only one aide was on the bus); Exhibit J, Decl. of Ebony McBeth ¶ 15 (A.B. repeatedly arrived home with her safety harness incorrectly fastened).

The above referenced declarations demonstrate the seriousness of the consequences caused by the District's egregious failure to maintain an even semi-functional transportation system, as well as to demonstrate that numerosity is plainly satisfied in this matter. Based upon the Bates White analysis and the parental declarations submitted, there are well over 40 students who have been and continue to be impacted by the failures of the transportation system, and the numerosity standard has been met. As reflected in all of these declarations, the deficiencies in the District's special education system – and the repercussions flowing from those deficiencies – are endemic, substantial, and grave. This Court should grant Plaintiffs' Motion for Class Certification and allow

the named plaintiffs  to seek meaningful relief on behalf of the thousands of students with disabilities in the District of Columbia who remain at the mercy of a crumbling transportation system.

## CONCLUSION

For the reasons described above, as well as those set forth in Plaintiffs' Motion for Class Certification (ECF No. 29-1) and Reply in Support of Class Certification (ECF No. 41), Plaintiffs respectfully request that the Court certify a class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (3).

Dated: October 15, 2025                                  Respectfully submitted,

/s/ *Kaitlin R. Banner*                                  /s/ *Eugene I. Goldman*
Kaitlin R. Banner, D.C. Bar No. 1000436          Eugene I. Goldman, D.C. Bar No. 9399959
Chelsea Sullivan, D.C. Bar No. 90017708          Margaret H. Warner, D.C. Bar No. 359009
Washington Lawyers' Committee for Civil Rights   Christopher M. Shoemaker, D.C. Bar No. 90019351
and Urban Affairs                                Theresa M. Babendreier, D.C. Bar No. 90005505
700 14th Street, NW, Suite 400                   McDermott Will & Schulte LLP
Washington, DC 20005                             500 North Capitol Street NW
(202) 319-1000                                   Washington, DC 20001
kaitlin_banner@washlaw.org                       (202) 756-8400
chelsea_sullivan@washlaw.org                     egoldman@mwe.com
                                                 mwarner@mwe.com
                                                 cshoemaker@mwe.com
                                                 tbabendreier@mwe.com

Katherine Zeisel,* DC Bar No. 979552             Shira Wakschlag, D.C. Bar No. 1025737
Shayna Stern,* DC Bar No. 1617212                Evan Monod, D.C. Bar No. 1764961
Children's Law Center                            The Arc of the United States
501 3rd St, NW, 8th Floor                        2000 Pennsylvania Ave. NW Suite 500
Washington, DC 20001                             Washington, D.C. 20006
(202) 267-4900                                   (202) 534-3708
kzeisel@childrenslawcenter.org                   wakschlag@thearc.org
sstern@childrenslawcenter.org                    monod@thearc.org

                                                 *Counsel for Plaintiffs*

*Certification to practice pursuant to Rule 83.2(f) submitted or to be submitted.*